UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

JENNIFER BOUGHTON,                  :
                                    :
        Plaintiff,                  :
                                    :
        -vs-                        :  CASE NO. 1:19-cv-154
                                    :
WILLIAM BARR,                       :
ATTORNEY GENERAL OF                 :
THE UNITED STATES,                  :
                                    :
        Defendant.                  :
                                    :

- - -

Zoom Deposition of JENNIFER BOUGHTON, the plaintiff herein, taken by the defendant as upon cross-examination pursuant to the Federal Rules of Civil Procedure and pursuant to agreement between counsel as to time and place and stipulations hereinafter set forth, at the offices of The United States Attorney, 221 East Fourth Street, Suite 400, Cincinnati, Ohio, at 9:30 a.m., on Wednesday, August 12, 2020, before Pamela S. Giglio, a notary public within and for the State of Ohio.

- - -

GIGLIO REPORTING SERVICES
Three Cypress Garden
Cincinnati, Ohio 45220
(513) 861-2200

1    APPEARANCES:

2         On behalf of the Plaintiff:

3              Elizabeth Asbury Newman, Esq.
                    of
4              Freking Myers & Reul, LLC
               600 Vine Street
5              9th Floor
               Cincinnati, Ohio 45202
6
          On behalf of the Defendant:
7
               Margaret A. Castro, Esq.
8                   of
               U.S. Attorneys Office
9              221 East Fourth Street
               Suite 400
10             Cincinnati, Ohio 45202

11        Also present:

12             Joy Williams (Telephonically)
               Zachary LeCompte
13
                         -  -  -
14

15

16

17

18

19

20

21

22

23

24

1                S T I P U L A T I O N S

2            It is stipulated by and between counsel

3       for the respective parties that the deposition

4       of JENNIFER BOUGHTON, the plaintiff herein, may

5       be taken at this time by the defendant as upon

6       cross-examination pursuant to the Federal Rules

7       of Civil Procedure and pursuant to Notice of

8       Deposition; that the deposition may be taken in

9       stenotype by the notary public-court reporter

10      and transcribed by her out of the presence of

11      the witness; that the transcribed deposition is

12      to be submitted to the witness for her

13      examination and signature, and that signature

14      may be affixed out of the presence of the notary

15      public-court reporter.

16                           -  -  -

17

18

19

20

21

22

23

24

<pre>
 1                    E X H I B I T S

 2    Defendant's Exhibits:            Marked for ID

 3    No. 1                      12
      Plaintiff'S Response to Defendant's First Set of
 4    Interrogatories and Requests for Production

 5    No. 2                      59
      E-mail chain
 6
      No. 3                      59
 7    Performance Appraisal Report for Jennifer
      Boughton dated 9-30-15
 8
      No. 4                      84
 9    E-mail chain

10    No. 5                      86
      Typewritten memo dated 10-28-15
11
      No. 6                      90
12    E-mail chain

13    No. 7                      91
      E-mail chain
14
      No. 8                      93
15    E-mail chain

16    No. 9                      93
      E-mail chain
17
      No. 10                     98
18    E-mail chain

19    No. 11                    100
      E-mail chain
20
      No. 12                    100
21    E-mail dated 7-20-15

22    No. 13                    108
      E-mail chain
23
      No. 14                    108
24    E-mail chain
</pre>

1
2          Defendant's Exhibits:                Marked for ID

           No. 15                               108
3          E-mail chain

4          No. 16                               109
           E-mail chain
5
           No. 17                               119
6          E-mail chain

7          No. 18                               133
           E-mail chain
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          MS. CASTRO:  We'll go on the

2     record and just have it on the record

3     that we all stipulate that we have

4     agreed that the video is an

5     appropriate way to take a deposition

6     and we don't expect there to be any

7     issues with accurate transition or

8     testimony.  Is that fair?

9          MS. NEWMAN:  Yes.

10          MS. CASTRO:  If at any time you

11     guys have any difficulty hearing me,

12     please let me know, and I will maybe

13     take my mask off or do the best I can

14     to speak up.

15          Pam has indicated that she may at

16     points jump in to help clarify, if she

17     has difficulty hearing.

18          Ms. Boughton, do you have any

19     questions?

20          THE WITNESS:  None so far.  Thank

21     you.

22          MS. CASTRO:  And thanks for being

23     here today.  We appreciate it.

24     So we're going to go ahead and get you

1          sworn in.

2                    JENNIFER BOUGHTON

3          Of lawful age, the plaintiff herein,

4     being first duly sworn as hereinafter certified,

5     was examined and deposed as follows:

6                    CROSS-EXAMINATION

7     BY MS. CASTRO:

8          Q.   Ms. Boughton, for the record, I'm

9     Margaret Castro.  I'm here today representing

10    the FBI in your case that was filed in federal

11    Court.

12                    Have you ever given a deposition

13    before?

14         A.   Can you clarify?

15         Q.   Sure.  Have you ever had your

16    testimony taken in a deposition before?

17         A.   I have had my testimony taken for

18    FBI matters, but I've never for a court

19    proceeding.  No, I didn't.

20         Q.   So you have been a sworn witness

21    before and been subject to questioning?

22         A.   Yes.

23         Q.   I would assume, then, that you

24    are familiar, at least a little bit with the

1    process, so I won't delve too deep into the

2    rules.

3                    If there is a time when you need

4    a break, please let me know and we can stop.

5    And if you have any trouble understanding my

6    questions, please do let me know.

7                    A.    Okay.

8                    Q.    If you answer, I will assume that

9    you have understood the question.  Does that

10   make sense?

11                   A.    Yes.

12                   Q.    Do you have any questions for me

13   about the process before we start?

14                   A.    No, just that, is my microphone

15   level acceptable, can you hear me?

16                   Q.    Absolutely perfect.  Yep, we're

17   good to go.

18                   A.    All right.

19                   Q.    Thank you.

20                   A.    I'm on a different setup myself

21   and I don't know where the microphone is on my

22   computer.

23                   Q.    This is all so new to us.  I feel

24   like I'm back last spring, like when I was

1       trying to get my kids on Zoom calls and trying

2       to figure that out.

3                   So if you answer a question, I'll

4       assume that you understood it as asked.

5                   A.    Okay.

6                   Q.    Is there any reason that you

7       believe you cannot give honest testimony today?

8                   A.    No.

9                   Q.    Are you under the influence of

10      any medications or alcohol or drugs which would

11      affect your ability to give testimony today?

12                  A.    No.

13                  Q.    Let's go ahead and get started.

14      I did e-mail to your attorney very many exhibits

15      last night.  I hope you've had the opportunity

16      to print them off, or have them available to you

17      to review.

18                  Are they in front of you?

19                  A.    They are not in front of me.  I

20      was told that you would probably share them via

21      this venue.  I mean, I reviewed them last night

22      when I pulled them up electronically.

23                  Q.    Do you have them available

24      electronically where you could pull up the PDFs?

1              A.    Yes, I did.

2              Q.    Why don't we go ahead and you get

3     your device ready and have those there, and when

4     I point to an exhibit, if you could just pull it

5     up and review as we discuss it.

6                    Does that work for you?

7              A.    That works for me.

8              Q.    Okay.

9              A.    Can I do it on a separate

10    computer?

11             Q.    Yes.

12             A.    Okay.

13             Q.    Yes.

14                   MS. CASTRO:  Liza, do you have

15             the exhibits available?

16                   MS. NEWMAN:  Yes.

17                   MS. CASTRO:  Okay.

18                        (Discussion off the

19                        record.)

20                   THE WITNESS:  I should be able to

21             find it.

22    BY MS. CASTRO:

23             Q.    Sure.

24             A.    If you can tell me where it was

1    and maybe where it is and then I can find it

2    after and set it up.

3              Q.    So each PDF is labeled by the

4    Bates number, the stamped number in the bottom

5    right-hand corner.

6              A.    Yes.

7              Q.    Except for a few which are Court

8    filings.  And the first one I am going to look

9    at with you is the plaintiff's disclosure of

10   nonexpert witnesses.

11              And this one, if you can't find

12   it, I think we can just go through it fairly

13   quickly with me asking you questions.

14              MS. NEWMAN:  I don't see an

15              attachment labeled with that one.

16              MS. CASTRO:  Okay.  And it may be

17              that I didn't forward it.  Why don't

18              we then look at the Plaintiff's

19              Response to Interrogatories?

20              MS. NEWMAN:  Okay.

21              MS. CASTRO:  Then we can look at

22              that instead.

23              MS. NEWMAN:  So this is the one

24              labeled "2020 0304 Plaintiff's

1              Discovery Responses"?

2                    MS. CASTRO:  Yes.

3                    MS. NEWMAN:  Okay.

4        BY MS. CASTRO:

5              Q.   Ms. Boughton, you let me know

6        when you are ready.

7              A.   I have it pulled up already.

8                    MS. CASTRO:  First we will

9              provide a copy here to our court

10             reporter.

11                   THE COURT REPORTER:  Yes.  This

12             will be Defendant's Exhibit 1.

13                        (At which time,

14                        Defendant's Exhibit No. 1

15                        was marked for

16                        identification.)

17       BY MS. CASTRO:

18             Q.   So I am going to look at

19       Interrogatory No. 16 and your answer to that,

20       Ms. Boughton.  It's on Page 7.

21                   Are you ready to go?

22             A.   I am.  I have it pulled up.

23             Q.   What I would like to do is you

24       list, in response to this interrogatory,

```
 1    individuals that you believe or that you

 2    communicated with about your case.  I would like

 3    to go through these individuals.  You just tell

 4    me how you know them and what information was

 5    provided.

 6              A.    Okay.

 7              Q.    So we will start with Danielle

 8    Stosur, S-t-o-s-u-r.

 9                    How do you know Ms. Stosur?

10              A.    A current coworker.

11              Q.    Would you consider her to be a

12    friend as well?

13              A.    I mean, I'm friendly with her,

14    but we are coworkers.  So coworkers.

15              Q.    What information did you convey

16    to her about of this case?

17              A.    When I filed in Federal Court, it

18    was picked up by a couple of local Cincinnati

19    reporters.  And she had just asked me, she just

20    approached me about it and just asked me about

21    it so it is very brief detail.

22              Q.    Do you anticipate her being a

23    witness in your case?

24              A.    No.
```

1          Q.    Then the next name is Susan

2     Wullenweber.

3                How do you know Ms. Wullenweber?

4          A.    Same way, she's a current

5     coworker.  Same situation.  When the filing

6     posted, she also approached me and asked me.

7          Q.    Do you anticipate her being a

8     witness in your case?

9          A.    No.

10          Q.    Next name is Cady Wullenweber.

11     For the benefit of our court reporter, these are

12     all in the exhibit.

13                How do you know Ms. Wullenweber?

14          A.    She is a former coworker, related

15     to Susan Wullenweber.  Same situation.

16          Q.    Do you anticipate her being a

17     witness?

18          A.    No.  I do not, no.

19          Q.    Tana Weingartner.  I think I know

20     who that is.

21          A.    Yes.  She actually, I think maybe

22     works for NPR or something, in Cincinnati.  She

23     is also a friend of a coworker, same situation,

24     in a general venue.  She has asked me in the

1   presence of the other coworker.

2           Q.   Do you anticipate her being a

3   witness?

4           A.   No.

5           Q.   Steven Knull.  How do you know

6   that individual?

7           A.   Current coworker.  Same

8   situation.

9           Q.   Do you anticipate him being a

10  witness to the case?

11          A.   No.

12          Q.   Jesse Disabatino (pronouncing)?

13          A.   Disabatino.

14          Q.   Disabatino.

15          A.   Former coworker.  Same situation

16  when the story came out.  No, I don't

17  anticipated him being used.

18          Q.   Eric Ebersole?

19          A.   Same situation, current coworker.

20  No, I do not anticipate him being used.

21          Q.   And I guess what I would ask is

22  maybe to help move this along, are any of these

23  not coworkers, former or current, that you do

24  not anticipate being witnesses?

```
 1              A.    So there are some that are not

 2    former or current coworkers, like there are

 3    family members and very close personal friends,

 4    but none of them are anticipated to be used as

 5    witnesses.

 6              Q.    Okay.  Then I think we can move

 7    along with that, if you don't expect any of them

 8    to offer testimony in your case.

 9              A.    Actually, one of them is my

10    spouse, and I don't even know if he is even able

11    to because he is also my spouse.

12                   THE COURT REPORTER:  He is also

13              what, ma'am?

14    BY MS. CASTRO:

15              Q.    Could you repeat that?

16              A.    One of them is my spouse, and if

17    permitted, he might be used, his testimony.

18    Robert Ryan.

19              Q.    But he is the only one on this

20    list that you would anticipate using as a

21    potential witness in your case?

22              A.    Stand by.  Sorry.  I'm going

23    to -- yes.

24              Q.    Sure.
```

1        A.    I'm going to look for this.

2        Q.    Let us know when you are ready to

3    continue.

4        A.    Okay.  Wendy Surikov is a former

5    coworker.  She might be used.

6        Q.    Kenneth Wall?

7        A.    Former coworker.  Might be used.

8    Lois Moore, former coworker, might be used.

9    Michael Morgan, former coworker, might be used.

10    Calvin Janes, former coworker, might be used.

11    James Davis, former coworker, might be used.  TJ

12    Felder, former coworker, might be used.  Connie

13    New, former coworker might be used.  Regina

14    Smith, former coworker, might be used.

15    Also, my medical doctors, I'm not sure if you

16    have that, if we use medical information.

17        Q.    I would like to talk about those

18    more specifically.

19              Which ones are your medical

20    doctors?

21        A.    Stephen Johnson.

22        Q.    Where is he located?

23        A.    TriHealth, Good Samaritan Women's

24    Center.

1          Q.    And that's here in Cincinnati or

2     the suburbs of Cincinnati?

3          A.    Yes.  Sorry.  Yes.  Cincinnati.

4          Q.    How long have you been a patient

5     of Dr. Johnson's?

6          A.    Since 2010, possibly 2009 or

7     early 2010.

8          Q.    What information do you believe

9     Dr. Johnson has that would be relevant to your

10    case?

11         A.    He is someone that actually wrote

12    things to my personnel file regarding the

13    medical situation that I was facing.

14         Q.    What medical situation are you

15    referring to?

16         A.    It is mentioned many times in my

17    OPR investigation and I had mentioned it in an

18    EEO filing prior.

19              I had a situation that is very

20    specific to the female gender, and also subject

21    of discriminatory employee, anonymous survey

22    that is also the subject of an OPR

23    investigation.

24         Q.    I would strike that answer as

1    nonresponsive and ask you to just answer the

2    question as asked and we will move along much

3    more quickly.

4              What I'm trying to get is the

5    factual information of the medical condition

6    itself.

7              Could you provide that to me?

8         A.   How much detail do I need to

9    include in this?

10         Q.   Well, I will tell you this.  You

11    have told me and testified right now that you

12    believe it is relevant to your claims.  And so

13    as a result, I have an obligation to ask you how

14    it is relevant.

15              In all likelihood, if you are

16    planning on presenting testimony or documents

17    from Dr. Johnson in your case, then we will have

18    you sign a waiver or an authorization for us to

19    obtain your medical records and we will do that

20    so we will have those records available to us.

21    But we are still obligated to ask you about that

22    because you have listed him as a witness in your

23    case.

24         A.   Okay.  He first started treating

1    me when I had to go to the emergency room for a

2    severe abdominal case and I had to have

3    emergency surgery to remove a large unknown

4    origin mass in my abdomen and ovary and my

5    fallopian tube.

6             Q.    Pardon me for interrupting.

7             A.    Okay.

8             Q.    When was that?

9             A.    This was in 2009, 2010, that time

10   period.  Late 2009, early 2010.  And it went on

11   through the spring of 2010 because he continued

12   to see me and I had to have treatment.  And he

13   believed it was from stress that I grew this

14   unknown mass.

15             It was not -- I can't think of

16   the right word.  It wasn't a cancerous mass, but

17   it was also -- it was dangerous.  We had to

18   remove it.  And they had to remove, like I said,

19   an ovary and a fallopian tube that was damaged

20   severely by it, and I had a severe infection.

21             He then again had to treat me

22   multiple times after that because I started

23   having reoccurrence in my ovary problems.  And

24   up until I was removed from the FBI, I was still

1    getting treatments and on medications.

2         Q.    I'm sorry.  When you say

3    reoccurrence, what are you referring to?

4              Did you have a mass on your other

5    ovary then?

6         A.    There was another mass that was

7    grown, yes.

8         Q.    Was that removed?

9         A.    I had to have a complete

10   hysterectomy.

11        Q.    What year was that?

12        A.    2018, I believe that one was.

13   They tried to treat it medicinally for quite

14   some time, multiple years.

15        Q.    Because you contend that this

16   treatment is relevant to your claims, I will be

17   sending over an authorization for to you sign to

18   obtain the medical records for that.  I don't

19   think we need to talk any more about it at this

20   point.

21              Is it your contention that that

22   is a disability?

23        A.    I did not say that word.

24        Q.    All right.  Then which other of

1    these witnesses on Exhibit 1 are your doctors or

2    medical providers?

3              A.    Garvin Nickell.

4              Q.    Would you mind repeating that?

5    You kind of came in and out.

6              A.    Sorry.  I'm reading other things.

7    Garvin Nickell.

8              Q.    Okay.

9              A.    He's just my primary care doctor

10   but he knew about this information also.

11   He's -- obviously sees my medical records.

12             Q.    What practice is he with?

13             A.    UC Health.

14             Q.    And how do you believe he will

15   provide relevant testimony in your case?

16             A.    He just also saw me and checked

17   on me with recovery, and with the medical

18   treatment I was receiving.

19             Q.    Was that with regard to the

20   surgery that you had, or are there other

21   instances of treatment that you believe might be

22   relevant?

23             A.    The same things that Steven

24   Johnson was treating me for and seeing me more

1    in that surgery, yes.  There were multiple

2    surgeries.

3                Q.    Then I will also provide an

4    authorization to your attorney for the release

5    of those medical records and you will get that

6    and you will need to sign that as well.

7                     Are there any other individuals

8    on here that you believe may provide relevant

9    testimony in your case?

10               A.    I believe that covers all of

11   them.  There are no more.

12               Q.    Thank you.  Did you seek any

13   mental health or counseling treatment during the

14   time period at issue, say, 2010 forward?

15               A.    I'm sorry.  Could you repeat that

16   last part?  You kind of broke up a little.

17               Q.    Sure.  Did you seek any mental

18   health counseling or treatment from 2010

19   forward?

20               A.    No, I did not.

21               Q.    Do you believe that there are any

22   other medical professionals that could provide

23   information in your case?

24               A.    No.

1          Q.   Did you seek any counseling

2    outside of the medical community, say, through a

3    faith based organization?

4          A.   No.

5          Q.   Then I think we can dispose of

6    this list, if you don't believe anyone else will

7    be a witness in your case, is that correct?

8          A.   Yes.

9          Q.   Now, I have in front of me that I

10   did not provide to you your disclosure of other

11   witnesses, and some of these names appear

12   familiar to me and some don't.  So I just wanted

13   to ask for clarification of a couple

14   individuals.

15              Susan Holliday.  How is she

16   related to your case?

17          A.   She was the unit chief.  She was

18   the unit chief; I believe she still is, over the

19   program that I was assigned to.  She was

20   stationed at headquarters and she also provides

21   some statements for EEOs.  Signed, sworn

22   statements for EEOs.

23          Q.   What testimony do you believe she

24   might offer in your case?

1          A.    She was familiar with the program

2   and oversaw the program, and as I said, she was

3   also the person that knew about the alleged team

4   leader questions that they said that I had prior

5   to somebody's interview.

6          Q.    The next name that I'm looking at

7   is Karl Swenson?

8          A.    Yes.

9          Q.    Could you tell me how he's

10  involved?

11         A.    He was a former supervisor of

12  mine in Cincinnati and he was assigned in

13  Cincinnati still, and yet, it was refused

14  multiple times.  I asked if they would interview

15  for any of the OPR investigation or for the EEO

16  investigation, my former supervisors, yet he was

17  never interviewed.

18         Q.    What year was Mr. Swenson your

19  supervisor?

20         A.    It was sometime between 2010 and

21  2014.  I would have to check for an exact date.

22         Q.    How long of a period of time was

23  he your supervisor?

24         A.    I would have to check the exact

1    date.  Probably a year or less, I would say.  He

2    also served in the acting capacity multiple

3    times.

4              Q.    The next name that I'm looking at

5    is Kristi Kennelly.

6              A.    Does it start with a K?

7              Q.    Yes, Kristi with a K, and then

8    Kennelly, K-e-n-n-e-l-l-y.

9              A.    Okay.

10             Q.    How is Ms. Kennelly related to

11   your case?

12             A.    She was a team leader from

13   Chicago.  And their team was TDY to Cincinnati

14   for a high priority case we were working.  And

15   she had some interaction with Andrew Munafo.

16             Q.    Was she the individual that asked

17   you why Andrew Munafo was making disparaging

18   comments about the TDY?

19             A.    I'm sorry, which point are you

20   referring to?  Does it have anything about

21   surgery, then can you clarify at what point?

22             Q.    Sure.  Why don't I ask you.  You

23   said she had some interactions with Andrew

24   Munafo.

1          Tell me what those interactions

2     were.

3          A.   She had said at one point that

4     she thought he was sleeping when they came to

5     relieve my team.  And she also, they were all

6     TDY teams.  When you go TDY, if you want me to

7     clarify what TDY is; temporary duty assignments.

8     Okay.

9          When you go on a temporary duty

10    assignment, you are assigned a radio that is

11    specific to that office to use.  And so they had

12    been assigned radios to use of her team from

13    Chicago.  And this was after I had been removed.

14    Andrew was in charge of supposedly returning the

15    radios to the electronic technicians in

16    Cincinnati.

17         And she was the only female

18    supervisor other than myself that had come in to

19    work this case.  And her radio was the only one

20    that went missing and Andrew tried to blame her

21    for it.  And she had contacted me and said, my

22    radio is lost, and I said I had nothing to do

23    with that, I am not on that assignment right

24    now.

```
 1                      And I later came to find out that

 2      he found it in, somewhere in the tire well of

 3      his car and it magically reappeared.  But this

 4      was a big problem, if it's a coded radio,

 5      obviously.  It is a secure piece of equipment to

 6      lose.

 7                      Q.   When did this occur,

 8      approximately?

 9                      A.   It was after I had been removed

10      from MST or SSG.

11                      Q.   When was that?

12                      A.   I was removed in May of 2015.

13                      Q.   Then I would like to --

14                      A.   There was --

15                      Q.   Please go ahead.

16                      A.   There were teams coming in TDY

17      since the fall of 2014 past the time that I was

18      removed.  So I am not completely sure when it

19      was, but I would say it was late summer or fall

20      of 2015 is when this occurred.

21                      Q.   Okay.  Then I'm going to continue

22      asking you about a few more names that you have

23      listed.

24                      TJ Felder.  How is Mr. Felder
```

1    involved in the case?

2         A.   He is -- he was in a

3    similarly-sized office as I.  He went through

4    training class with me in the bureau so we have

5    known each other since 2003.

6         He was also a team leader, like I

7    said, in a similar-sized office.  His team came

8    in TDY for the same case.  They were actually

9    two or three cases that were kind of related.

10   So they were all in it for the same major case,

11   but there were offset cases on it.

12        He came in from that case and he

13   is one of the people that did ask me at a

14   briefing for the cases.  He asked me why my team

15   members were talking classified information

16   about a case at an open forum restaurant.  He

17   also experienced a lot of similar situations

18   just from the prospective of having a one-team

19   office.

20        Q.   What office was he from?

21        A.   At the time, I believe he was in

22   Memphis, and he's currently, I want to say he's

23   in Indianapolis perhaps, maybe Detroit.  I know

24   he mentions both of those.  I want to say

1    Indianapolis.

2         Q.    That's where you believe he is

3    currently?

4         A.    I believe he's currently in

5    Indianapolis.

6         Q.    Turning to another name on the

7    list is Nicole D. Barkley.

8              How do you believe Ms. Barkley

9    has information related to your case?

10        A.    She had been -- she was a former

11   member of the team.  And during the OPR

12   investigation, they claimed they interviewed all

13   of the members of my team, yet they interviewed

14   people that were no longer on my team, but they

15   did not interview her and she had a lot of

16   interaction with a lot of the people that were

17   involved in this.  And she also states a lot of

18   the environment of discrimination against

19   females.

20        Q.    Where is Ms. Barkley now?

21              Is she still with the FBI?

22        A.    I believe she is.  I believe

23   she's back in Cincinnati.

24        Q.    Another name that I have on my

1    list is Mary M. Fecich, (pronouncing), Fecich?

2    F-e-c-i-c-h.

3                A.    Fecich (pronouncing).

4                Q.    What information do you believe

5    Ms. Fecich has related to your case?

6                A.    She was one of the former team

7    members they did interview that I believe that

8    her statements were not complete.  I also

9    believe that she had more information than she

10   had given.  She was also friends with Andrew

11   Munafo and two of the people that died in the

12   boat accident.  And also Joseph Hamilton.

13               Q.    The next name that I see is

14   Nicole Gearty, G-e-a-r-t-y.

15                     Could you tell me who she is?

16               A.    She's a former coworker that I

17   worked with in Detroit.

18               Q.    What information does she have

19   that's relevant to your case?

20               A.    She also experienced gender

21   discrimination in the Detroit office.

22               Q.    Do you believe you experienced

23   gender discrimination in the Detroit office?

24               A.    Yes.

1          Q.    By whom?

2          A.    Multiple employees in the Detroit

3    office.  There were times where I was passed

4    over for trainings, even if I was specifically

5    requested by headquarters by name for a training

6    that had to do with curriculum and training to

7    come out for a TDY assignment.

8               The male supervisor there tried

9    to insert another male employee instead who was

10   not as qualified.

11         Q.    What is the name of that

12   supervisor?

13         A.    It was Ron Rose.

14         Q.    Was he your supervisor?

15         A.    He was the coordinator so he was

16   the reviewing official for my performance

17   reviews.

18         Q.    Who was your supervisor?

19         A.    I had three different supervisors

20   in Detroit.  I had Stephen Croal. (Phonetic) I

21   also have Lawrence Leopold, and for a little

22   while, I had Robert Ryan.  I think it was

23   Lawrence Leopold at the time.

24               And the team member was Larry

1    Errol. (Phonetic)  he was not qualified for --

2    as qualified as I was for this because my

3    training and my master's degree are in

4    curriculum and instruction.  And yet, Ron Rose

5    tried to push him to go on the TDY instead, and

6    he certainly didn't do the training.  And then

7    they actually cancelled the training when he

8    said that he wouldn't let me go.

9            Q.    Did you experience discrimination

10   from Mr. Croal?

11           A.    Yes.

12           Q.    From Mr. Leopold?

13           A.    Yes.

14           Q.    From Mr. Ryan?

15           A.    No.

16           Q.    Mr. Ryan is your husband; right?

17           A.    Yes.

18           Q.    Was he your husband at the time?

19           A.    No.

20           Q.    Were you dating or seeing each

21   other at the time?

22           A.    Not at that time.  Before I left

23   Detroit, we did date a little bit, but...

24           Q.    So you were dating while you were

1    an employee at the Detroit field office?

2           A.   Yes, and we actually disclosed it

3    to Ronald Rose, who was the supervisor, in

4    writing.

5           Q.   How long were you with Detroit?

6           A.   I was in Detroit from 2003 to

7    December 7th of 2008 when I reported to

8    Cincinnati.

9           Q.   Why did you leave the Detroit

10   office?

11          A.   I applied for and got promoted to

12   the supervisor for Cincinnati.

13          Q.   When did you begin dating

14   Mr. Ryan?

15          A.   I would say around 2007, I want

16   to say late 2007.

17          Q.   Probably or?

18          A.   I honestly don't have a perfect

19   date on that.  It was very infrequent.

20          Q.   But you don't believe you saw him

21   socially before 2007; is that correct?

22          A.   We were friends before that, but

23   I was married and went through a divorce.

24          Q.   What is your ex-husband's name?

```
 1              A.    Timothy Corson.

 2                    THE REPORTER:  Could you spell

 3              that for the record?

 4    BY MS. CASTRO:

 5              Q.    Could you spell that, please?

 6              A.    Timothy is the standard spelling

 7    of Timothy.  Corson is:  C as in Charlie, O as

 8    in Oscar, R as in Romeo, S as in Sierra, O as in

 9    Oscar, N as in November.

10              Q.    What year were you divorced?

11              A.    2005.

12              Q.    Did your leaving the Detroit

13    field office have anything to do with your

14    concerns about experiencing sex discrimination

15    there?

16              A.    Yes.

17              Q.    Did you report those incidents?

18              A.    Yes.

19              Q.    Who did you report those to?

20              A.    My supervisor, Ronald Rose.

21              Q.    When did you make that report?

22              A.    As the incidents happened.  And

23    they were verbal reports.

24              Q.    Did you make any EEO claims
```

1    during your time at the Detroit field office?

2         A.   No.

3         Q.   Then there is one final person

4    here that I don't recognize the name, and that's

5    Bennie Bustamante?

6         A.   Yes.

7         Q.   Who is that individual?

8         A.   He's a former coworker in the

9    Cincinnati office.  He is a retired special

10   agent.  He was the security officer in

11   Cincinnati.

12        Q.   What information does he have

13   that you believe may be relevant?

14        A.   I reported a lot of the security

15   violations to him that occurred on my team.  I

16   also reported to him at least twice.  One time

17   when I felt threatened by James Wilson, who was

18   a subordinate and when I felt threatened by

19   Andrew Munafo, also a subordinate.

20        Q.   Thank you for going through those

21   names with me.  I'm just going to keep plowing

22   forward.  So if at any time anybody needs a

23   break, let me know.  But I figure, let's get

24   this over and done with.

```
 1                      And I'm going to turn back to
 2      what we have labeled as Exhibit 1, which is your
 3      responses to the Interrogatories.  And I'm now
 4      looking at Page 5.
 5                 A.   Okay.
 6                 Q.   What I see here is a list of
 7      names, and I would like to just go through this
 8      list very quickly of individuals that you
 9      believe -- well, I'll let you say.
10                      I see Jason Distasio.  Could you
11      tell me what false information against you Mr.
12      Distasio reported?
13                 A.   Yes.  Mr. Distasio in a signed
14      sworn statement for OPR, he reports things that
15      I went to Disneyland while I should have been on
16      shift on a special assignment in California with
17      the team.  And I was actually in a field office
18      getting radios exchanged and in L.A. traffic.
19                 Q.   You didn't go to Disneyland?
20                 A.   I never went to Disneyland on
21      that trip.  And the only time that I had taken
22      off, and he made some other claims about me just
23      leaving and not showing up for work.  The other
24      time that I was off was on my regular day off,
```

1    my RDO that was assigned for the TDY.

2         Q.    What is your opinion of

3    Mr. Distasio?

4         A.    I feel that he is extremely

5    discriminatory against females.  There were many

6    incidents where he had to be pulled aside by my

7    supervisor because he said a thing where he

8    called a female a baby maker.  He called -- he

9    talked about when you have a kid, once you have

10   a boy, it's all good after that.  Everything is

11   gravy.  He would often make very discriminatory

12   remarks regarding females.

13        Q.    I appreciate that.  But what I'm

14   asking is, what is your opinion of him?

15        A.    I didn't have any opinion of him

16   with those interactions.

17        Q.    What do you mean by that?  I'm

18   not sure what you mean.

19             You did not have an opportunity

20   to develop an opinion of him?

21        A.    No, I had an opportunity.  I feel

22   like he was condescending towards women.  He

23   would also get into fights a lot of times with

24   people on the team.

1              Q.    What I am asking is just your

2    opinion right now.  And I'm going to move on to

3    the next individual that you have listed and

4    that's Joseph Hamilton.

5                   You contend that there was some

6    sort of offsite security breach.  What do you

7    believe that to be?

8              A.    Joseph Hamilton had an issue with

9    securing the offsite.  Multiple times, he

10   wouldn't engage the locks, he would not engage

11   the locks, he would set the alarm system.  He

12   also lost a covert ID, he had his passport

13   stolen at one point.

14             Q.    What is your opinion of

15   Mr. Hamilton?

16             A.    I feel that he did not like to be

17   told that he needed to work.  He did not like to

18   work and he often tried to distract from his own

19   ineffectiveness with the security things, and

20   make a joke out of it.

21             Q.    And again, I appreciate that you

22   are giving me factual allegations.  What I'm

23   asking for is your opinion.

24                   What is your opinion of

1    Mr. Hamilton?

2              A.    My opinions are based on

3    interactions that I have had.

4              Q.    And what are those opinions?

5              A.    I just said.  I believe that he

6    did not like being told to work.  He hadn't been

7    taking accountability for his own actions.

8              Q.    Did you get along with

9    Mr. Hamilton?

10             A.    I tried to get along with every

11   member of my team.

12             Q.    Well, I didn't ask if you tried.

13   I asked if you did.

14             A.    For the most part, yes.  When he

15   started to act unlike his regular personality at

16   the end of 2014 after the boating accident that

17   killed two of our team members, he did not act

18   the same way, and I do not feel like we got

19   along.  I felt that he was disrespectful, too.

20             Q.    Do you respect him?

21             A.    That's a very broad, broad

22   question.  Could you be more specific?

23             Q.    No.

24             A.    I respect every individual as a

1    human being.  I tried to respect every person as

2    a human being.

3              Q.    That includes Mr. Hamilton?

4              A.    He is a human being, yes.

5              Q.    You have referenced a couple

6    times a boating accident that took place in

7    September of 2014.  It might be worthwhile just

8    quickly going through what effect that had on

9    your team members.

10             Could you explain to me whether

11   that had an effect, and if so, what was it?

12             A.    I believe it did have a serious

13   effect on the entire team and people that had

14   been friends that were former members of the

15   team, when the people that had perished in the

16   accident.

17             Prior to the accident, we would

18   often go on TDYs up until a few weeks --

19   actually, they had just gotten back since the

20   week before the accident and we just returned

21   from a TDY and the team would be doing -- a

22   couple members would often go out and go out to

23   eat, or a lot of them would go out to bars in

24   the area where we were assigned.  And I had

1    actually made --

2              Q.   If you don't mind, in the

3    interest of time, I would like to stick with the

4    question that I asked and maybe I need to be

5    more specific.

6              So tell me what effects, how in

7    the work situation the accident changed the

8    dynamics of your team.

9              A.   I feel like the people that -- I

10   feel like there was a division a lot with the

11   personalities on my team after this.  The boat

12   accident was from being intoxicated and driving

13   a boat.  And my point was, I had disclosed to my

14   supervisors --

15             Q.   Again, I'm not asking you about

16   what happened before the accident.

17             I'm specifically asking you, how

18   did the accident impact your team

19   professionally?

20             You were the supervisor; right?

21             A.   Yes.

22             Q.   So there is probably no better

23   person to describe how your team changed as a

24   result of this very sad and tragic event.

```
 1                    Is that right, do you feel like
 2      you are in a good position to able to make that
 3      assessment?
 4              A.    I'm trying to explain to you the
 5      assessment but it is relevant that --
 6              Q.    Well, first I'm asking you, do
 7      you believe that you were in a position to be
 8      able to evaluate the impact the accident had on
 9      your team members?
10              A.    Yes.
11              Q.    What impact, and if it's easier,
12      we can go through each team member, if you want,
13      and you can tell me individually what impact the
14      boat accident had.
15                    Would you prefer to do that?
16              A.    It's your choice.
17              Q.    Go ahead and name the team
18      members at the time of the boat accident.
19              A.    Jason Distasio.
20              Q.    How did the boat accident impact
21      him professionally?
22              A.    So I need clarification on that
23      one.  You're asking how it impacted them
24      professionally?  You want to just know how it
```

1    impacted their performance or do you want to

2    know how it impacted their interactions with all

3    of the personalities on the team because we work

4    as a team in how we interact with each other.

5          Q.    Do you believe that the element

6    of working together professionally as a team is

7    relevant to professional performance?

8          A.    We were a team.  We had to work

9    as a team.  Like we literally had to depend on

10    each other to do our job.  Yes.

11          Q.    I take it that's a yes?

12          A.    Yes.

13          Q.    Is that because you believe that

14    it is important professionally?  I would ask

15    both how it affected their individual

16    performance and how it impacted their ability to

17    work together as a team?

18          A.    Okay.

19          Q.    Let's start with Mr. Distasio.

20          A.    Okay.  Mr. Distasio was notably

21    different in his interaction with the team.

22          Q.    Following the accident?

23          A.    Following the accident.

24          Q.    Who was another member of the

1    team at the time?

2              A.    Andrew Munafo.

3              Q.    How would you describe his

4    professional performance, both before and after

5    the accident?

6                    Did it change in any way?

7              A.    He already had some performance

8    issues and was not always very professional with

9    his interactions.  And it became exacerbated, I

10   would say, by the accident.  It became an

11   exponential noticeable difference.

12                   He would turn off his phone.

13   Even if he was the acting team leader, he would

14   not respond to things.  He was making threats of

15   violence.  He was threatening to kill somebody.

16             Q.    Was he friends with the two

17   individuals that died in the accident?

18             A.    Yes.

19             Q.    I assume you all were friends?

20             A.    For the most part, the team

21   members, my subordinates were very good friends.

22             Q.    And were you?

23             A.    That's sort of like when you

24   asked me if my coworkers were my friends.  Yes.

```
 1     I would get a bite to eat with them off shift,

 2     and sometimes even talk to them.  But I don't

 3     know if I would call it friends.

 4              Q.    Who were the other members of

 5     your team at the time?

 6              A.    Joseph Hamilton.

 7              Q.    How did the accident change his

 8     professional performance?

 9              A.    He stopped, he stopped kind of

10     interacting with a lot of the other members.  He

11     started almost complaining about every minutia

12     of work.  He didn't want to do the timecards, he

13     didn't want to do the logs, he didn't want to

14     do -- it's like it kind of took the motivation,

15     any motivation he may have had out of it.

16                    And he was very -- he became

17     very, I want to say almost defensive.  I think

18     it was more aggressive.  It was different than

19     his personality had been if you took like an

20     average of his personality over the years prior.

21              Q.    Did you have any other team

22     members at the time?

23              A.    James Wilson.

24              Q.    Tell me how the accident changed
```

1    his professional performance?

2            A.   I don't know that it changed his

3    professional performance.

4            Q.   Okay.

5            A.   He was, he was aloof beforehand

6    and sort of aloof afterwards.

7            Q.   In your response to the

8    interrogatory, you state that Mr. Wilson

9    provided false information on a signed

10   affidavit --

11           A.   Yes.

12           Q.   -- or a signed sworn statement?

13           A.   Yes.

14           Q.   What are you referring to there?

15           A.   I'm sorry.  You broke up.

16           Q.   Sure.  What are you referring to

17   with that?

18           A.   In the signed sworn statement for

19   the OPR, he said that I put him on a performance

20   improvement plan.  I never put him on a

21   performance improvement plan.  I never put any

22   individual on the team on a performance

23   improvement plan.  And that was used in the

24   investigation against me saying I retaliated

1    against people.

2              And a simple check, a records

3    check would show that I never put him on a

4    performance improvement plan and he put that in

5    a signed sworn statement.

6              Q.    What is your opinion of

7    Mr. Wilson?

8              A.    I worked with Mr. Wilson in

9    Detroit also, and I feel like he was different

10   in Detroit than he was in Cincinnati, but our

11   roles also changed.  We were coworkers on a team

12   in Detroit, and then when I went to Cincinnati,

13   I was a supervisor.

14             And he had also applied for my

15   position and I feel like he had a lot of issues

16   reporting to a female.  He would not, like when

17   I said no to something, he would break the team

18   off two hours or three hours early, and I told

19   him he couldn't do that.

20             Q.    I asked what your opinion is of

21   Mr. Wilson.

22             A.    I feel like he tried to undermine

23   authority, and he was especially condescending

24   to women.

```
 1              Q.    Did you like him or do you like

 2     him?

 3              A.    I tried to respect him as a human

 4     being, but I feel like he lied.

 5              Q.    I take that as a no?

 6              A.    No.  I did not say no.

 7              Q.    Okay.

 8              A.    I said I try to respect everyone

 9     as a human being.

10              Q.    All right.  I will tell my kids

11     to follow that advice.

12                    Who else was a team member at the

13     time?

14              A.    I'm trying to remember who we

15     talked about.  Did we talk about Hamilton?

16              Q.    Yes.

17              A.    Wilson?

18              Q.    Yes.

19              A.    Munafo?

20              Q.    Yes.

21              A.    Distasio?

22              Q.    Right.

23              A.    I think that was good.  I think

24     we are still missing a member because Barkley
```

1    had just departed for an assignment in

2    St. Louis.

3              Q.    So you have told me that, and

4    then it sounds like the boat accident had a

5    significant impact on these individual's

6    performance professionally.

7                   Is that a fair statement?

8              A.    Yes.  They were having trouble

9    interacting with each other.  Like our team

10   performance was impacted tremendously.  They

11   were not responding the way that they normally

12   responded.

13             Q.    Would you consider that to be a

14   fair response to what had just occurred?

15             A.    I feel like we were all mourning

16   and we were all shocked.

17             Q.    What I asked was, would that have

18   been a fair response to the tragic accident that

19   occurred?

20             A.    I don't know that I can honestly

21   answer that, because my response is the only

22   thing that I can attest to.

23             Q.    Was your's a fair response?

24             A.    Sorry?

1          Q.    Was your response a fair

2     response?

3          A.    I think that for every person

4     it's going to be different.

5          Q.    Well, I'm asking for you.

6          A.    It's kind of a subjective

7     question and I'm not a psychological expert to

8     say if it is fair or not fair on how somebody

9     responds to a tragic death or a tragic accident.

10          Q.    You can't testify as to whether

11     you feel like you responded appropriately to the

12     accident?

13          A.    That's different.  That's

14     different.

15          Q.    Okay.

16          A.    You want appropriate or fair?

17          Q.    Appropriate.

18          A.    I feel like I responded

19     appropriately, yes.

20          Q.    Do you feel that the rest of the

21     team members responded properly?

22          A.    I don't think all of them handled

23     themselves appropriately and I feel like some of

24     them acted out on me in particular.

1        Q.    Do you believe that you handled

2   it appropriately?

3        A.    All I can say is I can attest to

4   the best of my ability given the situation.

5        Q.    Do you feel that there were any

6   team members that didn't handle it to the best

7   of their abilities given the situation?

8        A.    I couldn't gauge, because I don't

9   know everyone's ability for handling grief.

10        Q.    Let's move on.  In your

11   interrogatory response, I want to talk about

12   Hugh Eby, E-b-y.

13        A.    Okay.

14        Q.    First of all, who is that?

15        A.    Hugh Eby was a Special Agent in

16   the Cincinnati office.

17        Q.    What candor issue was he

18   investigated for?

19        A.    I'm not sure I know all the

20   details of it.  I believe he lied on a document

21   that was submitted to -- I can't remember what

22   the name of it is.  It's for following the

23   subject of opening a document to open a case on

24   a subject.

 1              Q.    You believe or you know?

 2              A.    I never saw the document but that

 3    is my knowledge.

 4              Q.    Did you see the OPR report?

 5              A.    I was interviewed for the OPR

 6    investigation.

 7              Q.    Did you see the OPR report?

 8              A.    Not that I remember.

 9              Q.    Okay.  Turning to the next page

10    on those Interrogatories, you list several more

11    individuals that are in different field offices

12    throughout the country.

13              A.    Okay.

14              Q.    And what I would like to know is,

15    for each of these individuals, what do you

16    believe the wrongdoing was?

17                    And we will start with Glennis

18    Jones.  What was he investigated for?

19              A.    Hold on, sorry.  My page just

20    flipped.

21              Q.    Sure.

22              A.    This is Page 6; right?

23              Q.    Yep.  Page 6.

24              A.    Okay.  Okay.  One more time.

1          Q.    Sure.

2          A.    Glennis Jones.

3          Q.    You had indicated in your

4    response to the Interrogatories that each of the

5    following individuals were investigated by OPR

6    or had EEO complaints against them.

7               Tell me what your basis of

8    knowledge is for the complaint against

9    Mr. Jones, Glennis Jones.

10          A.    I believe there were a multitude

11    of things that were being investigated on him.

12    And he was also a one-team office team leader.

13    And I think timecard fraud was one of the

14    incidents.

15          Q.    When you say you believe, you

16    believe or you know?

17          A.    I know that he was investigated

18    by OPR.

19          Q.    Did you see the investigative

20    report?

21          A.    No.

22          Q.    Do you have any personal

23    knowledge of what occurred with Mr. Jones?

24          A.    Firsthand?  No.

1          Q.    Then let's turn to Michael Jones.

2                Do you have firsthand knowledge

3     of what occurred with Mr. Michael Jones?

4          A.    My knowledge is that the team

5     leader that had to take over for him, it was

6     based on financial issues, and also timecard

7     issues because I had to help them fix the

8     financial issues in the office.

9          Q.    Who provided you that

10    information?

11         A.    The team leader at that time.

12         Q.    John Shaw.  Are you aware of any

13    wrongdoing by Mr. Shaw?

14         A.    He was in New Haven.  Also a

15    one-team office.  I did not see the report.  I

16    just know that he was removed because of the --

17    or excuse me.  He was under an OPR

18    investigation.

19         Q.    How are you aware of that fact?

20         A.    He was then put in a different

21    position.

22         Q.    I guess I should ask, who made

23    you aware of that fact?

24         A.    One of my team members who knew

1    John Shaw.

2              Q.    Lawrence Leopold.  How did you

3    become aware of any wrongdoing by Mr. Leopold?

4              A.    Lawrence Leopold, I actually

5    spoke with him personally.  And while he was in

6    Washington, DC, I happened to be out there for a

7    TDY separate, completely unrelated.  And he had

8    reached out to me and we had lunch and he told

9    me.

10             Q.    Kevin Holyfield?

11             A.    Kevin Holyfield.

12             Q.    How did you become aware that

13   Mr. Holyfield had alleged wrongdoing?

14             A.    He told me.

15             Q.    Joe Gladd?

16             A.    Yes.

17             Q.    How did you become aware that

18   Mr. Gladd was subject to an OPR investigation?

19             A.    No.  Joe Gladd, when he was in

20   Houston, he suddenly disappeared from that

21   position and then he resurfaced in Detroit.  And

22   my husband Robert Ryan was in Detroit at the

23   time, and he relayed that information.

24             Q.    Tom Brink?

```
 1                A.    I was on a TDY with Tom Brink.

 2    And I don't believe he was OPR, it's different

 3    from the EEO category, and he told me about his

 4    experience.

 5                Q.    Kevin Smith?

 6                A.    Also on TDY.  He was accused of

 7    having a team leader questioned.

 8                Q.    How did you become aware of that?

 9                A.    He talked about it on the TDY

10    that we were on.

11                Q.    And what about Ed Foley?

12                A.    Mary Fecich worked in the New

13    York office and she talked with those team

14    members and I'm not sure if she talked with Ed

15    himself, the same situation.

16                Q.    So you heard about that situation

17    from Mary?

18                A.    Yes.

19                Q.    Okay.  All right.  Give me just a

20    moment.  I'm going to switch gears here.

21                A.    Could this be a good time that we

22    could take a five-minute quick break possibly?

23                Q.    Sure.  I was going to say the

24    same thing.
```

```
 1              MS. CASTRO:  I am not entirely
 2         sure how to do this electronically.
 3         I might just leave things on.  Do you
 4         guys think you can go to another room
 5         and call each other from there?
 6              THE WITNESS:  Yes.  Is it okay if
 7         I turn off my camera and my mike?
 8              MS. CASTRO:  Yes.  Maybe that's
 9         the best way to do it.  I don't know
10         if we all can do that, but we can try
11         it.
12              THE WITNESS:  Like five minutes,
13         or six minutes?
14              MS. CASTRO:  Sure.
15              THE WITNESS:  Okay.  I'm off.
16                   (At which time, a short
17                    recess was taken.)
18   BY MS. CASTRO:
19         Q.   Are you ready to go?
20         A.   Yes.
21         Q.   Okay.  I'd just remind you that
22   you are still under oath.
23         A.   Yes.
24         Q.   I have a stack of documents, as
```

```
 1   you know, that I think we'll just kind of try to

 2   hammer through it as quickly as we can.

 3              The first one I would the ask you

 4   to turn to is marked 1189.  That's the name of

 5   the PDF.  Just give me a shout out whenever you

 6   are ready.

 7              A.   Okay.  Is it the one that starts,

 8   it's an e-mail?

 9              Q.   Yes.

10              A.   Yes.  I'm ready.

11              Q.   And then I would ask you also to

12   open up 511.

13              MS. CASTRO:  We are going to mark

14         these as Defendant's Exhibits 2 and 3.

15              THE COURT REPORTER:  Yes.  These

16         will be Defendant's Exhibits 2 and 3.

17              (At which time,

18              Defendant's Exhibit Nos. 2

19              and 3 were marked for

20              identification.)

21              MS. NEWMAN:  You said 511?

22              MS. CASTRO:  Yes.  Liza, do you

23         have it?

24              MS. NEWMAN:  Yes.  Jennifer, if
```

```
 1                    you can bring all of the attachments

 2                    out into a folder, and then they will

 3                    be in numeric order.

 4                         THE WITNESS:  Okay.  I haven't

 5                    even downloaded all of them at this

 6                    point, so I'm still searching.  Okay.

 7                    I have 511.

 8     BY MS. CASTRO:

 9                    Q.   We will start with 511, which we

10     have marked as Defendant's Exhibit 3 and I see

11     that this is a performance appraisal report with

12     a rating of record date of September 30, 2015.

13     Do you see that as well?

14                    A.   Yes.

15                    Q.   So we are on the same page, and

16     we are looking at the same document?

17                    A.   Yes.

18                    Q.   Your performance rating here,

19     what period of time did this cover?

20                    A.   This would have been from

21     October 1st of 2014 through September 30th of

22     2015.

23                    Q.   So that would have encompassed

24     the period of time shortly after the boat
```

1    accident in September of 2014; is that correct?

2            A.    Starting, yes; shortly after the

3    boating accident up through 2015, yes.

4            Q.    And if you look at block number

5    six, your rating was marked as what?

6            A.    The summary rating is marked as

7    "excellent."

8            Q.    Is that a good rating?  I'm not

9    familiar with the FBI in terms of -- I mean, I

10   see the scale here.

11           Do you consider excellent to be a

12   good rating?

13           A.    It is a good rating.

14           Q.    And so you took that to be a good

15   rating when you were given this report?

16           A.    As an overall rating, it is a

17   good rating.  Yes.

18           Q.    Who gave that you rating?

19           A.    It is issued to me by my

20   supervisor, Herbert Stapleton.

21           Q.    Tell me, what's your opinion of

22   Mr. Stapleton?

23           A.    Again, I try to have respect for

24   all human beings, but he's not somebody that I

```
 1    would choose as a friend.

 2              Q.    Why is that?

 3              A.    We do not have things in common.

 4    I don't think our views on life, politics, et

 5    cetera, are in line.

 6              Q.    Is he a respectful person?

 7              A.    To me, no.

 8              Q.    To others?

 9              A.    I have seen him be respectful to

10    some people, but disrespectful to others.

11              Q.    Is he fair?

12              A.    I do not feel he is, no.

13              Q.    Does he feel that way toward you,

14    or as to other people as well?

15              A.    From what I have seen, I feel

16    that it applies to myself and to other people.

17              Q.    Just to other women or other men

18    as well?

19              A.    I would say other people, men and

20    women.

21              Q.    Did Mr. Stapleton ever make any

22    harassing comments to you based on your gender?

23              A.    Yes.

24              Q.    Tell me what that was.
```

1          A.   Multiple times, he's quoted in

2     signed sworn statements saying, I'm overly

3     picky, I'm overly emotional.  I overreacted to

4     things.  I could be divisive, negative.

5     Sometimes my commentary or my communications

6     lacked professionalism.

7                    He had, at one point, had a joke

8     and told me about it that he talked with other

9     male agents on the squad and calling me a GS-24,

10    which to me, I felt reflected on me being a

11    working female.  Because they were combining my

12    income with my spouse's income and making fun of

13    it.

14                    He will say things to me, like, I

15    will not be talked to like a child.  And I was

16    just asking him, do you see what is happening

17    here with my team?  And he would respond with

18    condescending things that I feel I have never

19    heard him say to a male and I couldn't say to a

20    male.  I feel it's very condescending.

21                    And, you know, he also would say

22    things to me after he completed a project.  He

23    said, "let that be a lesson to you."  And I felt

24    that that was very offensive to me as a woman

1    that I needed to be taught a lesson, or he felt

2    that I needed to be taught a lesson.

3                He would also, he volunteered me

4    for activities that are stereotypical towards

5    females. At one point after the accident, he

6    volunteered and pretty much scheduled me to go

7    kind of sympathetically to go to one of the

8    employees that died in the boating accident.

9    I was the only female on the team. He did not

10   ask any of the other males to do it. And he

11   said that I was the best suited to do it. I

12   felt those were all disrespectful to me as a

13   female.

14               He also referred to me as cynical

15   and I think that that is often a stereotypical

16   phrase attributed to females.

17         Q.   You have given me a litany of

18   complaints about Mr. Stapleton and you also

19   testified that he could be disrespectful toward

20   both men and women.

21         A.   I said he was not fair towards

22   men and women. That fairness means that he

23   could have shown favor, and I believe he showed

24   favor to males.

1              Q.    The types of words that you have

2     used that you attribute to Mr. Stapleton, like

3     "picky," "emotional," "over emotional," "lack of

4     professionalism," "cynical," are those words

5     that you would expect for him to describe a man

6     as well?

7              A.    No.

8              Q.    Did you ever recall him offering

9     constructive criticism to male subordinates?

10             A.    Yes.

11             Q.    Do you recall who he did that to?

12             A.    During some, during the six-month

13    reviews that he sat in on, he would often

14    interject things to the male subordinates and he

15    never used any of that language with them.

16             Q.    What types of interjections would

17    he make?

18             A.    He would even, on men things,

19    like if it looked like it upset a male, he would

20    say it looked like you are not doing the

21    normal -- and I'm going to be misquoted.

22    It was stated in one of the signed sworn

23    statements that he made.

24                   He had sat in on a six-month

1    review and he had been talking to Joseph

2    Hamilton.  And he had said that, "I feel like

3    you are not performing to your normal level."

4    And Hamilton, I think, got upset by it.  And so

5    Stapleton revamped what he said and he even

6    said, "let me rephrase."  And he said it in a

7    more positive way saying, "how can we make you a

8    TDY like you were before?"

9                    It's not a direct quote.  It's in

10   a signed, sworn statement.  So I don't want

11   to...

12              Q.   Sure.  Sure.

13              A.   It was slanted or rephrased in a

14   very, in a more positive action way.

15              Q.   I'm not asking about positive

16   interactions with Mr. Stapleton.  I'm asking

17   about negative interactions with him.

18                    And the way you described him to

19   me, he sounds very abrasive, is that correct?

20              A.   He was abrasive with me.  I did

21   not witness him being abrasive with any of the

22   male employees.

23              Q.   Okay.  So then you don't recall

24   him using any of this negative language towards

1       the male employees?

2               A.   I never experienced him using

3       this language towards males.

4               Q.   Are you aware of any times when

5       he may have given criticism to male employees?

6               A.   I witnessed a few times, just

7       like I evidenced, like I just told you.

8               Q.   What were those again, because I

9       think I kind of got lost?

10              A.   During six-month reviews.  He sat

11      in on six-month reviews.

12              Q.   And what type of language would

13      he use?

14              A.   I am sorry?

15              Q.   What type of language did he use

16      that you are referring to?

17              A.   He used, like I said, he used

18      more positive actionable language.

19              Q.   I am sorry.  I am not asking

20      about the positive language.  I'm asking about

21      negative language that he's used.

22                   Can you give me examples of

23      negative language he's used?

24              A.   I just answered, I did not

1    witness him using negative language towards

2    males.

3              Q.    Okay.  Never?

4              A.    I did not witness.

5              Q.    But it is your testimony that he

6    did toward you?

7              A.    Yes.

8              Q.    Did he do it toward other women?

9              A.    I don't know that I witnessed

10   any, just because I was the only female on the

11   team for most of the time Stapleton was our

12   supervisor.

13             Q.    So you don't --

14             A.    He actually -- yes, yes, he did.

15   He -- it wasn't someone on my team.  He

16   described, on one of the supervisors in the main

17   office, as crazy.  Claudia Henderson, he

18   described her as "crazy."  And he had also

19   referred to Lisa Bustamante, who was the

20   administrative officer as -- I don't remember if

21   it was not right in the head or something

22   similar to the word crazy.  But I just remember

23   distinctly that he called Claudia Henderson

24   crazy.

```
 1              Q.   And that was to your face?

 2              A.   Yes, in a one-on-one talk we were

 3    having.

 4              Q.   Is it appropriate to talk about

 5    coworkers or subordinates using that type of

 6    language?

 7              A.   I felt uncomfortable when he did

 8    it.

 9              Q.   Well, I'm not asking you how you

10    felt.  I'm asking if it's appropriate?

11              A.   No.

12              Q.   And would you contend that

13    supervisors really shouldn't be talking about

14    other employees with that type of language?

15              A.   They should not be calling

16    employees names, no; other employees names.  No.

17              Q.   Is that unprofessional?

18              A.   Yes.

19              Q.   Would you say that it's

20    unprofessional to discuss subordinates with

21    other employees using terms like you have

22    described that Mr. Stapleton used, name calling,

23    essentially?

24              A.   If that person is instigating it,
```

```
1         I would say that that is not appropriate.  Like

2     if I used that word and he were like reiterating

3     what I had said to try talk to me about it, then

4     I can understand him using that language, but I

5     don't think that he should be name calling

6     somebody else, no.

7              Q.   Do you think it's professional to

8     discuss other employee's performance issues with

9     their coworkers?

10             A.   If it has an impact on a team

11    action, I do believe that they should.

12             Q.   So you think that that's okay to

13    discuss other employee's performance issues with

14    other coworkers?

15             A.   If the coworker has an impact on

16    the team performance, such as, if they are an

17    acting team leader at the time, then you have to

18    discuss that because they have the issues.  They

19    are the acting supervisor, so it would be

20    necessary.

21             Q.   But it's not okay for Mr.

22    Stapleton to do that, or is it?

23             A.   Can you ask me clearly which

24    question you are asking me?
```

1        Q.    Sure, sure.

2        A.    Okay.

3        Q.    So you just testified that it is

4  okay to discuss other employee's performance if

5  it impacts on their work as a team.

6            Is that correct; am I stating

7  that fairly?

8        A.    I said if it's the acting

9  supervisor, yes, it is necessary to discuss

10  those items.  Yes.

11        Q.    So does that then apply to Mr.

12  Stapleton as a supervisor?

13        A.    If that is the situation, he can

14  discuss it, yes.  That's not the situation with

15  Claudia Henderson.

16        Q.    Well, I'm just asking generally

17  if that is the situation, and your testimony is

18  yes?

19        A.    I didn't hear the last part.

20        Q.    Yes.

21        A.    You were muffled.

22        Q.    Okay.  I think I got the answer.

23        A.    Okay, sorry.  It keeps crackling

24  at the last two words.

1          Q.   Yeah, yeah.  I'll take it off, if

2     it gets really difficult.

3          A.   Okay.

4          Q.   So generally then, would you

5     characterize Mr. Stapleton as a good supervisor?

6          A.   No.

7          Q.   Was he a poor supervisor?

8          A.   I would say he was a very poor

9     supervisor.  He was the worst supervisor I had

10    in Cincinnati.

11         Q.   What other supervisors did you

12    have in Cincinnati?

13         A.   I reported to Ken Wall, I

14    reported to Karl Swenson, I reported to Wendy

15    Surikov.

16         Q.   Yes.

17         A.   And I reported to Herbert

18    Stapleton.

19         Q.   And I'm assuming of those, Wendy

20    is the only female?

21         A.   Yes.

22         Q.   Then I want to look back here at

23    Exhibit 3, which is 511.  It's your performance

24    review.

1             A.    Okay.

2             Q.    So Mr. Stapleton gave you an

3     excellent rating; right?

4             A.    The summary rating, yes, is

5     excellent.

6             Q.    Who is Mr. Morin?

7             A.    Morin was the reviewing official.

8     He was the ASIC, the Acting Special Agent in

9     Charge for our branch.

10            Q.    So he would have had to sign off

11    on this as well?

12            A.    Yes, he did.

13            Q.    Let's turn to the next page of

14    it, and these are the critical elements of your

15    position.

16                  Do you see that?

17            A.    Yes.

18            Q.    So these elements where you

19    received an "outstanding," five "excellents," a

20    "successful," and a "minimally successful,"

21    those were completed by Mr. Stapleton, is that

22    right?

23            A.    That's -- usually I didn't

24    witness him doing it, but that's usually how it

1    goes.  The person that is the direct supervisor

2    fills this out and then the reviewing official

3    signs it.

4           Q.    Okay.

5           A.    That is my understanding, yes.

6           Q.    You met with Mr. Stapleton to

7    discuss this performance evaluation; right?

8           A.    Yes.

9           Q.    So it's your understanding that

10    he's the one that assigned these values?

11           A.    Yes.

12           Q.    Do you think -- I'm sorry.

13    Turn the page to the next page and there is a

14    narrative section giving comments about various

15    areas of performance.

16           Do you see that?

17           A.    Yes.

18           Q.    Who do you believe wrote this

19    evaluation or these comments?

20           A.    As far as I know with protocol,

21    it should have been Stapleton.

22           Q.    Do you have any reason to believe

23    it wasn't Stapleton?

24           A.    No.

1          Q.   What I see on here are some very

2     positive comments.

3               SIS Boughton is highly skilled.

4     You sought out opportunities for training, you

5     excelled at providing professional service.

6               Would you consider those to be

7     positive remarks about your performance?

8          A.   (No response.)

9          Q.   I think we lost your audio.

10         A.   Are you able to hear me?

11         Q.   There we go.  You are back.

12         A.   It had a weird thing.  It was

13    like muffled.

14         Q.   Yes.

15         A.   I'm sorry, could you repeat that?

16         Q.   Sure.  I am looking at the

17    narrative portion of your performance review.

18    And what I see, I see comments like, highly

19    skilled, sought out opportunities, excelled,

20    entrusted, excellent.

21               Do you consider those to be

22    positive comments about you?

23         A.   Yes.

24         Q.   Then I'm going to go ahead and

1    look at what we have already marked as

2    Exhibit 2.  And that's 1189.

3                A.    Wait a minute.  Now, you are

4    going off of the performance review?

5                Q.    Yes.

6                A.    I just want to clarify.  The

7    words that you said, specifically read, those I

8    do consider positive.

9                Q.    Okay.

10               A.    But there were negative ones

11   included on here also.  You just did not itemize

12   those words.

13               Q.    Okay.

14               A.    So just to clarify.

15               Q.    We can do that.  They are harder

16   to find because there are less of them.

17                     Looks like what I see as a

18   potential negative comment comes on the next

19   page in the area of supervising.

20                     Is that what you are referring

21   to?

22               A.    I'm referring to the supervising

23   category, and also the relating with others, and

24   providing professional service has negative

1    language in it.

2            Q.    Let's start with relating with

3    others.

4            I see that you excelled, case

5    agent's comments is favorably, and Boughton

6    should work towards more positive interactions

7    with supervised staff and avoid making critical

8    remarks about one subordinate to another

9    subordinate.

10           Is that accurate?

11           A.    That's the part that I am

12   referring to, yes.

13           Q.    So you would consider that to be

14   a negative evaluation?

15           A.    A negative and, yes, and unfair.

16   Yes.

17           Q.    So you do not believe that you

18   had any area that you needed to improve on with

19   relating with others in providing professional

20   services?

21           A.    That is not what I said.

22           Q.    Okay.

23           A.    But they were not the areas that

24   I would have selected.

1          Q.   So you do not believe that this

2     accurately reflects your performance in the

3     relating with others category?

4          A.   Not in its entirety, no.

5          Q.   Okay.

6          A.   I believe he based his opinion

7     on, especially the last sentence on here where

8     he is going through on hearsay from the team,

9     and he is supposed to be evaluating me.

10         Q.   What I'm having trouble with is,

11    this category is relating with others, and how

12    is he supposed to evaluate how you relate with

13    others if he doesn't ask your subordinates how

14    you relate with them?

15         A.   So he picked one particular

16    instance and I would refer him to one here, and

17    he even spoke of it during my verbal review

18    going over that.

19         Q.   Okay, I appreciate that, but what

20    I'm asking is, how is a supervisor supposed to

21    fairly evaluate an employee on their ability to

22    relate with others without speaking to that

23    employee's subordinates?

24         A.   I didn't say that he couldn't

1    talk to the subordinates, but he needs to take

2    what they say and overall assess.  And he took

3    one particular instance from an employee and

4    focused on it.

5              Q.    How do you know that?

6              A.    Because he said it verbally to

7    me.

8              Q.    What I'm seeing here is that he

9    offered a whole paragraph of a response and you

10   are telling me that that paragraph is not

11   accurate because he should not have listened to

12   what your subordinates communicated about you?

13             A.    I specified in the last sentence.

14             Q.    Okay.

15             A.    I was more concerned with the

16   supervising category.

17             Q.    Let's finish this one first, so

18   we don't muddy things up.  "Should work toward

19   more positive interactions with supervised

20   staff."

21                   How is Mr. Stapleton to know

22   about your interactions with supervised staff if

23   he doesn't speak with the supervised staff?

24             A.    I just said a second ago that he

1    should talk to them, it's fine to talk to them,

2    but he made everything as a summary and not one

3    particular instance.

4                Q.    How do you know that he didn't do

5    that?

6                A.    Because the sentence that he

7    wrote is referring to one particular instance.

8                Q.    How do you know that?

9                A.    Because he discussed it with me

10   verbally in the meeting for this part.

11               Q.    Could there have been more

12   instances that he did not discuss with you

13   verbally?

14               A.    He did not discuss with me

15   verbally.

16               Q.    I'm asking you --

17               A.    He thought that there were.  I

18   did not experience any others.

19               Q.    But you don't know what he knew

20   from speaking to your subordinates, do you?

21               A.    I was not part of those

22   conversations, no.

23               Q.    Then you wanted to move on to

24   supervising, which is on the last page, and you

1    do not believe this was a fair assessment?

2          A.   I do not believe it was a

3    positive assessment, no.

4          Q.   Do you believe it was a fair

5    assessment?

6          A.   No.

7          Q.   How do you believe that Mr.

8    Stapleton arrived at these conclusions?

9          A.   What he told me was, he said that

10   he looked at his notes and then experiences and

11   he talked to other people that I was working

12   under when I was on special projects in the

13   office.  Because from the point of my six-month

14   review to the point of this, I was only

15   supervising in a supervisory capacity in my

16   position for less than 30 days.

17         Q.   I don't remember what I asked you

18   but I don't believe that answered the question.

19         A.   Okay.

20              MS. CASTRO:  I'm going to ask if

21              Pam will read back what the question

22              was.

23                   (At this time, the

24                   reporter read back the

 1                              requested portion of the

 2                              testimony.)

 3    BY MS. CASTRO:

 4              Q.    How do you believe Mr. Stapleton

 5    arrived at the conclusions in this supervising

 6    paragraph?

 7              A.    He told me that he got to the

 8    categories, all of the write-ups for my card

 9    from what he had and from the people that I was

10    temporarily assigned to in the office.  That's

11    all that I know that he gathered his information

12    from.

13              Q.    Then I would like you to go ahead

14    and look at what we've marked as Exhibit 2.

15    It's labeled under the Bates Number 1189.  I

16    think you have it open.

17              A.    Okay.

18              Q.    What I have here in front of me

19    are several e-mails between Mr. Stapleton and

20    Lisa Bustamante and Elaine Doll.

21              Is that what you have?

22              A.    Yes.

23              Q.    What I see in these e-mails are

24    requests from Mr. Stapleton to these two

1    individuals asking for feedback on your

2    performance review, is that right?

3              A.    Yes.    That's what it appeared to

4    me also.

5              Q.    So then it wasn't just Mr.

6    Stapleton contributing to that performance

7    evaluation in 2015, was it?

8              A.    No.    What I referenced.    The

9    other supervisors that I was assigned under

10   during my temporary scheduled program.

11             Q.    Those supervisors were Elaine

12   Doll and Lisa Bustamante?

13             A.    Yes.

14             Q.    And I'm taking it they are both

15   females based on their names, is that right?

16             A.    Yes.

17             Q.    Do you have any reason to believe

18   that Ms. Doll or Ms. Bustamante would lie on a

19   performance evaluation?

20             A.    No.

21             Q.    Do you have any reason to believe

22   that Ms. Doll and Ms. Bustamante wouldn't be

23   fair in a performance evaluation?

24             A.    No.

1          Q.   Okay.  You can set that aside and

2     I'll grab of other ones here.  Let's go to 1326.

3               MS. CASTRO:  We are going to mark

4          this as Defendant's Exhibit 4.

5               THE COURT REPORTER:  This will be

6          Defendant's Exhibit 4.

7                    (At which time,

8                    Defendant's Exhibit No. 4

9                    was marked for

10                    identification.)

11    BY MS. CASTRO:

12          Q.   Why don't you take a look and

13     just get familiar with it?

14               And what I see here is an e-mail

15     from Ms. Doll to Mr. Stapleton and it is

16     discussing some of the examples of the project

17     you worked on.

18               I see that this says your overall

19     summary rating -- when I referred to "your," we

20     are talking about Mr. Stapleton's overall

21     summary rating seems very valid and it is

22     favorable while offering some honest points on

23     areas for improvement.

24               Do you see that?

1            A.    Yes.

2            Q.    Do you have any reason to

3    question Ms. Doll's judgment in making that

4    statement?

5            A.    No.

6            Q.    So then it also seems that this

7    e-mail indicates that Ms. Doll provided feedback

8    to contribute to your evaluation, is that right?

9            A.    That is my understanding, yes.

10           Q.    It sounds like she thinks pretty

11   highly of you.  You have been "pleasant,

12   professional, and responsive," is that right?

13           A.    It appears, yes.

14           Q.    How was your working relationship

15   with Ms. Doll?

16           A.    I thought it was fine.  She was a

17   good supervisor, I mean, what I experienced of

18   her.  And I was only temporarily under her, but

19   she was very nice and answered questions, helped

20   me.

21           Q.    Great.  Then I want you to turn

22   to 515.

23                 MS. CASTRO:  We are going to mark

24                 this as Exhibit 5.

```
 1                    MS. NEWMAN:  What was the number?

 2                    MS. CASTRO:  515.

 3                    MS. NEWMAN:  Thank you.

 4                    THE COURT REPORTER:  This will be

 5            Defendant's Exhibit No. 5.

 6                         (At which time,

 7                         Defendant's Exhibit No. 5

 8                         was marked for

 9                         identification.)

10                    THE WITNESS:  Sorry.  I'm still

11            having trouble finding it.

12                    MS. CASTRO:  Take your time.

13                    MS. NEWMAN:  I don't have a 515,

14            I have a 550.  So maybe that is what

15            you said all along.

16                    MS. CASTRO:  Let's see.  Well,

17            maybe I didn't copy it correctly

18            because our law clerk can't find it

19            either.  Sorry about that.

20                    THE WITNESS:  I don't feel as bad

21            then.

22      BY MS. CASTRO:

23                    Q.  So I am just going to ask you,

24      what I have are some notes that Mr. Stapleton
```

1    took talking about your performance evaluation,

2    and it is a verbal feedback he gave you and what

3    he says is that Ms. Doll sat in on a meeting

4    with you, is that correct?

5                A.    Yes.

6                Q.    So she would able to corroborate

7    anything that happened in the meeting on your

8    performance evaluation, is that right?

9                A.    It should be, yes.

10               Q.    Okay.  What Mr. Stapleton

11   described -- I am sorry.  What Mr. Stapleton

12   says he based his rating on was his own

13   observations, input from Lisa Bustamante, input

14   from Elaine Doll and review of the employee

15   assessment reports that you provided.

16                     Does that sound correct?

17               A.    Yes.

18               Q.    Do you have any reason to believe

19   that Mr. Stapleton based his review on anything

20   else?

21               A.    Not that I would know of.

22               Q.    Do you have any reason to

23   question that Mr. Stapleton didn't answer any

24   questions you had during that meeting?

1          A.   I'm sorry. You said that I felt

2   that he didn't answer any questions that I had?

3          Q.   Did you feel the opportunity to

4   be heard at the meeting?

5          A.   Heard?

6          Q.   Did you feel that you had the

7   opportunity to be heard, that you could make

8   comments and you could raise questions with Mr.

9   Stapleton?

10         A.   I actually, it was kind of

11   contentious that the meeting occurred with an

12   individual that I did not consent to. That was

13   not part of the program either.

14         Q.   So you would have preferred that

15   the meeting was just held with you and Mr.

16   Stapleton?

17         A.   Or with a former supervisor from

18   the program, or someone with program knowledge,

19   yes.

20         Q.   Even though Ms. Doll was the one

21   that was giving you your assignments at the

22   time?

23         A.   Yes.

24         Q.   You felt that that meeting was

1    contentious?

2              A.    Maybe contentious was a bad word.

3    It made me feel ill at ease, just because I

4    wasn't expecting other individuals outside of

5    the program.

6              Q.    Did you ask that Mr. Doll lead

7    the meeting?

8              A.    No, but I did say I did not feel

9    comfortable with someone that was not in the

10   program being in the meeting.

11             Q.    Were you informed in advance that

12   Ms. Doll would be in on that meeting?

13             A.    He had sent an e-mail that she

14   would be available, and he had sent something

15   similar before if I wanted a witness at a

16   meeting with him.  And it was similarly worded,

17   so I just thought that if I wanted, all I had to

18   say was yes, I wanted her there.

19             Q.    Okay.  I would like for you to

20   open up 569.

21                   THE COURT REPORTER:  This will be

22             Defendant's Exhibit No. 6.

23                   MS. CASTRO:  Yes.

24                        (At which time,

1                    Defendant's Exhibit No. 6

2                    was marked for

3                    identification.)

4       BY MS. CASTRO:

5              Q.    Now what I have in front of me is

6       an e-mail of October 27, 2015.

7                    Is that what you have?

8              A.    Yes, and that's what I just

9       referred to.

10             Q.    So when I see this e-mail, it

11      looks like the day before your evaluation, Mr.

12      Stapleton made you aware that "Elaine has

13      already indicated she is available at that time

14      to sit in with us," is that correct?

15             A.    Yes.

16             Q.    And you responded, "Herb, 8:30

17      a.m. tomorrow morning works for me," is that

18      right?

19             A.    Yes.

20             Q.    So you were aware that Elaine was

21      going to be sitting in on that?

22             A.    That's not what I said and that's

23      not what I inferred from what he said.  He sent

24      that e-mail, but he also sent something similar

```
 1    prior whenever we had a meeting because he

 2    stated that he could not meet with me on his own

 3    anymore earlier on.

 4            Q.   What I'm asking you is, you were

 5    aware that Ms. Doll was going to be present at

 6    that meeting, is that right?

 7            A.   No.  No.  My impression from this

 8    e-mail based on other e-mails that he sent

 9    similarly was that she was available if I wanted

10    her in the meeting.

11            Q.   So you do not believe based on

12    this e-mail that Ms. Doll would be sitting in

13    with you?

14            A.   No.

15            Q.   Okay, all right.  I'm going turn

16    to some other documents and I would like for you

17    to open 1124.

18                        (At which time,

19                        Defendant's Exhibit No. 7

20                        was marked for

21                        identification.)

22            MS. NEWMAN:  Is this Exhibit 5,

23         515?

24            MS. CASTRO:  Five, I'm going to
```

```
1              provide to you.

2                   THE COURT REPORTER:  I don't have

3              it marked yet.

4                   MS. CASTRO:  Yes.  I'm going to

5              make a copy at a break and e-mail 5 to

6              you.

7                   MS. NEWMAN:  Because that was

8              like a theme?

9                   MS. CASTRO:  Right.

10                  MS. NEWMAN:  Okay.  I just want

11             to make sure I'm keeping track.

12                  MS. CASTRO:  Yes.  We are on 7

13             now.

14                  MS. NEWMAN:  Okay.  Can you say

15             again that Bates Number?

16                  MS. CASTRO:  Sure.  1124.

17                  MS. NEWMAN:  Okay.  Thank you.

18     BY MS. CASTRO:

19             Q.   Whenever you are ready, Ms.

20     Boughton I'll be ready.

21             A.   Okay.  I am having trouble

22     getting to open that.  I got it.

23             Q.   Go ahead, if you don't mind, and

24     also open up 1149 and 1152.
```

```
 1              A.    Okay.

 2              Q.    And then were you able to get

 3     1152?

 4              A.    1149, 1152, and 1124.

 5              Q.    Yes.

 6              A.    Yes.

 7              MS. CASTRO:  And we will mark

 8         those as Exhibits 8 and 9.

 9                   (At which time,

10                   Defendant's Exhibit Nos.

11                   8 and 9 were marked for

12                   identification.)

13              THE COURT REPORTER:  This will be

14         Defendant's Exhibit Nos. 8 and 9.

15     BY MS. CASTRO:

16              Q.    Are you ready to go?  Okay.

17     So what I have in front of me as Exhibits 7, 8,

18     and 9 are e-mails that were exchanged on

19     August 28, 29th and 31st.

20              Is that what you have?

21              A.    Yes.

22              Q.    These e-mails, it looks as if you

23     were requesting some training, is that correct?

24              A.    Yes.
```

1           Q.   What I see looking at 1149 is

2    that you requested the training on August 28th,

3    is that right?

4           A.   Yes.

5           Q.   And it looks like Mr. Stapleton

6    responded on Saturday, August 29th.  So one day

7    later?

8           A.   Yes.

9           Q.   And forwarded the request to

10   Elaine for her awareness?

11          A.   That's what he said he did, yes.

12          Q.   "We'll discuss and make an

13   approval decision in advance of the deadline,"

14   is that right?

15          A.   That's what it says, yes.

16          Q.   I'm assuming that when he said we

17   will discuss, he's talking about himself and Ms.

18   Doll, is that right?

19          A.   That's what I assumed from this,

20   yes.

21          Q.   Why would he discuss that with

22   Ms. Doll?

23          A.   Because she had me working on

24   projects.  He was the one that I was assigned to

1    work on projects for her, and some of them were

2    case sensitive, and time sensitive also.

3                Q.    So her input would have been

4    important in determining whether or not you

5    should attend that training?

6                A.    I don't think to the relevancy of

7    the training, but I think if my body was able to

8    be missing from her work detail.

9                Q.    So your availability?

10               A.    Yes.  Thank you.

11               Q.    Okay.

12               A.    Yes.  That is a better word.

13               Q.    And I think maybe then 1152,

14   which we've marked as Exhibit No. 9, probably

15   goes towards that.

16                     It is an e-mail from Ms. Doll to

17   Mr. Stapleton.  Do you see that?

18               A.    Yes.

19               Q.    What I see is that on the

20   following Monday, Ms. Doll responded that when

21   someone is on TDY, their ability to go on

22   additional training is somewhat curtailed, is

23   that true?

24               A.    Yes.

1          Q.    Why?

2          A.    You are assigned to something if

3    you are set on the TDY, then, that's what your

4    assignment is for that temporary duty.  It also

5    impacts like if you could take leave.  They

6    don't allow you to take extended vacation on

7    TDY.  I mean, I don't make up the rules.  I just

8    remember that rule from headquarters of TDY.

9          Q.    So that sounds like it was a fair

10   statement that Ms.  Doll made?

11         A.    It appears that she was following

12   policy, yes.

13         Q.    And it says that the course is

14   being held the week of the planned PC op for

15   17/9.

16               Now, you are going to have to

17   tell me what that was, if you remember.

18         A.    I don't know what that was.

19         Q.    But she continues to say, we will

20   need as much help as possible, is that right?

21         A.    That's what it says, yes.

22         Q.    Do you have any recollection of

23   what was going on at that time?

24         A.    I don't even -- I don't even

1    recall. I don't even know if I knew what the PC

2    op was or if I even alerted to what it was. It

3    might not have applied to anything I was working

4    on.

5            Q.   What is a PC op?

6            A.   I don't know.

7            Q.   You don't know, okay.

8            A.   Public corruption.

9            Q.   Okay.

10           A.   That is what I learned.

11           Q.   What is op?

12           A.   Operation.

13           Q.   What does 17/9 mean?

14           A.   I have no idea.

15           Q.   Some of these acronyms can be

16   difficult so I figured you knew it better than

17   me. But what I took from this is here, she

18   basically says, we will need as much help as

19   possible, is that right?

20           A.   That's what it says, yes.

21           Q.   Do you have reason to doubt or

22   question Ms. Doll's, what she said here was

23   legitimate or was really happening?

24           A.   I don't doubt. I do not doubt.

```
 1              Q.    Okay, thank you.  Then I'm going

 2       to ask you to go ahead and open up 1175.

 3              A.    That's a different one?

 4              Q.    That is a different one, yes.

 5              A.    Okay.

 6              MS. CASTRO:  We are going to wait

 7              for the court reporter to mark it as

 8              Exhibit 10.

 9              THE COURT REPORTER:  This will be

10              Defendant's Exhibit No. 10.

11                   (At which time,

12                   Defendant's Exhibit No. 10

13                   was marked for

14                   identification.)

15       BY MS. CASTRO:

16              Q.    So Ms. Boughton, what I have here

17       in front of me is another e-mail from Mr.

18       Stapleton to Mr. Morin with Ms. Doll CC'd on

19       September 1st.

20              Do you have that, too?

21              A.    Yes.

22              Q.    And if we scroll down to the next

23       page, we can see that Mr. Stapleton e-mails Mr.

24       Morin, who I think is his supervisor, is that
```

1    right?

2          A.    Correct.

3          Q.    And asked him to make a decision

4    about this training.  "I need to make a call on

5    this prior to the deadline."

6          Do you see that?

7          A.    You mean -- I'm sorry.

8          Q.    Sure.  The e-mail of Tuesday,

9    September 1st from Mr. Stapleton.

10         A.    Yes.

11         Q.    It looks like Mr. Stapleton then

12    consulted with Mr. Morin about the training?

13         A.    Yes.  Yes.  I'm there.

14         Q.    Okay.

15         A.    Yes.

16         Q.    Does that sound like -- and

17    Mr. Morin is Mr. Stapleton's supervisor,

18    correct?

19         A.    Correct.

20         Q.    Would that be something that

21    would normally happen that he would request

22    information from a supervisor about this?

23         A.    It could happen.

24         Q.    And it looks like the concerns he

1    articulated in this e-mail were operational

2    concerns raised by Elaine, is that right?

3            A.   Yes.

4            Q.   And he also cites a limited

5    benefit to our division, is that right?

6            A.   Yes.

7            Q.   So it looks like at minimum, we

8    are aware of three people having been involved

9    in the decision as to whether you would go on

10   this training, is that right?

11           A.   It appears that's what the e-mail

12   says, yes.

13           Q.   All right.  You can set that one

14   aside now, and I'm going to have you open 812

15   and 833.

16               MS. CASTRO:  We are going to mark

17           Exhibits 11 and 12.

18               THE COURT REPORTER:  This will be

19           Defendant's Exhibit Nos. 11, and 12.

20                   (At which time,

21                   Defendant's Exhibit Nos.

22                   11 and 12 were marked for

23                   identification.)

24               THE WITNESS:  Okay.

1    BY MS. CASTRO:

2            Q.    So what I have marked as

3    Exhibit 11 is an e-mail between you and Mr.

4    Stapleton of July 16, 2015.

5            A.    Yes.

6            Q.    And then I've marked as

7    Exhibit 12 an e-mail of July 20, 2015.

8                  Is that what you have in front of

9    you?

10           A.    I think I inverted your numbers.

11   I have the 12 to be the 16th, then 833 to be the

12   20th of July.

13           Q.    We are on the same page, yes.

14           A.    Okay.

15           Q.    Let's focus on the one of the

16   16th of July first.  This was regarding your use

17   of -- tell me how to pronounce this, bucar?

18           A.    Bucar.

19           Q.    What was the bucar?

20           A.    It was an assigned bureau

21   vehicle.

22           Q.    And is that something that is

23   used only on professional time or is it

24   something that is taken home?

1                Can you describe that for me?

2                A.    It is a take-home vehicle for

3     certain operations of Special Agents and

4     other -- and I think certain supervisors that

5     are nonagent also in the office are assigned

6     Work-to-Home vehicles.

7                Q.    Okay.

8                A.    And all of the SSG is a work from

9     home on operations.

10               Q.    When you say, "operations," what

11    are you referring to?

12               A.    Our daily work.

13               Q.    So you, as a supervisor, had of

14    bucar; is that right?

15               A.    I did, I did.

16               Q.    Are you aware as a supervisor of

17    what the Home-to-Work policy was?

18               A.    Yes.  It was our published

19    policy.

20               Q.    Where would I find that?

21               A.    It was actually attached to one

22    of the EEOs.

23               Q.    I mean, if you were an employee

24    of the FBI and I were trying to find that, where

1    would I find that policy?

2            A.   Well, I can't speak for the past

3    five years because I have not be assessing any

4    bureau computers.

5            Q.   Right.

6            A.   But at the time, and from most of

7    the time that I was in the FBI, there was

8    something called the Intranet.  It's like an

9    internal system, and you could do a little

10   internal search and you could find any policy to

11   read about, as long as it was open to public.

12           When I say "open to public," open

13   to employees, to all employees.  Everybody had

14   the same access to all these.

15           Q.   So mine is contained in something

16   called the U.S. Attorneys Manual.

17           Was yours contained in something

18   called the FBI Manual or?

19           A.   It had its own little separate

20   manual with its own cover page.  But each thing

21   they published there, like was either like a

22   time and attendance one, or if you want to take

23   certain leave for H.R. questions.  There was

24   also a policy for vehicles.

1          Q.   As a supervisor, I presume you

2     had to be fairly familiar with those policies,

3     is that right?

4          A.   Yes.

5          Q.   Do you believe you were familiar

6     with those policies?

7          A.   Generally, yes.

8          Q.   That includes the policy about

9     the use of the bucars?

10         A.   Yes.

11         Q.   This Home-to-Work, I think is

12    what it is called, right, Home-to-Work

13    transportation?

14         A.   Something like that, yes.

15         Q.   What does that mean?

16         A.   It just means you have privileges

17    of the use of this bureau vehicle to drive from

18    work to home, and from home to work.  So you get

19    to go in with the car and back with the car.

20         Q.   Turning to the e-mail that you

21    have in front of you, it looks like your bucar

22    was not authorized for the Home-to-Work program,

23    is that right?

24         A.   According to this, yes.

1          Q.    And the reason it's given is, the

2    Home-to-Work Transportation is not essential for

3    the safe and efficient performance of

4    intelligence, counterintelligence, protective

5    services, or criminal law enforcement duties.

6          A.    And that was their determination,

7    that it is not essential.  Essential is the word

8    that they determined, yes.

9          Q.    Would I find that in the FBI

10   policy section on the Intranet?

11         A.    I'm sure that that's part of like

12   a quote from the policy, yes.

13         Q.    I just wanted to make sure that I

14   understood that, thank you.  Then let's turn to

15   833.

16               What I see, this is an e-mail of

17   Monday, July 20th.  Is that what you have in

18   front of you?

19         A.    Yes.

20         Q.    Because this is an e-mail from

21   you, can you tell me what this is?

22         A.    This was the EEO person that does

23   the first, I believe it was the first mediation

24   of an EEO.  It's not the filing.  I think it's

1     the initiating of the claim.

2                When you initiate a claim, the

3     first round, the first person that takes your

4     statement.  I believe that's who Kuchay was.

5           Q.   And this writing here, this is

6     something that you composed; right?

7           A.   Yes.  This is the timeline.

8           Q.   I'm looking at the July 15th

9     entry.

10           So this is something that you

11    would have written; correct?

12          A.   Uh-huh, yes.

13          Q.   And it looks like it's a short

14    description of the e-mail that you received from

15    Mr. Stapleton about the bucar?

16          A.   I think it was primarily about my

17    rating, but it does mention the bucar, yes.

18          Q.   So it sounds like you realized,

19    or that Mr. Stapleton had cited the bucar policy

20    when he discussed the removal of the bucar from

21    your possession, is that right?

22          A.   He had highlighted part of the

23    original bucar policy, yes.

24          Q.   Do you have any reason to doubt

```
 1    that that policy was what he had -- that the

 2    policy that he presented was the correct policy?

 3            A.   I don't know, no.  No, sorry.  It

 4    means I don't know.  No, I don't have any

 5    reason.

 6            Q.   This is written in your own

 7    words?

 8            A.   This was my writing, yes.

 9            Q.   Okay.  We can set this aside for

10    now then.  I'm going to have you then pull up

11    788.

12            A.   I'm sorry.  What was that number

13    one more time?

14            Q.   Sure.  788.

15            A.   Okay.

16            Q.   Why don't you go ahead and pull

17    up 796 as well?

18            A.   Okay.

19            Q.   And 824.

20            MS. CASTRO:  And we'll mark all

21            of these as 13, 14, and 15.

22            THE COURT REPORTER:  This will be

23            Defendant's Exhibit Nos. 13, 14, and

24            15.
```

```
 1                    (At which time,

 2                    Defendant's Exhibit Nos.

 3                    13, 14 and 15 were marked

 4                    for identification.)

 5              THE WITNESS:  What was the last

 6         one, 924 or 824?

 7    BY MS. CASTRO:

 8         Q.   824.

 9         A.   Sorry.

10         Q.   This is not the ideal way to do

11    things.

12         A.   Yes.

13         Q.   It's much easier in person.

14         A.   Okay.  Okay.  I believe I have

15    all of them now.

16         Q.   I'm going to be a real pain.  Go

17    ahead and do 971, too.  Thanks.

18         A.   Okay.

19              MS. CASTRO:  And we'll mark that

20         as Exhibit 16.

21              THE COURT REPORTER:  This will be

22         Exhibit 16.

23                    (At which time,

24                    Defendant's Exhibit No. 16
```

```
 1                        was marked for

 2                        identification.)

 3              MS. CASTRO:  And I see that it's

 4         12:15, so...

 5              THE COURT REPORTER:  Well, maybe

 6         1:00-ish.

 7              MS. CASTRO:  I don't know if you

 8         can guys can hear Pam or not, but do

 9         you want to go until about 1:00-ish?

10         We will find a natural breaking point

11         sometime between now and then.  We

12         will take maybe a half hour.

13              THE WITNESS:  Sure.

14              MS. CASTRO:  Okay.

15              MS. NEWMAN:  That's okay.

16    BY MS. CASTRO:

17         Q.   I'll turn to 788, which we've

18    marked as Exhibit 13.  What I have is Tuesday,

19    July 14th, an e-mail between Ms. Bustamante and

20    Mr. Stapleton.

21              Is that what you have?

22         A.   Yes.

23         Q.   What I see here, this is about

24    your assignment to special projects?
```

1          A.    Yes.

2          Q.    And I see that there had been

3     some discussion as to what your current status

4     was, and whether your pay would be impacted by

5     your assignment.

6          A.    Yes.  I see that.

7          Q.    In this email, there is

8     referenced, HRD slash PAU UC, James Judd.

9               Who is that?

10         A.    I have no idea.

11         Q.    Do you know what any of those

12    acronyms mean?

13         A.    Human Resources Department,

14    Performance Award and something unit, I think is

15    what that stands for.  I don't know the

16    individual, who it is.

17         Q.    So in all likelihood, this was an

18    H.R. employee?

19         A.    Looks like it, yes.

20         Q.    That employee advised Ms.

21    Bustamante you will be assigned special projects

22    but your pay will not be impacted, right?

23         A.    That's what it says.

24         Q.    Was your pay impacted?

1      A.    My base pay was not impacted.  My

2  overall pay was impacted.

3      Q.    Your base pay was not impacted?

4      A.    Base pay, not impacted.

5      Q.    Was your locality pay impacted?

6      A.    No.

7      Q.    How was your pay impacted?

8      A.    Regularly, we worked a variable

9  schedule and a night differential included in

10  it.  There was an opportunity for overtime.

11  There was an opportunity for comp time.

12      Q.    So your schedule changed?

13      A.    Drastically, yes.

14      Q.    But your base pay did not?

15      A.    My base pay, locality pay did not

16  change.

17      Q.    Okay.  Let's turn to 796, which

18  I've marked as 14.  And I see this is an e-mail

19  from Mr. Morin to Mr. Stapleton?

20      A.    Yes.

21      Q.    What I see is that Mr. Morin is

22  instructing Mr. Stapleton, or Ms. Bustamante to

23  make sure that, "Jen," I'm assuming that's you,

24  "is fully assigned," is that right?

```
1              A.   Yes.

2              Q.   What does fully assigned mean?

3              A.   I don't know.  It wasn't my

4     phrase.  I don't know.

5              Q.   I didn't know if it was an FBI

6     specific thing.  "If projects" --

7              A.   Not to my knowledge.

8              Q.   "If projects get light,

9     considered jailhouse calls, transcriptions,

10    T-III's, and whatever else needs to be done."

11              I take this to mean that they

12    were finding projects for you to do, is that

13    right?

14              A.   It looks that way.

15              Q.   Were they?

16              A.   I would get assigned things, yes.

17              Q.   You had work to do?

18              A.   Yes.  I also found additional

19    things to do, like online training, there were a

20    number of online trainings to do.  So in between

21    projects, I would do online trainings.

22              Q.   Sounds like you were trying to

23    make the best of the situation?

24              A.   I don't like being idle.  I like
```

1       being paid to work, I went to work.

2                   Q.    You are not going to be idle very

3       soon, I take it, right?

4                   A.    For what?

5                   Q.    For your new -- well, not your

6       new, but your position that will be starting

7       soon as a teacher?

8                   A.    Oh, yes.

9                   Q.    No idle hands there.

10                  A.    There never are, even in the

11      summer.

12                  Q.    You know, that raises a fair

13      point.

14                        What was your background in; your

15      educational background?

16                  A.    My educational background, like

17      degrees in college?

18                  Q.    Sure.

19                  A.    In college, I have a degree, a

20      bachelor degree in physics education and a

21      degree in physics.  And then I have a master's

22      degree in curriculum and instruction.

23                  Q.    What are you teaching now?

24                  A.    Physical sciences, physics, and

```
 1    math.

 2              Q.    What grades, just out of

 3    curiosity?

 4              A.    High school.

 5              Q.    Oh, wow.  So you have got a tall

 6    order on your hands coming up?

 7              A.    It's interesting.  It changes

 8    every day.

 9              Q.    Right, right.  So you said you

10    had, it sounds like a math and science

11    background or math and physics background.

12              Did that at all tie into your

13    work at the FBI?

14              A.    No.  Not until actually, probably

15    the special projects time period.  And you will

16    see one of the e-mails that I approach Lisa

17    Bustamante with a list of things that I thought

18    maybe I could contribute with.

19              And I had computer programming at

20    one point so maybe I could follow the project.

21    I was going more for helping with web pages.

22    And they had me work with the computer science

23    person, but it was fine.

24              Q.    Okay.  Well, I'll turn then to
```

1    971, which is the e-mail you are referring to?

2           A.   Okay.

3           Q.   We've marked it as Exhibit 16.

4           A.   Yes.  That is the e-mail I was

5    referring to.

6           Q.   It sounds like also, beyond your

7    useful background, Mr. Morin thought it would be

8    helpful because somebody was going on maternity

9    leave, is that right?

10          A.   I had no idea about any of those

11    things, so I don't know.  I was stationed

12    outside of the office at an offsite primarily.

13    So when I would run into the office, I did not

14    know the situation or a lot of people's

15    situations in the office.  So I can't speak to

16    that, whatever.

17          Q.   When I see this e-mail, it looks

18    like one of the considerations that was involved

19    was that you expressed interest in a certain

20    type of work because of your background, is that

21    right?

22          A.   Yes.  I felt I could contribute.

23          Q.   And also that, at least Mr. Morin

24    felt like that would be helpful to assist with

1  somebody's maternity leave coming up; is that

2  right?

3          A.    That's what it says, yes.

4          Q.    Do you believe that you provided

5  helpful work during the time when you were

6  assigned in Special Assignments?

7          A.    I would like to think that I did,

8  because I tried to work very hard, but I have no

9  idea because I didn't get to see the fruition of

10  it at the end.

11          Q.    But you continued to work at the

12  level of professionalism that you had always had

13  throughout your time there?

14          A.    Yes.  I maintained the same

15  level.

16          Q.    And you felt like some of the

17  skills that you had were applicable to some of

18  the work that you could be doing?

19          A.    I could be doing, is that the

20  last part?

21          Q.    Yes.  Just with your background,

22  you had offered that you could be useful for

23  certain types of projects?

24          A.    Yes.

```
 1              Q.    And then I want to turn to 824,
 2    which we've marked as Exhibit 15.
 3              A.    Okay.
 4              Q.    I see that it's an e-mail of
 5    Friday, July 17th?
 6              A.    Yes.
 7              Q.    What I see in this is again a
 8    reassurance that the employee, referring to you,
 9    is still employed in the position of Supervisory
10    Investigative Specialist?
11              A.    Yes.
12              Q.    So that was still your title
13    while you were doing special projects, is that
14    right?
15              A.    Yes.  Yes.
16              Q.    And going on, it says, "she,"
17    referring to you, "retained her job title and
18    her pay grade," is that correct?
19              A.    Yes.
20              Q.    You can set that aside now, and
21    we will move on to something else.  I have in
22    front of me your pay information for various
23    years.
24                    We could enter this in, but do
```

1  you have any reason to doubt the information

2  that's contained in your personnel records?

3          A.    Such as the SF50's, is that

4  the --

5          Q.    Yes.

6          A.    At the top?

7          Q.    Right.

8          A.    They're usually -- they're

9  generally pretty accurate.

10         Q.    Then I won't go through the

11  trouble of introducing these.  Okay.

12               I want to talk a little bit about

13  the OPR investigation.  Who conducted that

14  investigation?

15         A.    Inspection Division at

16  headquarters.

17         Q.    When you say "headquarters," for

18  those of us that are not familiar, are you

19  referring to headquarters in Cincinnati or

20  headquarters in...

21         A.    Washington, D.C.

22         Q.    Okay.  Do you recall the name of

23  the individual that conducted that

24  investigation?

```
 1              A.    Well, there were two people that

 2    did the interviews, and the preliminary, I

 3    believe and then the overall summary, all of the

 4    evidence was done by William Trencher.

 5              Q.    Why don't I have you take a look

 6    at this.  It's 1331.

 7                   MS. CASTRO:  And we'll mark that

 8              as Exhibit 17.

 9                   THE COURT REPORTER:  This will be

10              Exhibit 17.

11                        (At which time,

12                        Defendant's Exhibit No. 17

13                        was marked for

14                        identification.)

15    BY MS. CASTRO:

16              Q.    So we've marked this as

17    Exhibit 17.

18                   What I have is an e-mail of

19    October 20, 2015.  Is that what you have?

20              A.    I have an string of e-mails.

21    Yes.

22              Q.    Okay.

23              A.    October 20th is the first one.

24              Q.    It looks like if you scroll down,
```

1    attached to that is a memorandum?

2            A.    Yes.

3            Q.    All right.  We have the same

4    thing.

5                  This e-mail on October 20th was

6    sent from SSA Tiffany Baker.

7                  What does SSA stand for?

8            A.    Supervisory Special Agent.

9            Q.    It sounds like she, from this

10   e-mail, she may have been the one gathering

11   information, putting together the report?

12           A.    I believe she was one of the

13   interviewers sent from the Inspection Division,

14   yes.

15           Q.    Now, explain to me how the

16   process of an investigation of this sort works?

17           A.    I'm not privy to the other side

18   of the investigation, how they do it.  I just

19   experienced it from being investigated.  So I

20   was just notified that I was being investigated,

21   and they just told me categories that I was

22   being investigated on when they removed me from

23   my position.

24                  It was very vague.  And then I

1    was moved to the special projects in the office

2    and I was told that I would be interviewed

3    regarding the allegation.  Then I was

4    interviewed, and I had to sign a sworn

5    statement.

6            Q.    So OPR investigations are not

7    conducted in-house?

8            A.    No.  They are not supposed to be.

9    Well, that's not correct.  That's not correct.

10   So apparently, they can be sent to the

11   Inspection Division, and a lot of times the

12   Inspection Division does send it back to be

13   investigated by agents in-house.

14           Q.    To your knowledge, was your

15   investigation completed in-house?

16           A.    No, it was supposed to be by the

17   Inspection Division.

18           Q.    You have no reason to believe

19   that it was anyone but the Inspection Division

20   that did yours?

21           A.    Well, I have a lot of reason to

22   believe that there was interference by people.

23           Q.    I didn't ask about interference.

24   I asked about who completed the investigation.

1                    And that was done in DC, is that

2     right?

3                    A.    They sent two people from DC to

4     Cincinnati.  So it originated in DC, and then

5     they sent them to Cincinnati.

6                    Q.    The individuals that come to

7     Cincinnati are not employees of the Cincinnati

8     field office, is that right?

9                    A.    Correct, that's correct.

10                   Q.    So the two individuals that came

11    for your investigation, do you know who those

12    were?

13                   A.    I believe Tiffany Baker was one

14    of them.  I'm going to say, I'd have to look and

15    see who the other person was.  It was two

16    females.

17                   Q.    When I'm looking at this e-mail

18    that we've marked as Exhibit 17, I see that this

19    is Ms. Baker forwarding on the report, the

20    Notice of Adjudication Report to Ms. Byers.

21                   Do you see that?

22                   A.    Yes.

23                   Q.    Who is Ms. Byers?

24                   A.    She was at the head of the

1    Cincinnati Office, Special Agent in Charge at

2    the time, yes.

3              Q.    In terms of hierarchy, it would

4    have been Ms. Byers at the top, and then

5    Mr. Morin, then Mr. Stapleton, and then you, is

6    that right?

7              A.    For our branch, yes.

8              Q.    Yes.   So Ms. Byers would have

9    been the highest ranking official in the

10   Cincinnati field office?

11             A.    She made the official decisions

12   for things that happened in Cincinnati, yes.

13             Q.    Did you have much day-to-day

14   interaction with her?

15             A.    No.   I don't know that we did

16   anything more than meet when she came into the

17   office.

18             Q.    So you have not had extensive

19   conversations with Ms. Byers?

20             A.    I believe we had no

21   conversations.

22             Q.    Have you had the opportunity to

23   form an opinion about her professional ability?

24             A.    Yes.

1          Q.    And what is that?

2          A.    I don't think that she was very

3    professional and that was from interactions that

4    I saw in meetings and how she conducted

5    meetings.  And obviously, my experience with

6    this situation does not bode well in my opinion

7    on how she handled things.

8               I don't want to quarterback here,

9    but it looks like she is inserting opinion and

10   inflection, and I think that's inappropriate and

11   unprofessional.

12          Q.    Show me where, what you are

13   referring to.

14          A.    It's in here in 1331, Angela

15   Byers to Tiffany Baker.  "Tiffany, I understand

16   that Herb was not able to find the list

17   questions Jennifer pulled out," but she

18   certainly searched my office.

19               "Sorry, not trying to quarterback

20   from here, but I have so much at stake to make

21   sure OPR understands the situation and

22   adjudicates appropriately, with no wiggle room

23   for Jennifer."

24               And I am saying later that they

1    need a strong leader, or a good leader, they

2    need a good leader.  I think that's really

3    inappropriate to insert whatever her opinion is

4    into an inspection that's supposed to be

5    unbiased.

6           Q.    Can you back up and tell me what

7    pages you were looking at?

8           A.    I'm looking just above the

9    memorandum that you were referring to in the

10   same 1331.

11          Q.    Okay.

12          A.    And on page -- sorry, I'm not on

13   my computer.

14          Q.    Okay.

15          A.    It's on this page.

16          Q.    Okay, on 1332.

17          A.    It says, 1331, it says, Angela

18   Byers to Tiffany Baker, August 10th, it's an

19   e-mail right before the memorandum.

20          Q.    Yes.  Yes.

21          A.    And I was referencing snippets

22   right from my e-mail from Angela Byers.

23          Q.    Other than that e-mail, what

24   other specific instances have you had with Ms.

1    Byers that helped you formulate your opinion

2    about her professional abilities?

3            A.    Just from meetings that I had.

4    So say we had supervisory meetings.  I don't

5    want to say it doesn't matter what day of the

6    week, but they were usually once a month and all

7    supervisors had to attend.  And I was expected

8    to attend, so I would attend them.

9                And I felt like her conducting of

10   the meetings was not appropriate.  Some of the

11   casualness that she would talk about cases with

12   was not appropriate either.

13           Q.    Can you think of a specific

14   example?

15           A.    I would have to think or go look

16   through my notes.

17           Q.    So is your main criticism of Ms.

18   Byers then that she was too casual?

19           A.    She was casual.  I can't think of

20   an example.  She would often joke around, or --

21   I'm kind of a reserved person.  I don't, even

22   before the pandemic, I'm not a touch type of

23   person.  I'll shake your hand but she would

24   sometimes inappropriately touch shoulders of

1    some of the male agents, and some of the female

2    agents, too.  But I primarily had seen her do it

3    twice with male agents.

4              Q.   So touching people's shoulders,

5    perhaps she was too casual, she joked too much.

6                   Do you have any other examples?

7              A.   In the workplace, yes.  In a

8    workplace in a professional environment, I

9    thought that was not professional.

10             Q.   Do you recall having heard any

11   inappropriate jokes made by Ms. Byers?

12             A.   I don't recall any of them, no.

13             Q.   And I guess I would extend that

14   to any supervisor.

15             A.   Any supervisor in Cincinnati?

16             Q.   Yes.

17             A.   I have already referenced the one

18   from Stapleton about me being a GS-24.  There

19   was a joke, a running joke, a lot of times with

20   the supervisors.  One of them was one of my

21   supervisors, Ken Wall that they would keep track

22   of how many times they had somebody cry in their

23   office or made them cry in the office as a

24   supervisor.  I thought that was really

1    unprofessional.

2              Q.   Can you think of any other times

3    that supervisors made inappropriate jokes?

4              A.   There were times where another

5    supervisor, Michael Regal, would make jokes

6    about cases that they were working, and the

7    subject of the cases.  Especially if they were

8    of like a diverse population, he would imitate

9    in a very condescending way and made in an

10   uncomfortable way.  Things that people would

11   say, or if they were reading transcripts from a

12   phone call, he would joke about them in the

13   office and I found that to be really

14   discriminatory.

15             Q.   What did --

16             A.   It was specifically about

17   African-American people.

18             Q.   Which individual was this?

19             A.   Michael Regal.

20             Q.   Did you report Mr. Regal for

21   making those inappropriate statements?

22             A.   I would say I don't think that's

23   funny.  I would say that and then I would even

24   walk away.

1    Q. Did you ever report him?

2    A. No, not other than verbal.  No.

3    Q. So you made a verbal report about

4 his --

5    A. I told my supervisor, Ken Wall.

6 I said, I think that that's inappropriate.

7 And also, I did tell Stapleton because he was

8 still supervisor at that time.  Then Michael

9 Regal has actually stepped down from a

10 supervisory position and was under Stapleton.

11 That was one of the people that was making jokes

12 with him about the GS-24.

13    Q. Getting back to Ms. Byers, do you

14 contend that she specifically took any

15 discriminatory action against you?

16    A. Yes.

17    Q. What specifically did she do?

18    A. She took the words of male

19 subordinates of mine, along with Stapleton who

20 was a male, and made these decisions.  And she

21 came up -- she didn't know me and she came up

22 with this assessment that they need to find

23 against me, and I should have wiggle room, and

24 clearly that she didn't think I was a good

leader.

Q.    Would you be surprised if she did testify that she knew your work?

A.    Would I be surprised?  I guess I'm not understanding.

Q.    Would you be surprised if Ms. Byers testified that she was aware of your work?

A.    I'm sure she was aware of my work, and she was reading things that others contributed about my work, but she had no firsthand knowledge or experience with me or my work.

Q.    So then she would have had some knowledge based upon the information that was provided to her, is that right?

A.    On hearsay, yes.

Q.    And that would have been provided to her through Mr. Morin?

A.    I don't believe it would have been through Mr. Morin.  I believe it would have been through Stapleton.

Q.    In terms of going back to SSA Baker, she then would have provided information to Ms. Byers as well, right?

1          A.    Based on interviews, yes.

2          Q.    In looking at this 1331, Ms.

3     Baker provided the notice of adjudication

4     directly to Ms. Byers; correct?

5          A.    Yes.

6          Q.    And in the last line of her

7     e-mail beyond, "Please contact me with

8     questions," was "my apologies for any disruption

9     this delay may have caused."

10               I'm sorry, I'm being confusing.

11    Let me take a step back.  She said she is

12    "forwarding this now to advise the hard copy is

13    on its way, as I know the Division has been

14    waiting for this documentation.  My apologies

15    for any disruption this delay may have caused."

16               Is she just acknowledging that it

17    took time for this report to be prepared; is

18    that what you take that to mean?

19          A.    I have no idea since I wasn't

20    part of this.  And I'm not familiar about how

21    long the adjudication happens with OPRs.  I

22    would have no way to gage.

23          Q.    So you don't know what -- if a

24    year takes a long time or if that's a reasonable

1    amount of time, you wouldn't know?

2              A.    I have no idea.

3              Q.    Okay.

4              A.    I have no idea.

5              Q.    Do you have any idea how Ms.

6    Baker conducted her investigations?

7              A.    I'm not privy to that, no.

8              Q.    Okay.

9              A.    All I know was she interviewed

10   me.  And I'm assuming she interviewed other

11   people from the transcript that I received

12   later.

13             Q.    Do you know if she gathered

14   documentation?

15             A.    I don't know.  I would say yes.

16             Q.    Are you aware of everybody that

17   she interviewed?

18             A.    I received a transcript of the

19   entire report of investigation, so I think so,

20   yes.

21             Q.    And are you aware of all of the

22   information she received?

23             A.    All I have is the report that I

24   was sent.  I was sent something with a lot of

1    documents in it.  But I mean, that's all I had

2    from her report.  I'm assuming it's supposed to

3    be everything.  Legally, I think it's supposed

4    to be everything.

5                    Q.   Can you pull up 955 for me?

6                    A.   Okay.

7                    MS. CASTRO:  And we'll mark that

8              as Exhibit 18.

9                    THE COURT REPORTER:  This will be

10             Exhibit 18.

11                        (At which time,

12                        Defendant's Exhibit No. 18

13                        was marked for

14                        identification.)

15   BY MS. CASTRO:

16                    Q.   And this is another e-mail

17   between Ms. Byers and Ms. Baker, is that right?

18                    A.   It looks like it, yes.

19                    Q.   In this, they are discussing

20   questions that you provided to IS Prater, to

21   Stephanie Prater, is that right?

22                    A.   Alleged questions.  Stephanie

23   Prater showed handwritten notes of questions

24   that were very similar to the team leader

1    questions, and she attributed it to me.  And

2    then one of the e-mails that you had earlier

3    shows that Angela and Herbert Stapleton both

4    searched my office, and did not find anything

5    even closely related to what Stephanie was

6    describing.

7                 I explained that Stephanie was

8    lying, and Stephanie actually was dismissed for

9    lying after all this on a separate unrelated

10   matter.

11            Q.   When I look at this e-mail and I

12   see that the referenced questions have already

13   been obtained from IS Prater last week.

14                 When we talk about questions, I'm

15   not necessarily talking about a list on a piece

16   of paper.  I'm talking about if information,

17   such as separate questions could have been

18   provided orally?

19            A.   I'm confused.

20            Q.   When I say a question, if I ask a

21   question, it can be verbal; correct?

22            A.   You ask me a verbal question,

23   yes.

24            Q.   Okay.  It doesn't necessarily

1    mean that a question is on a piece of paper,

2    right?

3                    I can ask you a question like I

4    am right now?

5              A.   Yes.  You can also read me a

6    question off a piece of paper.

7              Q.   Okay.  Okay.

8              A.   Yes.

9              Q.   And what I'm taking from this

10   e-mail is that Stephanie Prater provided

11   referenced questions to SSA Baker.

12             A.   Yes.

13             Q.   Do you see that?

14             A.   Yes.

15             Q.   Okay.  All right.  I just, I

16   needed to clarify that for my own understanding

17   of what happened.

18                    So are you then contending that

19   Stephanie Prater is not credible?

20             A.   Correct.

21             Q.   Why do you have that

22   understanding?

23             A.   Because I never gave her

24   questions that she had written on this piece of

1   paper.  I never orally gave her questions that

2   were written on that piece of paper.

3                I did not have the team leader

4   questions.  I had no reason to have the team

5   leader questions.  She, however, was trying to

6   become the team leader and she said, blatantly

7   said that multiple times in statements.  And

8   when she came into the Cincinnati office, she

9   said that.

10               So she kind of had, you know,

11  every reason and every ambition to have these

12  questions and pass her team leader interview.

13  Now, I even said in my signed sworn statement, I

14  went over job details and like having KSA

15  questions that are public to everybody based on

16  what you should have had ready to give examples

17  for, for the program.

18               There is a whole Intranet web

19  page on the program, too, for them to look at.

20  And the trainer's was with Cirg at the time.

21  You spell Cirg, C-i-r-g.  That was our program.

22  That he would post hints, and here's how we want

23  you to answer.  And I think the acronym was

24  STAR.  They love acronyms.

1                And I don't remember like the

2    situation and something, then it all stood for

3    something that you were supposed to do when

4    answering their questions.  And I went over that

5    with her frequently.

6                Q.    Did you hire Ms. Prater?

7                A.    I selected Ms. Prater because of

8    her background, yes.  And she was in a one-team

9    office while she was in Norfolk when she

10   interviewed.  She applied to come to Cincinnati

11   when we were replacing the two team members that

12   died in the boat accident.

13               Q.    What was it about Ms. Prater's

14   background professionally that led you to hire

15   or select her?

16               A.    For our job specifics, and in our

17   office, we were a one-team office.  And she and

18   Bethany Ritenour were the only two individuals

19   that were also in one-team offices that had

20   extensive experience, and talked about that

21   experience during their interviews with the

22   administrative duties and the balance they

23   needed to have in the one-team office.  It's a

24   very different environment than multiple team

1  offices.

2          Q.    So Ms. Prater's experience was

3  the reason that you hired her?

4          A.    That was one of the biggest

5  reasons, yes.

6          Q.    What were the other reasons?

7          A.    Operationally, if you are doing

8  surveillance, typically, if you are looking

9  around and you are looking to see if somebody is

10  following you, the typical is to have you think

11  it's the going to be a white male in a baseball

12  hat or a guy in a suit in a darkened car.

13              And so to have people that did

14  not fit that description were always beneficial.

15  The ability to also plan.  We just lost all of

16  our females.  I had no other females with me,

17  then that would be an asset.

18              And we also -- we also look for

19  people that are of diverse backgrounds that can

20  fit in, in any environment.

21          Q.    Was there anything specific to

22  Ms. Prater other than her being a female that

23  led you to select her for that position?

24          A.    The experience was the main

1    thing.  I even asked other individuals that were

2    not female to interview.  And I said, "So what

3    experience do you have with writing a six-month

4    report?  What experience do you have with

5    helping fix the log program"?

6              And none of the other applicants

7    that we interviewed had any experience.  They

8    said none, they had none.

9              Q.    Okay.

10             A.    I said, "Did you ever go to

11   trainings to do this"?  I mean, I tried to even

12   say, did you go to this training, did you go to

13   the log training program, like perhaps to see if

14   there was anything there that was relevant, but

15   none of them had the experience.

16             Q.    So the experience was the main

17   driver of that decision?

18             A.    That is the primary thing.  Yes.

19             Q.    Was there anything

20   personality-wise or a skill set wise other than

21   experience that you appreciated about Ms.

22   Prater?

23             A.    I mean, it was an interview so I

24   can't always get a sense from somebody's

1    personality.  So, no.

2              Q.   Okay.

3              A.   I did not base my judgment on

4    that.

5              Q.   Okay.

6              MS. CASTRO:  Well, I'm kind of at

7              a stopping point if you guys are.  Do

8              you want to take a little bit of time

9              to have lunch and reconvene?

10             MS. NEWMAN:  Yes, please.

11             MS. CASTRO:  Okay.  It's 12:52.

12             How long do you all want?  A half

13             hour?

14             MS. NEWMAN:  30 to 45 minutes is

15             good with me.

16             THE WITNESS:  That is fine.  I

17             know.

18             MS. CASTRO:  You want to come

19             back, what do you think, about 1:30?

20             MS. NEWMAN:  That is great.

21                  (At which time, a short

22                  lunch recess was taken.)

23   BY MS. CASTRO:

24             Q.   Ms. Boughton, thank you for

1    coming back.  I will remind you that you are

2    still under oath, which I'm sure you understand.

3            A.    Yes.

4            Q.    Just a few more points that I

5    would like to discuss with you.

6            When we last talked, we were

7    talking a little bit about Stephanie Prater.

8    And I would like to talk then about Ms.

9    Ritenour, Brittany Ritenour. (Sic) I believe she

10    was the other individual that you hired along

11    with Ms. Prater, is that right?

12            A.    Bethany?

13            Q.    No, I am sorry, Bethany, yes.

14            A.    She had been coming at the same

15    time.  They were already employed by the FBI.

16    They just got transferred to Cincinnati.

17            Q.    Okay.  Were you the selecting

18    official for Ms. Ritenour's employment at your

19    office?

20            A.    I was not the selecting official

21    for either.  It was Herbert Stapleton.

22            Q.    Were you the one that made the

23    recommendation to bring Ms. Ritenour in?

24            A.    Herb Stapleton and I both sat in

1    on interviews, and then discussed our separate

2    scorings of the people that were interviewed.

3    And from that, I give my input and he gave his

4    input, and a lot of them were kind of the same.

5              Q.   Okay.

6              A.   And then he wrote the official --

7                   THE WITNESS:  There was some

8              weird noise, are you hearing that?

9              Like a clanking?

10                  MS. NEWMAN:  Oh, I'm sorry.

11             That's me.  I was pouring tea, sorry.

12                  THE WITNESS:  And he wrote the

13             e-mail, he had wrote the official

14             e-mail stating what the request was.

15   BY MS. CASTRO:

16             Q.   So before we took a break when

17   you talked about when Ms. Prater came onboard

18   that you selected her, is that still what your

19   testimony is?

20             A.   We both selected her.  We both.

21             Q.   Okay.

22             A.   Stapleton and I agreed on

23   Ritenour and Prater.

24             Q.   What was it in particular about

1    Ms. Ritenour that stood out to you to make her a

2    good hire?

3              A.    The same thing.  Same

4    qualification and experience that Prater had,

5    that they both worked in a one-team office, they

6    were very familiar with the administrative

7    duties, they had had experience with the

8    administrative duties, they had experience

9    running teams, a one-team office team and these

10   things stood above the experiences of the other

11   people we interviewed.

12             And I don't believe that any -- I

13   think I stated this before, I don't believe that

14   any of the other applicants were from one-team

15   offices.

16             Q.    Was there anything specific about

17   Ms. Ritenour's skill set beyond her experience

18   that stood out to you?

19             A.    Just the experience.

20             Q.    Did she do a good job?

21             A.    She was there for less than 30

22   days before I was removed, so I don't think I

23   had enough information to answer that.

24             Q.    In the 30 days that you worked

1    with Ms. Ritenour, what was your assessment of

2    her performance?

3              A.   I don't have enough information

4    to assess her performance and she did not

5    receive an assessment from me at the six-month

6    review either because of that.

7              Q.   I'm not asking about a formal

8    assessment.  I am simply asking for your

9    observations as to her performance.

10              What did you think of how she did

11   in those 30 days?

12              A.   Um, in those 30 days, the things

13   that I saw were she seemed to know how to do the

14   basic skills of the operations of surveillance

15   operations.  I think she may have done a log,

16   I'm not positive, which is another basic skill

17   that they need to be able to write a log and so

18   I think she did.

19              I don't remember seeing anything

20   alertive about any of those things.  It was

21   probably successful.  She was probably, my guess

22   is, it would be a successful rating because that

23   would be a rating for FBI performance reviews.

24              Q.   Was there anything tremendously

1    negative about her performance that struck you

2    in that 30-day period?

3             A.    She seemed to be very withdrawn,

4    particularly with other members of the team.

5    And she did at one point talk to me about that

6    in the office that it was impacting her ability

7    to work with the team a little bit.

8             She said she knew, I think the

9    phrase she used was, they're sniffing around me

10   like I'm a stray dog.  And she meant the already

11   established Cincinnati members that were there.

12   So I think, to me, it was a -- she had a feeling

13   of uncomfort or discomfort, but she was in a new

14   office.  And I did ask if I could do anything to

15   help.  She just said, no, I want to take time

16   and see.

17            Q.    What was your response about the

18   statement, the sniffing around me like a stray

19   dog?

20            A.    I said that was very upsetting.

21   And she was somewhat -- like, her eyes were

22   getting a little bit red.  So I wasn't sure if

23   she wanted me to ask further or not.  And I

24   didn't know her very well, like I said.  She

1    like literally had been there -- when I say less

2    than 30 days, she was just assigned to our

3    office.

4               It doesn't mean she was working

5    all those 30 days.  She had time where she was

6    moving, she had time where she was getting her

7    administrative things done in the main office.

8    So it didn't mean that we interacted or I got to

9    actually work with her.  That's why I'm saying,

10   I probably only saw a few surveillance things

11   from her.

12              Q.   In terms of her credibility, did

13   you see anything in that less than 30-day period

14   that would lead you to believe that she would

15   lie about anything?

16              A.   From her statement about the

17   sniffing around me like dogs and that she was

18   upset by it and her unease, it did see him like

19   she might cower to what other people were saying

20   or doing or maybe go along with something,

21   especially if she is in a new office.

22              Q.   That's what you took that to

23   mean?

24              A.   Yes.

1          Q.    And I'm not sure, I guess, I

2    would ask you for some clarification.

3               What do you mean that she would

4    cower to others, or what you took that to mean

5    that she was --

6          A.    If there were an aggressive

7    personality, if you are new in a situation and

8    there is already a very forward or aggressive

9    personality, I don't think -- she's not the type

10   of person from my impression, she is not the

11   type of person that would go up against that

12   person or combat that person.

13              I think she would either back off

14   or bow down to whatever they were saying and

15   just let them pass.  Does that make sense?  If

16   you are giving way to something, I would say

17   that she would not be the one to assert herself.

18         Q.    Would you say that's how you

19   would describe yourself?

20         A.    Describe myself?

21         Q.    Yes.

22         A.    No.

23         Q.    So you would instead be assertive

24   and more combative to use your words?

1          A.    No.   That is also not -- that is
2     also not how I would describe myself.  I don't
3     feel like those are the only two categories.
4          Q.    How would you describe yourself?
5          A.    That's a good question.  I'm very
6     thoughtful in things that I do and I say and my
7     actions.  I try very hard to think things
8     through a lot.  I try very hard.  It is -- part
9     of my training is to try very hard to do a fair
10    analysis of something, especially like the whole
11    science background.  I try very hard to look at
12    all information, or numbers and every aspect of
13    it.
14         Q.    Would you be surprised -- I am
15    sorry, go ahead.
16         A.    Okay.  I was going to say, I
17    don't -- I'm not aggressive, I wouldn't say, but
18    I also, if something seems like it is wrong, I
19    will say something.
20         Q.    Would you be surprised if people
21    described you as stand-offish or aloof?
22         A.    No, I wouldn't.
23         Q.    Why is that?
24         A.    As I mentioned before, I'm not

1    particularly -- like before the pandemic even,

2    I'm not a particularly, you know, touching,

3    hugging, feeling type of person in that manner.

4    I am understanding.  I feel like I'm

5    compassionate as an individual, but I am not

6    that type of individual.

7                    I am an independent person, too.

8    A lot of times, and I have been told, it's not

9    in a negative way, and I know it's taken in a

10   negative way, that a lot of times if I -- if

11   someone is saying something or if I'm in a

12   meeting and somebody is speaking, I will often

13   think about I'm pondering what they are saying

14   and I'm quiet and I'm thinking.  And that,

15   sometimes that silence, especially online, too,

16   it makes people uncomfortable.

17                   And that's not my intention to

18   make someone uncomfortable.  I'm not even

19   thinking about it.  I am literally inside my own

20   head thinking about the situation and thinking

21   about what they are saying.

22              Q.   So then it's not your intention

23   to cause others discomfort?

24              A.    If they feel discomfort, that's

1    not what I am intending.  I am very matter of

2    fact at times when I say things.  I wouldn't say

3    blunt, I wouldn't say rude or condescending,

4    it's just I'm stating a fact and so it's a

5    matter of fact.

6              Q.    Would you be surprised if you

7    heard that people felt like you were a vengeful

8    person?

9              A.    Yes.

10             Q.    And would you be surprised if

11   people felt like you were the type of person

12   that would try to seek revenge for things?

13             A.    Yes, I am very surprised by that,

14   yes.

15             Q.    And would you be surprised if

16   people found you to be concerned with saying

17   things opposed to you because you would try to

18   inflict some sort of revenge upon them?

19             A.    What was the first part of the

20   question?

21             Q.    Yes.

22             A.    I want to make sure I answer it

23   right.

24             Q.    Fair enough.  Would it be

1    surprising to you if individuals were afraid to

2    speak out against you because they were afraid

3    of what sort of retaliation you would impose on

4    them?

5            A.    Yes.

6            Q.    Tell me about working -- in

7    reading through all of the documents, I thought

8    the idea of a surveillance team was very

9    interesting and it seems somewhat unique.

10            Is that true?

11            A.    Yes.

12            Q.    Tell me how so?

13            A.    We spend a lot of time, and it

14    kind of depends on the situation.  And it can

15    vary from office to office in the type of work

16    that we are doing or the type of case that you

17    are working.

18            In Cincinnati, we cover all of --

19    the Cincinnati office covers all of southern

20    Ohio, so that includes Columbus, Athens,

21    everything.  So there is a lot of variety in

22    Cincinnati.  And most of it is involved with

23    vehicles, the surveillances we had to do.

24            And so you have a lot of time

1    that you were either busy, busy, busy, or you

2    had to sit and wait for certain things.  And so

3    everybody does something different.  And they

4    are sitting around and waiting for how they

5    position themselves when they are working, too.

6            Q.    What is the role of the team

7    leader?

8            A.    So, okay.  Now this is also

9    different depending on the office.  In a

10   one-team office, which we are, there is a GS-12

11   and then it's the team leader.  There is no

12   GS-13 that is the coordinator.

13              In a multi-team office, you have

14   a coordinator then team leader and then the

15   team.  So that coordinator does strictly all of

16   the admin.

17           Q.    If you don't mind, let's just

18   stick to what is relevant here, and since

19   Cincinnati is a one-team office, just tell me

20   what the role of the team leader is in a

21   one-team office?

22           A.    Okay.  So this is relevant.

23   The coordinator's duties are done by

24   coordinators in other offices.  In Cincinnati,

1    which is a one-team office, there is no

2    coordinator.

3                So those administrative duties, a

4    full-time administrative job falls on the team

5    leader.  In addition to the team leader duties,

6    which are in a normal office, but not Cincinnati

7    because it is one-team, in a normal office, the

8    team leader is supposed to be controlling,

9    coordinating, and organizing the actual

10   operational team with the team.

11               Q.    I take it that there are more

12   one-team offices in the country than just

13   Cincinnati?

14               A.    There are.

15               Q.    Are there quite a few, meaning,

16   maybe more than ten?

17               A.    I honestly don't know at this

18   point because it has kind of vacillated over the

19   years.  There are not that many.

20               Q.    But Cincinnati is not the only

21   one?

22               A.    Correct.

23               Q.    So then the team leader, what I

24   hear you telling me is, the team leader's role

1    is to do a lot of organizing and administrative

2    work?

3            A.    In a one-team office, yes.  The

4    team leader has to be a GS-12 and the GS-13

5    unless they offer in the office to give like

6    administrative support, sometimes that also

7    happens.  So in some offices that have been

8    one-team offices, they have also been assigned

9    an administrative person.  Cincinnati denied

10   that.

11           Q.    In addition to the organizing and

12   the administrative work, what other job duties

13   fell on the team leader?

14           A.    The operational duties of

15   organizing the team, making sure everyone is on

16   leave.  Takes their leave, their REOs when

17   scheduled, setting up the surveillance, running

18   the surveillance, kind of organizing all of the

19   facets during surveillance.

20           Q.    What role does the team leader

21   take in personality issues within the teams?

22           A.    So the team leader is a

23   supervisor.  So just like a supervisor at any

24   workplace, you have to kind of mediate, find out

1    what is happening and mediate the issue so that

2    the team can then function again.

3                    And in a one-team office, if the

4    team leader is not out, there is an assistant

5    team leader that is named that is functioning as

6    that team leader in their absence and they are

7    supposed to be handling those issues.

8                    Q.    So those issues --

9                    A.    Or giving them up to the team

10   leader that passes along.  With references to

11   where you said before, you never have to

12   discuss, you know, issues with subordinates with

13   one of the people on the team.  That is the

14   instance that I was talking about.

15                   If there is an assistant team

16   leader and there is an issue, a lot of times I

17   would have to discuss the situation with them

18   and then help mediate.

19                   Q.    Did you see the role as team

20   leader to be more reactionary with regard to

21   relationships among your subordinates, or was it

22   more proactive?

23                   A.    I think it was a mix of both.  I

24   think that obviously, when you are dealing with

1  personalities and a lot of opinions that you are

2  going to have to react. That's kind of the job

3  of the supervisor.

4           You couldn't plan everything out

5  but I'm always very proactive about activities,

6  planning as much as I can, trying to get things,

7  you know, front loaded, like getting reports

8  done and things that I could in case something,

9  you know, a big case came out, and had to

10 respond. And that was very reactionary on a

11 work level, too.

12          Q.   And in terms of interpersonal

13 relationships among team members, tell me or

14 give me an example of how you were proactive?

15          A.   I would regularly, before

16 Stapleton became our supervisor, all of the

17 other supervisors prior would always let us do a

18 training day. And I would have my team members

19 a lot of times say, okay, what are the skills

20 that we need, you think we need to work on as a

21 team, and I would organize a training based on

22 that skill level. And I would do the training

23 with the team, we would all do it together.

24          And a lot of times we would use a

1     different complement, which I don't know that I

2     want to talk about, but we incorporate another

3     complement that is housed in the Cincinnati

4     office and have them kind of test our skills.

5     And it was a safe way that the team could bond,

6     the team could establish more rapport and

7     increase their skill set.

8                    And at the end of it, we

9     sometimes would just all bring in like our

10    sandwiches and have a hot lunch and we would

11    talk about things that happened, things we did,

12    how it would apply in the real world.  And our

13    supervisors all prior to Stapleton would attend

14    them also.  So I think that was also good that

15    they felt that there was this openness.

16             Q.    So you organized these trainings?

17             A.    The trainings, yes.

18             Q.    And so did you do them annually?

19             A.    We tried to do at least one per

20    year, but sometimes the case load is, you know,

21    the case load is unpredictable, because we were

22    actually working real cases from the office.  So

23    we would sometimes not be able to do it or, you

24    know, "life is what happens when you are making

1       plans" kind of thing.

2              Q.    Why did you stop doing them when

3       Stapleton came on board?

4              A.    When Stapleton came on board,

5       shortly thereafter -- well, we were on a number

6       of TDYs that we were on, so there was not an

7       opportunity.  We always tried to do them in the

8       home office area in Cincinnati.

9                    We came on board, we had a number

10      of TDYs we were addressing, and then the boating

11      accident happened, and then a high priority

12      national case came up and we were working 24/7

13      on some things with TDY teams coming in.  And I

14      was having to help coordinate that.  And we were

15      working, like I said, we were working a lot.  So

16      there was no opportunity to do that.

17                   We did, before the accident when

18      he first came in, there was a little bit of down

19      time, and we were finishing up one of these

20      little rounds where we did some training.  And

21      he was newer to the office, but he opted not to

22      come.

23             Q.    So it wasn't that you were

24      prohibited from holding these trainings by

1    Stapleton?

2          A.   By Stapleton on that?

3          Q.   Right.

4          A.   No.

5          Q.   Okay.  And in terms of that

6    timing that you had discussed when you said you

7    had multiple TDYs coming in and a big national

8    case, it sounds like that was a stressful period

9    of time?

10         A.   Yes.

11         Q.   What are you referring to,

12    generally, as that period?

13         A.   It was almost directly after the

14    boating accident in the fall, late fall of 2014.

15         Q.   How long did that stressful

16    period last?

17         A.   Up until today.

18         Q.   So until, at least in terms of

19    this case, until you left the FBI?

20         A.   That particular case had, I

21    think, three spin-off cases.  And they were

22    still working those the day I was dismissed.

23         Q.   Can you think of any other ways

24    that you were proactive in developing

1    interpersonal relationships amongst your team

2    members?

3            A.   Um, if we had a TDY, I would

4    always try.  If I was invited to go out for like

5    a dinner if the team was getting dinner, or I

6    would just say at the end of our shift, anybody

7    want to grab a bite, let me know, like as a team

8    kind of thing.

9            And sometimes, if you would, and

10   towards the 2014 time, it just wasn't happening

11   anymore.  And I know that a number of them were

12   going to like bars and things and I wasn't a big

13   drinker so it didn't phase me that I wasn't

14   included in that.  It didn't bother me.

15           Q.   Can you think of any other ways

16   that you were proactive in facilitating

17   interpersonal relationships?

18           A.   I did try to talk to individual

19   team members on a regular basis to see if they

20   had what they needed.  I tried to make sure also

21   that once an individual had the experience, once

22   they were a GS-11 and they had a year's worth of

23   experience, if they wanted to --

24           Well, and it's part of their job

1    description to take over the supervisory skills

2    of practice running and mentoring the team.  And

3    so I provided them the opportunity if they

4    wanted to go through and run the team as the

5    ATL, serve as the ATL, I rotated that through on

6    a regular basis.

7               Q.   As part of talking to team

8    members, you didn't discuss personal issues

9    regarding other team members, did you?

10              A.   Only if they had brought it up

11   that it was an issue.  Like I said before,

12   sometimes the ATLs or actually other team

13   members would bring up issues if they had

14   issues.

15              I received a phone call one day

16   from Distasio -- excuse me, from Munafo, telling

17   me that Distasio and Wilson stopped the

18   surveillance and were screaming at each other

19   outside of their cars.  Like they stopped in the

20   subject's neighborhood and were screaming at

21   each other outside of their cars.

22              And I was in the office working

23   on our report, and I said, "What do you mean

24   they stopped the surveillance?  Is everybody

1    okay?"  And he said, "I want to give you a heads

2    up."  And I'm like, "All right.  I'll reach out

3    to them, thanks."  And they were both were

4    furious because I wouldn't side with them that

5    they were yelling at each other.  And I believe

6    Wilson was calling Distasio, "a piece of shit."

7    And Distasio was telling Wilson, "You better do

8    what he told him to do."  It was a fight,

9    obviously.

10              There was a lot of this that went

11   on, on the team, especially if I got called into

12   a supervisor's meeting or if the ATL was

13   supposed to be in charge of it and sometimes

14   they would reach out.

15              Q.    In terms of a lot of that going

16   on, was that after the boat accident?

17              A.    No, no.

18              Q.    This was before?  Okay.

19              A.    That was from day one.  Wilson

20   was very combative with multiple team members,

21   and then it turned into Wilson and Distasio, and

22   then for a while it was Wilson and Munafo.

23              Q.    In terms of talking with team

24   members about things, is there a general

1      understanding that you do not talk about EEO

2      complaints?

3              A.    Correct.

4              Q.    And so as a supervisor, you were

5      aware that you were not to discuss EEO

6      complaints among your employees?

7              A.    Correct.

8              Q.    Do you recall having ever

9      disclosed or discussed any proceedings, any EEO

10     proceedings?

11             A.    None that I was involved in.

12             Q.    What about ones that you were not

13     involved in?

14             A.    I told you Tom Brink had told me

15     about one that had occurred in his office.

16             Q.    I would like to limit this to

17     just your team.

18             A.    Bethany Ritenour told me about

19     one that had occurred in the St. Louis office.

20             Q.    Did you tell her about any that

21     occurred in your office?

22             A.    No.

23             Q.    Can you recall discussing any

24     other EEO proceedings with any team members?

1          A.    No.

2          Q.    But you are aware that that is

3    not permissible; correct?

4          A.    What is not permissible?

5          Q.    Disclosing a pending EEO

6    proceeding.

7          A.    Yes.  I'm aware.

8          Q.    Okay.  It seems to me that

9    surveillance teams may be like a different

10   beast.

11               Do they have a reputation of

12   being a certain way?

13         A.    Yes.  In the bureau, the SSG

14   program is known to have a lot of very

15   disgruntled employees.

16         Q.    I'm sorry.  What is SSG?

17         A.    I am sorry?

18         Q.    What is SSG?

19         A.    I think that's the title that

20   they go by right now, special surveillance

21   group.

22         Q.    Okay.

23         A.    At the time it was MST, which I

24   think stands for mobile surveillance team.

1    Every time there is a new director, they change

2    the name.

3              Q.    Okay.

4              A.    There is a new name.

5              Q.    Right.

6              A.    The organization of everything so

7    nobody knows what the acronyms are.

8              Q.    I'm sorry for interrupting you.

9    Go ahead.

10             A.    Yes.  I was saying that there is

11   an overall census usually that people on the

12   team are very disgruntled, and a lot of times,

13   which I feel was reflective of the Cincinnati

14   team, too.

15             If somebody had attempted to be a

16   team leader or as an ATL, they would lock horns

17   a lot of times because they felt like they were

18   doing things the way they wanted to do them.

19   And this was one of the issues that I had with

20   Wilson is he would get mad at me because I

21   wouldn't let him cut the team short because he

22   was ATL.

23             Q.    What did you say, cut the team

24   short?

1          A.   Yes.  We were paid to work a

2    straight eight hours and he would let them go

3    after five or six hours if I wasn't there.  And

4    I told him that's not acceptable and he got

5    furious with me.  He was yelling at me, and he

6    said that he had no respect for me on multiple

7    occasions and he refused to do his basic job

8    duties.

9          Q.   It sounds like the MST team

10   members had to be actively managed.

11               Is that a fair statement?

12         A.   Yes, yes.

13         Q.   Almost like they needed to have

14   their hands held?

15         A.   I don't know about that.  I mean,

16   I think that's a little over the top for a

17   description.  I think they just needed to have a

18   supervisor, and then have a supervisor for that

19   part.  Like the team needed that, I mean the

20   trifecta, they needed that.

21               And I even wrote an essay to

22   headquarters requesting that they augment

23   one-team offices with either a coordinator

24   position or an administrative position asking

1    because it was too much.  And it was very -- it

2    was very -- not only just difficult for the team

3    leaders to have to do both duties, but it was

4    also taxing on the team because the team would

5    fight a lot.

6              There was a lot of stress.  And

7    if you were the only team to respond to things,

8    so we were on-call all the time.

9              Q.   Did you like it?

10             A.   I absolutely loved the job of

11   surveillance.  I'm sure I would have loved the

12   job of team leader, not having to do my duties

13   and the coordinator duties for the length of

14   time that I did.  And all of the instances that

15   played into it were -- it was a lot.  It was a

16   lot to handle.

17             Q.   I guess I should just ask this

18   more straight up?

19             Did you love or enjoy being in

20   the position of a team leader.

21             A.   I did like being a team leader.

22   I loved our program.  I loved my job when I was

23   just surveillance.  When I became a team leader,

24   I was very excited, too.  In Cincinnati, I was

```
 1    very, very excited.

 2              Q.    So you loved being a team leader?

 3              A.    I did.  I loved being in the

 4    program.

 5              Q.    And you felt you were well-suited

 6    for it?

 7              A.    Yes.  I thought I was probably

 8    overqualified for it in a lot of aspects.  I was

 9    told that by multiple supervisors.

10              Q.    Who told you that?

11              A.    When I was at headquarters doing

12    TDYs, the people that I worked with out there

13    and told me that.  Ken Wall told me that, Wendy

14    Surikov had told me that.

15                    THE COURT REPORTER:  What was

16              that last name?

17    BY MS. CASTRO:

18              Q.    Can you repeat those names for

19    us?

20              A.    I can't remember what I just

21    said.  When I was at headquarters, the

22    supervisors out there told me that when I did

23    TDY up there.  Ken Wall told me, Wendy Surikov

24    told me.  Do you need the names of people at
```

1    headquarters?

2              Q.    Sure.  We got it.  We just had

3    trouble hearing you the first time.

4              A.    Okay.

5              Q.    I want to talk a little bit about

6    your hobbies both before 2014 then after 2015.

7    And by "hobbies," I mean your life outside of

8    work.

9                    Did your life change in any way

10   having worked from 2008 to 2014, and then after

11   2015 when you left the FBI.

12             A.    Okay.  I'm sorry.  So you said

13   I'm comparing my work in Cincinnati time to like

14   what I'm doing after FBI until now?

15             Q.    Yeah.  I guess, not even

16   work-related.

17                   Tell me what some of your hobbies

18   are.

19             A.    I play tennis when I can, I do

20   yoga, garden, I read.  Well, I audio book read.

21   People say you can read and then I even don't do

22   it.  So I'm following it.

23             Q.    Did you do all of those things

24   during your time in Detroit?

1          A.   I don't think audio books were a

2     thing, but I did try to read.  I'm dating my age

3     here.  Yes.

4          Q.   Do you still do those now?

5          A.   Yes, yes.  It is what I do now.

6     I probably did them more intermittently when I

7     started with Cincinnati FBI just because of the

8     time demands of the job.  It was a lot more

9     taxing time-wise on my life.

10          Q.   Did your life change in any way

11    when you went from the Detroit office to the

12    Cincinnati office just in terms of hobbies or

13    interests?

14          A.   I don't think so.

15          Q.   And in terms of hobbies or

16    interests from the time that you were in the

17    Cincinnati office versus after you left the

18    Cincinnati office, did your hobbies or interests

19    change at all?

20          A.   Um, I probably done -- well, I

21    don't know.  I don't know, I don't think so.  I

22    mean, I probably do more like nerdy, sciency

23    things now just because it is part of my job.  I

24    kind of throw myself into trying to learn other

```
 1    aspects even as like a hobby.

 2            Q.    So you are able to do that type

 3    of thing now?

 4                  Your time allows for that?

 5            A.    Not really as much, no, not very

 6    much.

 7            Q.    Okay.

 8            A.    But when I can, you asked if I

 9    have a hobby.  That is what I would do if I had

10    some time, yes.

11            Q.    Did your life change in any other

12    way after you left the FBI other than

13    professionally?

14            A.    I'm sorry?

15            Q.    I am sorry about that.  Other

16    than professionally, did your life change in any

17    way after you left the FBI?

18                  I assume you are still married?

19            A.    Yes, I am still married.

20            Q.    Okay.

21            A.    It's become quite -- it is

22    different, and I guess some of the hobbies that

23    I probably had when I was in the FBI, some of

24    them I don't have, I can't partake in anymore.
```

1   Like I used to belong to tennis clubs.  I can't

2   afford that, to do that anymore because of the

3   pay decrease that I've experienced.  And I am

4   also working at three or four jobs at a time to

5   try to even make a portion of what I made.

6            In addition to my spouse, my

7   husband has also been facing economic issues

8   because they demoted him at work after I filed

9   this lawsuit.

10           Q.   What tennis clubs did you belong

11  to before that you can no longer afford now?

12           A.   There was one in Michigan that I

13  belong to, I don't even know what it was called.

14  It's on Brasset Road, (phonetic) if that helps.

15  I think it's like Northeast Tennis Club.  I

16  don't even know if it's still there.

17           And then down here, I was at the

18  Queen City Tennis Club.  And there was another

19  one.  I don't know if it's called Queen City

20  anymore either.  They recently changed their

21  name.  There was another one.  I played in some

22  tournaments for them and I played at -- what's

23  it called now?  It's where they play the big

24  tennis tournaments down here.

1          Q.    Right.  Right.

2          A.    So we played there, I played

3    there one season, too.

4          Q.    Other than having to quit your

5    clubs, is there any other way that you have seen

6    your life change from the time you were employed

7    at the FBI until now?

8          A.    Well, financially, there has been

9    a lot of, yeah, changes.

10          Q.    How about emotionally?

11          A.    I'm, obviously because I'm still

12    talking about these incidents and feeling

13    discriminated and retaliated against that I'm

14    still feeling the stress.  It's very stressful

15    and working and balancing financials and all of

16    these employments is very stressful.

17          Q.    Have you sought counseling for

18    your stress?

19          A.    I have already answered that

20    once.  No, I have not.

21          Q.    Are you taking any medication to

22    help you manage your stress levels?

23          A.    No.

24          Q.    Are you taking any medication to

1    help with any mental health issues?

2              A.    No.

3              Q.    Can you think of any other way

4    that your life has changed other than

5    professionally?

6              A.    So we are not talking about

7    hobbies anymore, and we are not talking about

8    emotionally?

9              Q.    Right, right.

10             A.    I mean, I had a loss of security

11   clearance.  So I feel like I have been very

12   limited on my career options and I feel like I

13   kind of had to start over.

14                   I have lost a lot of sleep

15   because of the things that have happened with

16   the FBI.  It makes me humiliated.  I have, I

17   would say, a lack of self-esteem many times.

18   I mean, I had a lot of anxiety because of these

19   kinds of things with workplace interactions that

20   probably wouldn't cause a lot of people anxiety.

21                   I feel like my reputation is

22   completely demolished by some of the things that

23   were allowed to be said about me.

24             Q.    You mentioned the loss of

1    security clearance.

2                     What impact has that had on you

3    professionally?

4              A.    I'm sorry, I didn't hear that.

5    Did you say effect?

6              Q.    What impact has the loss of

7    security clearance had on you professionally?

8              A.    Because I don't have a security

9    clearance, I no longer was eligible for lots of

10   things on the job, which is where my resume was

11   shattered and ruined my entire career.

12             Q.    I'm sorry, Ms. Boughton.  Could

13   you repeat all of that?

14             A.    The security clearance question,

15   yes.

16             Q.    Yes.

17             A.    I feel like I was not eligible

18   for a lot of jobs on USA jobs, which is where

19   most of the clearance jobs would be, or on

20   clearance jobs.  These were websites where I had

21   built my career.  And I had my resume and I

22   would actively, you know, apply for jobs and I

23   was no longer eligible because I didn't have a

24   security clearance.  And it was going to be a

1    blight on my record that the FBI dismissed me

2    and would not hire me again because of their

3    claims.

4                Q.   We talked a little about this

5    earlier today, but I know you're a teacher now.

6                     How do you like that job?

7                A.   I really like teaching.  I've

8    always enjoyed teaching.  I did, I was adjunct

9    faculty at the bureau.  The bureau had training

10   days which I organized the training, and I would

11   go to headquarters and do trainings there also.

12   I do enjoy teaching.  I don't necessarily know

13   that it's the thing that I want to do for my

14   whole life.

15               Q.   But you do enjoy it?

16               A.   I enjoy most of it, yes.

17               Q.   You said you don't anticipate

18   doing it forever.

19                    What would you prefer to be doing

20   now?

21               A.   I wanted to do surveillance.  I

22   wanted to work for the FBI.

23               Q.   Beyond, besides that?

24               A.   Well, if I had to change

1    government agencies, I would think about working

2    for another government agency.  But I don't have

3    security clearance anymore and I have a giant

4    blight on my record.

5            Q.    It's my understanding, and you

6    might be able to help me with this, but does the

7    FBI have a policy?

8            I'm sure it has many policies

9    about confidentiality, is that right?

10           A.    Yes.  There have been many

11   policies about confidentiality.

12           Q.    One of those that I know is an

13   issue with my office as well is securing your

14   e-mail.

15           Did you have any prohibitions

16   about how e-mail was to be used?

17           A.    We had two different platforms

18   for e-mails.

19           Q.    What were they?

20           A.    Well, there was a classified and

21   an unclassified one.

22           Q.    And for documents on the

23   unclassified platform, were you permitted to

24   forward e-mails generally outside of the

1    organization?

2              A.    Outside of the organization?

3              Q.    Yes.

4              A.    Everything was labeled so you had

5    to see if it was labeled unclassified.  And as

6    long as it wasn't for, I think it was official

7    or internal use only.

8              Q.    Maybe I should get right to the

9    point.

10             We have a number of e-mails that

11   were sent to you that were then forwarded to

12   your husband.

13             Do you recall doing that?

14             A.    Yes.

15             Q.    What was the reason for doing

16   that?

17             A.    I forwarded them to him in case I

18   lost access to any of my e-mails again because

19   Stapleton had my access revoked from a lot of

20   platforms on the FBI.

21             My husband was an employee, he

22   had the same clearance as I did, and he knew

23   about all of the situations and he had also been

24   interviewed about the situation.

1          Q.    Did you share information with

2     your husband about any of your subordinates?

3          A.    I think I would just share if we

4     had done a TDY or who had done the TDY.  He knew

5     where I was working, when I was working,

6     obviously, because we lived together.  He knew

7     who was on my team.  He had worked for my team

8     for a little when I was on medical recovery.  So

9     that type of information, yes.

10         Q.    Did you ever share any personnel

11    decisions or matters with your husband?

12         A.    I cannot remember if I did.  If I

13    did, it would have been related to, he was also

14    a team leader in the same program so he was also

15    still familiar with those things.  So it would

16    have been just a general question of, how do I

17    do this or what do I do if someone asked me

18    this.

19         Q.    Did you ever gossip with your

20    husband about your team members?

21         A.    I don't know that gossip is

22    really an appropriate word.  I find that

23    somewhat offensive.

24         Q.    Did you ever gossip with anyone

1    about any of your team leaders?

2             A.    I feel the word gossip is

3    somewhat offensive.  I feel like that's kind of

4    a discriminatory word.

5             Q.    Gossip?  Well, whether it is or

6    isn't, I'm asking you if you did that?

7             A.    Can you clarify what you mean by

8    gossip?

9             Q.    Did you ever speak with your

10   husband about matters internal to your team only

11   when he was not a member of that team?

12            A.    Can you give me an example?

13            Q.    That is what I'm asking you, if

14   you did that?

15            A.    He did not know details of a lot

16   of the things that were going on, on the team.

17   Even now, I don't often share specific details

18   of things that have happened.

19            Q.    Okay.

20            A.    He knew that I would be OPR'd.

21   He knew that I had filed an EEO.  He knew all of

22   those things.

23            Q.    What about the situation with

24   Munafo, did you speak to your husband about

1    Andrew Munafo?

2              A.   We had discussed Andrew Munafo

3    before because he had worked with Andrew Munafo.

4              Q.   Can you think of any other

5    examples?

6              A.   I mean, just on the basis -- Joe

7    Hamilton's daughter, she had come over to my

8    house and I helped her with math and reading.

9    So I discussed Joe because Joe would come over

10   to our house and he knew Joe.

11              Joe would come over at one point

12   when we had TDY people from other offices that

13   were visiting and I made a big pot of chili and

14   they all watched football and I was in and out.

15   And we probably had candid discussions about

16   being there, and I'm sure they may have

17   discussed things, too, but nothing out of the

18   ordinary.

19              Q.   I'm curious if you think the --

20   what did you say, the term gossip was offensive?

21              A.   Yes.

22              Q.   Do you consider the term

23   emotional to be offensive?

24              A.   I think overly emotional or

1    calling someone emotional, overly emotional, I

2    think that is adding a clarifying judgment on

3    somebody that, you know, you have a right to be

4    emotional about something, but saying somebody

5    is overly emotional.

6             Q.    So saying someone is emotional is

7    not offensive, but saying someone is overly

8    emotional is?

9             Is that a fair characterization?

10            A.    Not necessarily.

11            Q.    Why not?

12            A.    I think it depends on the

13   situation.  Like, if I want to show emotion to

14   something, I could.  Calling me emotional about

15   something, that is your judgment on how I'm

16   reacting to something and I don't think that

17   that's very fair.  I think that that's sometimes

18   condescending.

19            Q.    Is it always condescending?

20            A.    It depends on who is saying it,

21   what the situation is, and who it is being said

22   about.

23            Q.    If I were to describe myself as

24   being very emotional, would you consider that to

1    be offensive language?

2              A.    Are you saying that about

3    yourself?

4              Q.    Sure.

5              A.    I'm not judging what you say, so

6    I would not say that that's offensive.  If

7    that's what you feel, for you, then that is

8    fine.

9              Q.    And if I said that my law clerk

10   is overly emotional, would you say that's

11   offensive?

12             A.    I would say that you are making a

13   judgment on how much emotion your law clerk

14   should be using in a situation, and you are not

15   your law clerk, therefore, you don't know what

16   type of emotion your law clerk would normally

17   have in a situation.

18             Q.    But if I took out the word

19   overly, that would make a difference?

20             A.    It could make a difference, yes.

21             Q.    Okay.  But you didn't gossip

22   about your team members by saying things like

23   that?

24             A.    I don't feel like I gossiped

```
 1    about my team members, no.

 2               Q.    Did you gossip about OPR actions?

 3               A.    Gossip about OPR actions?

 4               Q.    Yes.

 5               A.    No.

 6               Q.    Investigations?

 7               A.    No.

 8               Q.    And you certainly never would

 9    threaten to seek revenge on someone that spoke

10    out against you?

11               A.    No.  And I would like to know

12    what type of revenge is being referred to,

13    because I mean, I just -- that whole statement

14    is just kind of ludicrous to be applied or said

15    even.

16               Q.    Do you believe that if your

17    former team members felt that you would seek

18    revenge on them, that they were being ludicrous?

19               A.    I feel like applying that to me

20    is a ludicrous statement.  It is inaccurate,

21    it's a somewhat biased statement because if

22    somebody misapplies a phrase like that to

23    somebody or said that, I feel like it is kind of

24    looking at -- we need to look at why would you
```

1    be afraid or why would you be saying that and

2    trying to distract by saying that about me?

3              Q.   I appreciate what you are saying

4    but I don't think it answered my question.

5              A.   Okay, I'm sorry.  Ask me one more

6    time.

7              Q.   I forget what my question was.

8    So we will just read it back again.

9              THE COURT REPORTER:  One moment.

10                   (At this time, the

11                   reporter read back the

12                   requested portion of the

13                   testimony.)

14             THE WITNESS:  Yes.  I mean, that

15             is not even a reasonable thing to

16             think.

17   BY MS. CASTRO:

18             Q.   Okay, thank you.  That made it

19   easier for me.

20             A.   Okay.

21             MS. CASTRO:  I'm going to take a

22             couple minutes and look through my

23             notes just to see if I have any more

24             questions.  Let me just -- give me

```
 1              maybe two or three minutes, if you

 2              don't mind.

 3                   THE WITNESS:  Can we take a quick

 4              break?

 5                   MS. CASTRO:  Sure.  We will take

 6              a quick five minutes, and we will put

 7              it on mute.

 8                   THE WITNESS:  Okay, thank you.

 9                        (At which time, a short

10                        recess was taken.)

11                   MS. CASTRO:  We are back.

12    BY MS. CASTRO:

13              Q.    Just a couple follow-up

14    questions.  I would remind you, Ms. Boughton,

15    you are still under oath.

16              I saw some indication in the

17    files that there were two women, way back in

18    2009, there were two women on your team who were

19    probationary employees.

20              Do you recall this?

21              A.    You said probationary employees

22    that were worked with me?

23              Q.    Right.

24              A.    Jennifer Wisecarver and Nicole
```

```
 1    Bornstein.

 2              Q.    Is it Wisecarver?

 3              A.    Yes.

 4              Q.    Nicole Bernstein?

 5              A.    Bornstein.

 6              Q.    Bornstein, okay.

 7              A.    Like a star is born, stein.

 8              Q.    Okay.  Were you their supervisor?

 9              A.    Yes.

10              Q.    And it's my understanding that

11    both of these women were released before their

12    probationary period ended, is that right?

13              A.    That's correct.

14              Q.    Why don't we talk about them

15    individually.

16                    With regard to Nicole, why was

17    she not hired permanently?

18              A.    There were a number of

19    performance issues that actually both of them

20    had, and they were documented.

21              Q.    What were those issues?

22              A.    Not following basic protocols for

23    surveillance and contributing to the team.  For

24    instance, when I asked them to go take an eye on
```

1    the subject, or silence on the radio for a

2    while, I find them in the Chick-fil-A

3    drive-through.  And that was just one example of

4    multiple times that they were not doing what

5    they were instructed to do.  And then giving

6    excuses, oh, well, I'll get there eventually or

7    it wasn't that important.

8                    And sitting in a drive-through,

9    that is something you do on your personal time

10   on your break.  You don't do it while we are

11   operational.

12             Q.   Do you recall, it's my

13   understanding that they were let go for

14   personality conflict reasons.

15                  Do you know anything about that?

16             A.   They had trouble, I'm going to

17   say, yes, coalescing with the team.  On a team

18   there were a lot of disagreements among team

19   members with them, specifically with Jim Wilson.

20   James Wilson would often come to me.

21                  And Ken Wall was our supervisor

22   at the time with a list of grievances about them

23   and their performance and the way that they

24   acted and talked to him.  And Nicole Barkley had

1  a few of those issues.  I think Nicole Barkley

2  ended up finding a way to work out her issues

3  with them, like talking to them more and trying

4  to mentor them more.

5            And that was my advice for both

6  of them was, can you mentor them more, and can

7  you give me specific things that I can come in

8  and help with that they could improve on or

9  things that I am looking for that you are

10  complaining about.  And this went on constantly

11  with certain individuals of the team.

12            There is also another female on

13  the team that they would be combative with.  Jim

14  Wilson was also combative with Lisa Burns.  She

15  was one of the original members.  And Mary

16  Fecich, she had a lot of trouble with this

17  interaction also.

18            Q.  Did you ever take steps to

19  counsel Mr. Wilson on his interactions with

20  these female employees?

21            A.  Yes, multiple times.  And after

22  an incident like I had mentioned before where I

23  had told him he could not let the team go early,

24  he would, regularly if we were as a group, we'd

1    meet up as group at the end of shift just to

2    kind of debrief and go over what happened just

3    for the log purposes.  Because we had to submit

4    an official log just to make sure that the

5    details were correct for the writer.  And he

6    would often just interrupt me while we were

7    talking as a group.

8                    If I were leading as the closer,

9    he would interrupt me, and he would undermine me

10   as a team leader or he would complain that he

11   didn't think some things were being done

12   correctly.  And he would become very

13   argumentative and combative.

14                   And multiple times, I would try

15   one-on-one to talk to him, but I didn't want to

16   make a show of it in front of everybody or

17   single him out.  I wanted him to be heard.

18   And then eventually, I had asked my supervisor

19   to talk to him, and at first, the first time it

20   was Ken Wall, and then the next time it was Karl

21   Swenson.

22                   And Karl Swenson had to intercede

23   and I had to have multiple talks with Jim

24   because Jim said that he refused to talk to me.

1    He said I nitpicked him.  He was a grown-up, he

2    didn't need to be babysat.  I need to stop

3    henpecking him.  He wanted to just come out and

4    sit and drink his Diet Coke and read his paper

5    and didn't want to be told what to do.

6                    And he wouldn't do anything.  He

7    would not come -- like, I said, you have to come

8    ready to work, ready to be fueled up like the

9    entire team.  And I was, too, and he didn't want

10   to do it.  He wouldn't take an eye.  He won't do

11   the duties for the team that everybody has to

12   do.

13                   And so Karl had to have what Karl

14   called a gentleman's conversation.  I'm not sure

15   what that means, but I didn't quite appreciate

16   the phrasing.  But that's what he said he had to

17   have with Jim to tell him he had to do his basic

18   job requirements and contribute to the team or

19   it was considered that he was being

20   insubordinate.

21                   Q.   It sounds like Jim Wilson was a

22   bad apple?

23                   A.   I would say he wasn't a good

24   apple.  He could bring down the entire team,

1   yes.

2              Q.    That was my next question.

3                    Did his influence rub off on the

4   other team members?

5              A.    Yes, because he is the one who

6   started poking at Andrew Munafo and Jason

7   Distasio.  And he would regularly get into, like

8   I said before, screaming matches in the middle

9   of a surveillance in the target's neighborhood

10  outside of their house screaming at each other

11  when I was not there.

12             Q.    You were the supervisor in 2009

13  when the two female employees were brought on,

14  weren't you?

15             A.    I'm confused.  Which two females,

16  Bornstein and Wisecarver?

17             Q.    Yes.

18             A.    So they were there before I even

19  reported to Cincinnati.  They went through

20  training class, and they went too fast before

21  the team was set up because I came in to set up

22  the team.

23                   We didn't have vehicles, we

24  didn't have equipment, we didn't even have an

1    office.  And headquarters kind of like spun them

2    through the class and then spit them to

3    Cincinnati so that they were already there.

4    That was in 2008.

5              Q.    You did not hire them then?

6              A.    No.  I had nothing to do with

7    selecting them.

8              Q.    Did you terminate them?

9              A.    I had to do the paperwork to send

10    to headquarters based on my office's request.

11              Q.    Did you make the request to

12    terminate them?

13              A.    I sent it to -- I gave it to Ken

14    Wall.  I think he gave it to Kevin Cornelius.  I

15    want to say Kevin Cornelius may have sent that

16    out.

17              Q.    Kevin Cornelius?

18              A.    He was our SAP at the time.

19              Q.    But did you make the request to

20    terminate those two employees?

21              A.    No.  I wanted them to be

22    remediated.  And I just sent it to -- I think it

23    was the H.R. PAR, whatever the acronym was that

24    you asked me about earlier.  Performance, it

1    sounds good, performance and awards, but it's

2    not a good thing.  But I just sent in the

3    details to them from their probationary period

4    and they came back and contacted the office, and

5    our H.R. said they needed to be put up for

6    dismissal.

7            Q.   I'm just wondering why Mr. Wilson

8    wasn't put up for dismissal as well?

9            A.   So I did ask because he wasn't

10   performing his duties.  If we can consider

11   something like that to my supervisor, because I

12   told him what was happening and that's when he

13   came in and he talked to him and he said, let's

14   have a conversation.

15               Then I had to have another

16   conversation with him.  But Jim wouldn't even

17   talk to me.  Like he wouldn't even have a

18   conversation with me because he said he had no

19   respect for me and he didn't like the way that

20   things were being run.  He had also put in, I

21   might add, for the team leader's spot in

22   Cincinnati, and I beat him out for it.

23           Q.   How would you say the other team

24   members would describe you?

1          A.     Describe me?

2          Q.     Yes.

3          A.     I think their description

4    probably would change just based on the mood of

5    the team.  It would go up and down like I said.

6    If I was out, if I was able to be out and not

7    having to do the administrative duties, I think

8    that it would have probably been more positive.

9                Like I think -- I know and I said

10   it in the headquarters that the team leader

11   needs to be out with the team.  We have already

12   identified also in just this time frame that

13   they need someone to just be there at that

14   point, that juncture, they need the supervisor

15   with them.

16               And I think they would have said

17   that when I am with them as the team, we

18   operated well and I probably led the team well

19   and I organized very well, but I think that also

20   it was very difficult.  They did not want to

21   serve as the acting team leader.

22               I mean, I expressed it with

23   headquarters that it was a lot of pressure and

24   duty to put on not only the team leader but to

1   the GS-11, which was the team members that have

2   to step up and always run the team like that.

3   So I think that that would have changed possibly

4   what the description would have been.

5            Q.   How do you believe that they

6   would describe you as the duties were performed,

7   meaning, you've already told me what you believe

8   they would have felt had you been in the field

9   more.

10           But the way it actually was, how

11  do you believe your team members would have

12  described you?

13           A.   In general, like

14  personality-wise, I think that probably, you

15  know, like somewhat stoic.  Sometimes a good

16  sense of humor, knowledgeable.  Most times I

17  would have liked to have thought they thought I

18  was fair, or at least I very much tried to base

19  my decisions or opinions on information.

20           MS. CASTRO:  Okay.  I don't have

21           any more questions for you.  I have

22           got a couple points for Ms. Newman.

23           We will get the authorizations for

24           medical records over to you for

1          signature.

2                MS. NEWMAN:  Okay.

3                MS. CASTRO:  And I also noticed

4          in the Interrogatories that they were

5          not signed.  And it's more of a

6          technical thing, but you guys may just

7          want to send over a verification at

8          some point.

9                MS. NEWMAN:  Yes, we will do

10         that.  The medical records, they may

11         have been part of our production.

12               MS. CASTRO:  I went through

13         everything and I didn't see them, but

14         if they are, then great.

15               MS. NEWMAN:  We will double check

16         on that because I know we had gotten

17         releases.  So I'll double check on

18         that and I'll send that over to you.

19               MS. CASTRO:  Okay, thanks.

20               MS. NEWMAN:  Yep.

21               MS. CASTRO:  Did you want to do

22         any follow up, Liza?

23               MS. NEWMAN:  No, I don't.

24               MS. CASTRO:  All right.

1          Well, thank you, Ms. Boughton.  I

2          appreciate your time and your

3          attention today.  Thanks for putting

4          up with our technical issues.

5               THE WITNESS:  I feel like we are

6          breaking ground, right?

7               MS. CASTRO:  Right.

8               THE WITNESS:  A new way to do

9          things.

10               MS. CASTRO:  Right.

11               Do you guys want to sign?

12               MS. NEWMAN:  Yes.  We'll read.

13               MS. CASTRO:  Pam will e-mail you

14          the details.

15          _____

16              JENNIFER BOUGHTON

17

18     DEPOSITION CONCLUDED AT 3:05 P.M.

19

20

21

22

23

24

1                    C E R T I F I C A T E

2    STATE OF OHIO        :

3                         : SS.

4    COUNTY OF HAMILTON  :

5           I, Pamela S. Giglio, the undersigned, a
     duly qualified and commissioned notary public
6    within and for the State of Ohio, do hereby
     certify that before the giving of her aforesaid
7    deposition the said JENNIFER BOUGHTON was by me
     first duly sworn to depose the truth, the whole
8    truth, and nothing but the truth; that the
     foregoing is the deposition given at said time
9    and place by the said JENNIFER BOUGHTON; that
     said deposition was taken in all respects
10   pursuant to Notice of Deposition and to
     agreement and stipulations of counsel
11   hereinbefore set forth; that said deposition was
     taken by me in stenotype and transcribed into
12   typewriting under my supervision; that the
     transcribed deposition was submitted to the
13   witness for her examination and signature; that
     I am neither a relative of nor attorney for any
14   of the parties to this cause, nor relative of
     nor employee of any of counsel, and have no
15   interest whatever in the result of this action.

16          IN WITNESS WHEREOF, I hereunto set my
     hand and official seal of office, at Cincinnati,
17   Ohio, this 26th day of August, 2020.

18                     /S/ Pamela S. Giglio
                       Notary Public - State of Ohio
19
     MY COMMISSION EXPIRES:
20   March 26, 2024

21

22

23

24

**/**

**/S** [1] - 199:18

**0**

**0304** [1] - 11:24

**1**

**1** [5] - 4:3, 12:12, 12:14, 22:1, 37:2
**10** [4] - 4:17, 98:8, 98:10, 98:12
**10-28-15** [1] - 4:10
**100** [2] - 4:19, 4:20
**108** [3] - 4:22, 4:23, 5:2
**109** [1] - 5:4
**10th** [1] - 125:18
**11** [5] - 4:19, 100:17, 100:19, 100:22, 101:3
**1124** [3] - 91:17, 92:16, 93:4
**1149** [3] - 92:24, 93:4, 94:1
**1152** [4] - 92:24, 93:3, 93:4, 95:13
**1175** [1] - 98:2
**1189** [3] - 59:4, 76:2, 82:15
**119** [1] - 5:5
**12** [8] - 1:19, 4:3, 4:20, 100:17, 100:19, 100:22, 101:7, 101:11
**12:15** [1] - 109:4
**12:52** [1] - 140:11
**13** [5] - 4:22, 107:21, 107:23, 108:3, 109:18
**1326** [1] - 84:2
**133** [1] - 5:7
**1331** [5] - 119:6, 124:14, 125:10, 125:17, 131:2
**1332** [1] - 125:16
**14** [5] - 4:23, 107:21, 107:23, 108:3, 111:18
**14th** [1] - 109:19
**15** [5] - 5:2, 107:21, 107:24, 108:3, 117:2
**15th** [1] - 106:8
**16** [7] - 5:4, 12:19, 101:4, 108:20, 108:22, 108:24,

115:3
**16th** [2] - 101:11, 101:16
**17** [6] - 5:5, 119:8, 119:10, 119:12, 119:17, 122:18
**17/9** [2] - 96:15, 97:13
**17th** [1] - 117:5
**18** [4] - 5:7, 133:8, 133:10, 133:12
**1:00-ish** [2] - 109:6, 109:9
**1:19-cv-154** [1] - 1:5
**1:30** [1] - 140:19
**1st** [3] - 60:21, 98:19, 99:9

**2**

**2** [6] - 4:5, 59:14, 59:16, 59:18, 76:2, 82:14
**20** [2] - 101:7, 119:19
**2003** [2] - 29:5, 34:6
**2005** [1] - 35:11
**2007** [3] - 34:15, 34:16, 34:21
**2008** [3] - 34:7, 169:10, 193:4
**2009** [5] - 18:6, 20:9, 20:10, 186:18, 192:12
**2010** [8] - 18:6, 18:7, 20:9, 20:10, 20:11, 23:14, 23:18, 25:20
**2014** [10] - 25:21, 28:17, 40:16, 41:7, 60:21, 61:1, 159:14, 160:10, 169:6, 169:10
**2015** [12] - 28:12, 28:20, 60:12, 60:22, 61:3, 83:7, 90:6, 101:4, 101:7, 119:19, 169:6, 169:11
**2018** [1] - 21:12
**2020** [3] - 1:19, 11:24, 199:17
**2024** [1] - 199:20
**20th** [4] - 101:12, 105:17, 119:23, 120:5
**221** [2] - 1:17, 2:9
**24/7** [1] - 158:12
**26** [1] - 199:20
**26th** [1] - 199:17
**27** [1] - 90:6
**28** [1] - 93:19

**28th** [1] - 94:2
**29th** [2] - 93:19, 94:6

**3**

**3** [6] - 4:6, 59:14, 59:16, 59:19, 60:10, 72:23
**30** [9] - 60:12, 81:16, 140:14, 143:21, 143:24, 144:11, 144:12, 146:2, 146:5
**30-day** [2] - 145:2, 146:13
**30th** [1] - 60:21
**31st** [1] - 93:19
**3:05** [1] - 198:18

**4**

**4** [4] - 4:8, 84:4, 84:6, 84:8
**400** [2] - 1:18, 2:9
**45** [1] - 140:14
**45202** [2] - 2:5, 2:10
**45220** [1] - 1:24

**5**

**5** [7] - 4:10, 37:4, 85:24, 86:5, 86:7, 91:22, 92:5
**511** [5] - 59:12, 59:21, 60:7, 60:9, 72:23
**513** [1] - 1:24
**515** [4] - 85:22, 86:2, 86:13, 91:23
**550** [1] - 86:14
**569** [1] - 89:20
**59** [2] - 4:5, 4:6

**6**

**6** [5] - 4:11, 53:22, 53:23, 89:22, 90:1
**600** [1] - 2:4

**7**

**7** [5] - 4:13, 12:20, 91:19, 92:12, 93:17
**7-20-15** [1] - 4:21
**788** [3] - 107:11, 107:14, 109:17
**796** [2] - 107:17, 111:17
**7th** [1] - 34:7

**8**

**8** [5] - 4:14, 93:8, 93:11, 93:14, 93:17
**812** [1] - 100:14
**824** [4] - 107:19, 108:6, 108:8, 117:1
**833** [3] - 100:15, 101:11, 105:15
**84** [1] - 4:8
**86** [1] - 4:10
**861-2200** [1] - 1:24
**8:30** [1] - 90:16

**9**

**9** [6] - 4:16, 93:8, 93:11, 93:14, 93:18, 95:14
**9-30-15** [1] - 4:7
**90** [1] - 4:11
**91** [1] - 4:13
**924** [1] - 108:6
**93** [2] - 4:14, 4:16
**955** [1] - 133:5
**971** [2] - 108:17, 115:1
**98** [1] - 4:17
**9:30** [1] - 1:19
**9th** [1] - 2:5

**A**

**a.m** [2] - 1:19, 90:17
**abdomen** [1] - 20:4
**abdominal** [1] - 20:2
**abilities** [2] - 52:7, 126:2
**ability** [9] - 9:11, 44:16, 52:4, 52:9, 78:21, 95:21, 123:23, 138:15, 145:6
**able** [14] - 10:20, 16:10, 43:2, 43:8, 75:10, 87:6, 93:2, 95:7, 124:16, 144:17, 157:23, 171:2, 177:6, 195:6
**abrasive** [3] - 66:19, 66:20, 66:21
**absence** [1] - 155:6
**absolutely** [2] - 8:16, 167:10
**acceptable** [2] - 8:15, 166:4
**access** [3] - 103:14, 178:18, 178:19
**accident** [34] - 31:12,

40:16, 41:6, 41:16, 41:17, 41:20, 42:7, 42:12, 42:16, 42:18, 43:8, 43:14, 43:18, 43:20, 44:22, 44:23, 45:5, 45:10, 45:17, 46:7, 46:24, 50:4, 50:18, 51:9, 51:12, 61:1, 61:3, 64:5, 64:8, 137:12, 158:11, 158:17, 159:14, 162:16
**according** [1] - 104:24
**accountability** [1] - 40:7
**accurate** [4] - 6:7, 77:10, 79:11, 118:9
**accurately** [1] - 78:2
**accused** [1] - 57:6
**acknowledging** [1] - 131:16
**acronym** [2] - 136:23, 193:23
**acronyms** [4] - 97:15, 110:12, 136:24, 165:7
**act** [2] - 40:15, 40:17
**acted** [2] - 51:24, 188:24
**Acting** [1] - 73:8
**acting** [6] - 26:2, 45:13, 70:17, 70:19, 71:8, 195:21
**action** [4] - 66:14, 70:11, 129:15, 199:15
**actionable** [1] - 67:18
**actions** [4] - 40:7, 148:7, 184:2, 184:3
**actively** [2] - 166:10, 175:22
**activities** [2] - 64:4, 156:5
**actual** [1] - 153:9
**add** [1] - 194:21
**adding** [1] - 182:2
**addition** [3] - 153:5, 154:11, 172:6
**additional** [2] - 95:22, 112:18
**addressing** [1] - 158:10
**adjudicates** [1] - 124:22
**adjudication** [2] - 131:3, 131:21
**Adjudication** [1] - 122:20
**adjunct** [1] - 176:8
**admin** [1] - 152:16

administrative [13] - 68:20, 137:22, 143:6, 143:8, 146:7, 153:3, 153:4, 154:1, 154:6, 154:9, 154:12, 166:24, 195:7

advance [2] - 89:11, 94:13

advice [2] - 49:11, 189:5

advise [1] - 131:12

advised [1] - 110:20

affect [1] - 9:11

affected [1] - 44:15

affidavit [1] - 47:10

affixed [1] - 3:14

afford [2] - 172:2, 172:11

aforesaid [1] - 199:6

afraid [3] - 151:17, 151:2, 185:1

African [1] - 128:17

African-American [1] - 128:17

afterwards [1] - 47:6

age [2] - 7:3, 170:2

agencies [1] - 177:1

agency [1] - 177:2

Agent [4] - 52:15, 73:8, 120:8, 123:1

agent [1] - 36:10

agent's [1] - 77:5

agents [5] - 63:9, 121:13, 127:1, 127:2, 127:3

Agents [1] - 102:3

aggressive [4] - 46:18, 147:6, 147:8, 148:17

ago [1] - 79:24

agreed [2] - 6:4, 142:22

agreement [2] - 1:15, 199:10

ahead [13] - 6:24, 9:13, 10:2, 28:15, 43:17, 75:24, 82:13, 92:23, 98:2, 107:16, 108:17, 148:15, 165:9

alarm [1] - 39:11

alcohol [1] - 9:10

alerted [1] - 97:2

alertive [1] - 144:20

allegation [1] - 121:3

allegations [1] - 39:22

alleged [3] - 25:3, 56:13, 133:22

allow [1] - 96:6

allowed [1] - 174:23

allows [1] - 171:4

almost [4] - 46:11, 46:17, 159:13, 166:13

aloof [3] - 47:5, 47:6, 148:21

ambition [1] - 136:11

American [1] - 128:17

amount [1] - 132:1

analysis [1] - 148:10

Andrew [12] - 26:15, 26:17, 26:23, 27:14, 27:20, 31:10, 36:19, 45:2, 181:1, 181:2, 181:3, 192:6

Angela [4] - 124:14, 125:17, 125:22, 134:3

annually [1] - 157:18

anonymous [1] - 18:21

answer [12] - 8:8, 9:3, 12:19, 18:24, 19:1, 50:21, 71:22, 87:23, 88:2, 136:23, 143:23, 150:22

answered [5] - 67:24, 81:18, 85:19, 173:19, 185:4

answering [1] - 137:4

anticipate [9] - 13:22, 14:7, 14:16, 15:2, 15:9, 15:20, 15:24, 16:20, 176:17

anticipated [2] - 15:17, 16:4

anxiety [2] - 174:18, 174:20

apologies [2] - 131:8, 131:14

appear [1] - 24:11

APPEARANCES [1] - 2:1

appeared [1] - 83:3

apple [2] - 191:22, 191:24

applicable [1] - 116:17

applicants [2] - 139:6, 143:14

applied [5] - 34:11, 48:14, 97:3, 137:10, 184:14

applies [1] - 62:16

apply [1] - 71:11, 157:12, 175:22

applying [1] - 184:19

Appraisal [1] - 4:7

appraisal [1] - 60:11

appreciate [7] - 6:23, 38:13, 39:21, 78:19, 185:3, 191:15, 198:2

appreciated [1] - 139:21

approach [1] - 114:16

approached [2] - 13:20, 14:6

appropriate [9] - 6:5, 51:16, 51:17, 69:4, 69:10, 70:1, 126:10, 126:12, 179:22

appropriately [5] - 51:11, 51:19, 51:23, 52:2, 124:22

approval [1] - 94:13

area [4] - 41:24, 76:19, 77:18, 158:8

areas [3] - 74:15, 77:23, 84:23

argumentative [1] - 190:13

arrived [2] - 81:8, 82:5

articulated [1] - 100:1

Asbury [1] - 2:3

ASIC [1] - 73:8

aside [5] - 38:6, 84:1, 100:14, 107:9, 117:20

aspect [1] - 148:12

aspects [2] - 168:8, 171:1

assert [1] - 147:17

assertive [1] - 147:23

assess [2] - 79:2, 144:4

assessing [1] - 103:3

assessment [10] - 43:3, 43:5, 81:1, 81:3, 81:5, 87:15, 129:22, 144:1, 144:5, 144:8

asset [1] - 138:17

assigned [20] - 24:19, 25:12, 27:10, 27:12, 38:1, 41:24, 74:10, 82:10, 83:9, 94:24, 96:2, 101:20, 102:5, 110:21, 111:24, 112:2, 112:16, 116:6, 146:2, 154:8

assignment [8] - 27:10, 27:23, 32:7, 37:16, 50:1, 96:4, 109:24, 110:5

Assignments [1] - 116:6

assignments [2] - 27:7, 88:21

assist [1] - 115:24

assistant [2] - 155:4, 155:15

assume [5] - 7:23, 8:8, 9:4, 45:19, 171:18

assumed [1] - 94:19

assuming [5] - 72:19, 94:16, 111:23, 132:10, 133:2

AT [1] - 198:18

Athens [1] - 151:20

ATL [5] - 161:5, 162:12, 165:16, 165:22

ATLs [1] - 161:12

attached [2] - 102:21, 120:1

attachment [1] - 11:15

attachments [1] - 60:1

attempted [1] - 165:15

attend [5] - 95:5, 126:7, 126:8, 157:13

attendance [1] - 103:22

attention [1] - 198:3

attest [2] - 50:22, 52:3

attorney [9] - 9:14, 23:4, 199:13

ATTORNEY [1] - 1:7

Attorney [1] - 1:17

Attorneys [2] - 2:8, 103:16

attribute [1] - 65:2

attributed [2] - 64:16, 134:1

audio [3] - 75:9, 169:20, 170:1

augment [1] - 166:22

August [6] - 1:19, 93:19, 94:2, 94:6, 125:18, 199:17

authority [1] - 48:23

authorization [3] - 19:18, 21:17, 23:4

authorizations [1] - 196:23

authorized [1] - 104:22

availability [1] - 95:9

available [7] - 9:16, 9:23, 10:15, 19:20, 89:14, 90:13, 91:9

average [1] - 46:20

avoid [1] - 77:7

Award [1] - 110:14

awards [1] - 194:1

aware [20] - 55:12, 55:19, 55:23, 56:3, 56:12, 56:17, 57:8, 67:4, 90:12, 90:20, 91:5, 100:8, 102:16, 130:7, 130:8, 132:16, 132:21, 163:5, 164:2, 164:7

awareness [1] - 94:10

## B

baby [1] - 38:8

babysat [1] - 191:2

bachelor [1] - 113:20

background [11] - 113:14, 113:15, 113:16, 114:11, 115:7, 115:20, 116:21, 137:8, 137:14, 148:11

backgrounds [1] - 138:19

bad [3] - 86:20, 89:2, 191:22

Baker [10] - 120:6, 122:13, 122:19, 124:15, 125:18, 130:23, 131:3, 132:6, 133:17, 135:11

balance [1] - 137:22

balancing [1] - 173:15

Barkley [6] - 30:7, 30:8, 30:20, 49:24, 188:24, 189:1

BARR [1] - 1:6

bars [2] - 41:23, 160:12

base [7] - 111:1, 111:3, 111:4, 111:14, 111:15, 140:3, 196:16

baseball [1] - 138:11

based [16] - 24:3, 40:2, 55:6, 62:22, 78:6, 83:15, 87:12, 87:19, 91:8, 91:11, 130:14, 131:1, 136:15, 156:21, 193:10, 195:4

basic [5] - 144:14, 144:16, 166:7, 187:22, 191:17

basis [4] - 54:7, 160:19, 161:6, 181:6

Bates [3] - 11:4, 82:15, 92:15

beast [1] - 164:10

beat [1] - 194:22

became [5] - 45:9, 45:10, 46:16, 156:16, 167:23

become [7] - 56:3,

56:12, 56:17, 57:8, 136:6, 171:21, 190:12
**beforehand** [1] - 47:5
**begin** [1] - 34:13
**behalf** [2] - 2:2, 2:6
**beings** [1] - 61:24
**belong** [3] - 172:1, 172:10, 172:13
**beneficial** [1] - 138:14
**benefit** [2] - 14:11, 100:5
**Bennie** [1] - 36:5
**Bernstein** [1] - 187:4
**best** [6] - 6:13, 52:4, 52:6, 58:9, 64:11, 112:23
**Bethany** [3] - 137:18, 141:12, 141:13
**bethany** [1] - 163:18
**better** [4] - 42:22, 95:12, 97:16, 162:7
**between** [9] - 1:15, 3:2, 25:20, 82:19, 101:3, 109:11, 109:19, 112:20, 133:17
**beyond** [4] - 115:6, 131:7, 143:17, 176:23
**biased** [1] - 184:21
**big** [6] - 28:4, 156:9, 159:7, 160:12, 172:23, 181:13
**biggest** [1] - 138:4
**bit** [9] - 7:24, 33:23, 118:12, 140:8, 141:7, 145:7, 145:22, 158:18, 169:5
**bite** [2] - 46:1, 160:7
**blame** [1] - 27:20
**blatantly** [1] - 136:6
**blight** [2] - 176:1, 177:4
**block** [1] - 61:4
**blunt** [1] - 150:3
**board** [3] - 158:3, 158:4, 158:9
**boat** [10] - 31:12, 42:11, 42:13, 43:14, 43:18, 43:20, 50:4, 60:24, 137:12, 162:16
**boating** [6] - 40:16, 41:6, 61:3, 64:8, 158:10, 159:14
**bode** [1] - 124:6
**body** [1] - 95:7
**bond** [1] - 157:5

**book** [1] - 169:20
**books** [1] - 170:1
**born** [1] - 187:7
**Bornstein** [2] - 187:1, 192:16
**bornstein** [2] - 187:5, 187:6
**bother** [1] - 160:14
**bottom** [1] - 11:4
**Boughton** [13] - 4:7, 6:18, 7:8, 12:5, 12:20, 75:3, 77:5, 92:20, 98:16, 140:24, 175:12, 186:14, 198:1
**BOUGHTON** [7] - 1:3, 1:11, 3:4, 7:2, 198:16, 199:7, 199:9
**bow** [1] - 147:14
**boy** [1] - 38:10
**branch** [2] - 73:9, 123:7
**Brasset** [1] - 172:14
**breach** [1] - 39:6
**break** [8] - 8:4, 36:23, 48:17, 57:22, 92:5, 142:16, 186:4, 188:10
**breaking** [2] - 109:10, 198:6
**brief** [1] - 13:21
**briefing** [1] - 29:14
**bring** [5] - 60:1, 141:23, 157:9, 161:13, 191:24
**Brink** [3] - 56:24, 57:1, 163:14
**Brittany** [1] - 141:9
**broad** [2] - 40:21
**broke** [2] - 23:16, 47:15
**brought** [2] - 161:10, 192:13
**bucar** [10] - 101:17, 101:18, 101:19, 102:14, 104:21, 106:15, 106:17, 106:19, 106:20, 106:23
**bucars** [1] - 104:9
**built** [1] - 175:21
**bureau** [7] - 29:4, 101:20, 103:4, 104:17, 164:13, 176:9
**Burns** [1] - 189:14
**Bustamante** [11] - 36:5, 68:19, 82:20, 83:12, 83:18, 83:22, 87:13, 109:19,

110:21, 111:22, 114:17
**busy** [3] - 152:1
**but..** [1] - 33:23
**BY** [25] - 7:7, 10:22, 12:4, 12:17, 16:14, 35:4, 58:18, 60:8, 82:3, 84:11, 86:22, 90:4, 92:18, 93:15, 98:15, 101:1, 108:7, 109:16, 119:15, 133:15, 140:23, 142:15, 168:17, 185:17, 186:12
**Byers** [16] - 122:20, 122:23, 123:4, 123:8, 123:19, 124:15, 125:18, 125:22, 126:1, 126:18, 127:11, 129:13, 130:7, 130:24, 131:4, 133:17

---

# C

**C-i-r-g** [1] - 136:21
**Cady** [1] - 14:10
**California** [1] - 37:16
**Calvin** [1] - 17:10
**camera** [1] - 58:7
**cancelled** [1] - 33:7
**cancerous** [1] - 20:16
**candid** [1] - 181:15
**candor** [1] - 52:17
**cannot** [2] - 9:7, 179:12
**capacity** [2] - 26:2, 81:15
**car** [4] - 28:3, 104:19, 138:12
**card** [1] - 82:8
**care** [1] - 22:9
**career** [3] - 174:12, 175:11, 175:21
**cars** [2] - 161:19, 161:21
**case** [42] - 7:10, 13:2, 13:16, 13:23, 14:8, 15:10, 16:8, 16:21, 18:10, 19:17, 19:23, 20:2, 22:15, 23:9, 23:23, 24:7, 24:16, 24:24, 26:11, 26:14, 27:19, 29:1, 29:8, 29:10, 29:12, 29:16, 30:9, 31:5, 31:19, 52:23, 77:4, 95:2, 151:16, 156:8,

156:9, 157:20, 157:21, 158:12, 159:8, 159:19, 159:20, 178:17
**CASE** [1] - 1:5
**cases** [8] - 29:9, 29:11, 29:14, 126:11, 128:6, 128:7, 157:22, 159:21
**Castro** [2] - 2:7, 7:9
**CASTRO** [76] - 6:1, 6:10, 6:22, 7:7, 10:14, 10:17, 10:22, 11:16, 11:21, 12:2, 12:4, 12:8, 12:17, 16:14, 35:4, 58:1, 58:8, 58:14, 58:18, 59:13, 59:22, 60:8, 81:20, 82:3, 84:3, 84:11, 85:23, 86:2, 86:12, 86:16, 86:22, 89:23, 90:4, 91:24, 92:4, 92:9, 92:12, 92:16, 92:18, 93:7, 93:15, 98:6, 98:15, 100:16, 101:1, 107:20, 108:7, 108:19, 109:3, 109:7, 109:14, 109:16, 119:7, 119:15, 133:7, 133:15, 140:6, 140:11, 140:18, 140:23, 142:15, 168:17, 185:17, 185:21, 186:5, 186:11, 186:12, 196:20, 197:3, 197:12, 197:19, 197:21, 197:24, 198:7, 198:10, 198:13
**casual** [3] - 126:18, 126:19, 127:5
**casualness** [1] - 126:11
**categories** [3] - 82:8, 120:21, 148:3
**category** [5] - 57:3, 76:23, 78:3, 78:11, 79:16
**caused** [2] - 131:9, 131:15
**CC'd** [1] - 98:18
**census** [1] - 165:11
**Center** [1] - 17:24
**certain** [8] - 102:3, 102:4, 103:23, 115:19, 116:23,

152:2, 164:12, 189:11
**certainly** [3] - 33:6, 124:18, 184:8
**certified** [1] - 7:4
**certify** [1] - 199:6
**cetera** [1] - 62:5
**chain** [14] - 4:5, 4:9, 4:12, 4:13, 4:15, 4:16, 4:18, 4:19, 4:22, 4:24, 5:3, 5:4, 5:6, 5:7
**change** [12] - 45:6, 46:7, 111:16, 165:1, 169:9, 170:10, 170:19, 171:11, 171:16, 173:6, 176:24, 195:4
**changed** [9] - 42:7, 42:23, 46:24, 47:2, 48:11, 111:12, 172:20, 174:4, 196:3
**changes** [2] - 114:7, 173:9
**characterization** [1] - 182:9
**characterize** [1] - 72:5
**charge** [2] - 27:14, 162:13
**Charge** [2] - 73:9, 123:1
**Charlie** [1] - 35:7
**check** [6] - 25:21, 25:24, 48:2, 48:3, 197:15, 197:17
**checked** [1] - 22:16
**Chicago** [2] - 26:13, 27:13
**Chick** [1] - 188:2
**Chick-fil-A** [1] - 188:2
**chief** [2] - 24:17, 24:18
**child** [1] - 63:15
**chili** [1] - 181:13
**choice** [1] - 43:16
**choose** [1] - 62:1
**Cincinnati** [58] - 1:18, 1:24, 2:5, 2:10, 13:18, 14:22, 18:1, 18:2, 18:3, 25:12, 25:13, 26:13, 27:16, 30:23, 34:8, 34:12, 36:9, 36:11, 48:10, 48:12, 52:16, 72:10, 72:12, 118:19, 122:4, 122:5, 122:7, 123:1, 123:10, 123:12, 127:15, 136:8, 137:10, 141:16, 145:11, 151:18, 151:19,

151:22, 152:19,
152:24, 153:6,
153:13, 153:20,
154:9, 157:3, 158:8,
165:13, 167:24,
169:13, 170:7,
170:12, 170:17,
170:18, 192:19,
193:3, 194:22,
199:16
**Cirg** [2] - 136:20,
136:21
**cited** [1] - 106:19
**cites** [1] - 100:4
**City** [2] - 172:18,
172:19
**Civil** [2] - 1:14, 3:7
**claim** [2] - 106:1,
106:2
**claimed** [1] - 30:12
**claims** [5] - 19:12,
21:16, 35:24, 37:22,
176:3
**clanking** [1] - 142:9
**clarification** [3] -
24:13, 43:22, 147:2
**clarify** [8] - 6:16, 7:14,
26:21, 27:7, 76:6,
76:14, 135:16, 180:7
**clarifying** [1] - 182:2
**class** [3] - 29:4,
192:20, 193:2
**classified** [2] - 29:15,
177:20
**Claudia** [3] - 68:17,
68:23, 71:15
**clearance** [10] -
174:11, 175:1,
175:7, 175:9,
175:14, 175:19,
175:20, 175:24,
177:3, 178:22
**clearly** [2] - 70:23,
129:24
**clerk** [5] - 86:18,
183:9, 183:13,
183:15, 183:16
**close** [1] - 16:3
**closely** [1] - 134:5
**closer** [1] - 190:8
**Club** [2] - 172:15,
172:18
**clubs** [3] - 172:1,
172:10, 173:5
**coalescing** [1] -
188:17
**coded** [1] - 28:4
**Coke** [1] - 191:4
**college** [2] - 113:17,
113:19

**Columbus** [1] -
151:20
**combat** [1] - 147:12
**combative** [5] -
147:24, 162:20,
189:13, 189:14,
190:13
**combining** [1] - 63:11
**comfortable** [1] - 89:9
**coming** [7] - 28:16,
114:6, 116:1, 141:1,
141:14, 158:13,
159:7
**comment** [1] - 76:18
**commentary** [1] - 63:5
**comments** [9] - 26:18,
62:22, 74:14, 74:19,
75:2, 75:18, 75:22,
77:5, 88:8
**COMMISSION** [1] -
199:19
**commissioned** [1] -
199:5
**common** [1] - 62:3
**communicated** [2] -
13:2, 79:12
**communications** [1] -
63:5
**community** [1] - 24:2
**comp** [1] - 111:11
**comparing** [1] -
169:13
**compassionate** [1] -
149:5
**complain** [1] - 190:10
**complaining** [2] -
46:11, 189:10
**complaint** [1] - 54:8
**complaints** [4] - 54:6,
64:18, 163:2, 163:6
**complement** [2] -
157:1, 157:3
**complete** [2] - 21:9,
31:8
**completed** [4] - 63:22,
73:21, 121:15,
121:24
**completely** [3] -
28:18, 56:7, 174:22
**composed** [1] - 106:6
**computer** [5] - 8:22,
10:10, 114:19,
114:22, 125:13
**computers** [1] - 103:4
**concerned** [2] - 79:15,
150:16
**concerns** [3] - 35:14,
99:24, 100:2
**CONCLUDED** [1] -
198:18

**conclusions** [2] -
81:8, 82:5
**condescending** [8] -
38:22, 48:23, 63:18,
63:20, 128:9, 150:3,
182:18, 182:19
**condition** [1] - 19:5
**conducted** [5] -
118:13, 118:23,
121:7, 124:4, 132:6
**conducting** [1] - 126:9
**confidentiality** [2] -
177:9, 177:11
**conflict** [1] - 188:14
**confused** [2] - 134:19,
192:15
**confusing** [1] - 131:10
**Connie** [1] - 17:12
**consent** [1] - 88:12
**consider** [10] - 13:11,
50:13, 61:11, 75:6,
75:21, 76:8, 77:13,
181:22, 182:24,
194:10
**considerations** [1] -
115:18
**considered** [2] -
112:9, 191:19
**constantly** [1] -
189:10
**constructive** [1] - 65:9
**consulted** [1] - 99:12
**contact** [1] - 131:7
**contacted** [2] - 27:21,
194:4
**contained** [3] -
103:15, 103:17,
118:2
**contend** [4] - 21:15,
39:5, 69:12, 129:14
**contending** [1] -
135:18
**contention** [1] - 21:21
**contentious** [3] -
88:11, 89:1, 89:2
**continue** [2] - 17:3,
28:21
**continued** [2] - 20:11,
116:11
**continues** [1] - 96:19
**contribute** [4] - 85:8,
114:18, 115:22,
191:18
**contributed** [1] -
130:10
**contributing** [2] -
83:6, 187:23
**controlling** [1] - 153:8
**conversation** [4] -
191:14, 194:14,

194:16, 194:18
**conversations** [3] -
80:22, 123:19,
123:21
**convey** [1] - 13:15
**coordinate** [1] -
158:14
**coordinating** [1] -
153:9
**coordinator** [7] -
32:15, 152:12,
152:14, 152:15,
153:2, 166:23,
167:13
**coordinator's** [1] -
152:23
**coordinators** [1] -
152:24
**copy** [4] - 12:9, 86:17,
92:5, 131:12
**Cornelius** [3] -
193:14, 193:15,
193:17
**corner** [1] - 11:5
**correct** [28] - 24:7,
34:21, 61:1, 66:19,
71:6, 87:4, 87:16,
90:14, 93:23, 99:2,
99:18, 99:19,
106:11, 107:2,
117:18, 121:9,
122:9, 131:4,
134:21, 135:20,
153:22, 163:3,
163:7, 164:3,
187:13, 190:5
**correctly** [2] - 86:17,
190:12
**corroborate** [1] - 87:6
**corruption** [1] - 97:8
**Corson** [2] - 35:1,
35:7
**counsel** [4] - 1:15,
3:2, 189:19, 199:10,
199:14
**counseling** [4] -
23:13, 23:18, 24:1,
173:17
**counterintelligence**
[1] - 105:4
**country** [2] - 53:12,
153:12
**COUNTY** [1] - 199:4
**couple** [7] - 13:18,
24:13, 41:5, 41:22,
185:22, 186:13,
196:22
**course** [1] - 96:13
**court** [6] - 3:9, 3:15,
7:18, 12:9, 14:11,

98:7
**COURT** [18] - 1:1,
12:11, 16:12, 59:15,
84:5, 86:4, 89:21,
92:2, 93:13, 98:9,
100:18, 107:22,
108:21, 109:5,
119:9, 133:9,
168:15, 185:9
**Court** [3] - 7:11, 11:7,
13:17
**cover** [3] - 60:19,
103:20, 151:18
**covers** [2] - 23:10,
151:19
**covert** [1] - 39:12
**cower** [2] - 146:19,
147:4
**coworker** [20] - 13:10,
14:5, 14:14, 14:23,
15:1, 15:7, 15:15,
15:19, 17:5, 17:7,
17:8, 17:9, 17:10,
17:11, 17:12, 17:13,
17:14, 31:16, 36:8,
70:15
**coworkers** [9] - 13:14,
15:23, 16:2, 45:24,
48:11, 69:5, 70:9,
70:14
**crackling** [1] - 71:23
**crazy** [4] - 68:17,
68:18, 68:22, 68:24
**credibility** [1] - 146:12
**credible** [1] - 135:19
**criminal** [1] - 105:5
**critical** [2] - 73:14,
77:7
**criticism** [3] - 65:9,
67:5, 126:17
**Croal** [2] - 32:20,
33:10
**CROSS** [1] - 7:6
**cross** [2] - 1:13, 3:6
**CROSS-**
**EXAMINATION** [1] -
7:6
**cross-examination** [2]
- 1:13, 3:6
**cry** [2] - 127:22,
127:23
**curiosity** [1] - 114:3
**curious** [1] - 181:19
**current** [7] - 13:10,
14:4, 15:7, 15:19,
15:23, 16:2, 110:3
**curriculum** [3] - 32:6,
33:4, 113:22
**curtailed** [1] - 95:22
**cut** [2] - 165:21,

165:23
**cynical** [2] - 64:14, 65:4
**Cypress** [1] - 1:23

# D

**D.C** [1] - 118:21
**daily** [1] - 102:12
**damaged** [1] - 20:19
**dangerous** [1] - 20:17
**Danielle** [1] - 13:7
**darkened** [1] - 138:12
**date** [5] - 25:21, 26:1, 33:23, 34:19, 60:12
**dated** [3] - 4:7, 4:10, 4:21
**dating** [4] - 33:20, 33:24, 34:13, 170:2
**daughter** [1] - 181:7
**Davis** [1] - 17:11
**day-to-day** [1] - 123:13
**days** [8] - 81:16, 143:22, 143:24, 144:11, 144:12, 146:2, 146:5, 176:10
**DC** [4] - 56:6, 122:1, 122:3, 122:4
**deadline** [2] - 94:13, 99:5
**dealing** [1] - 155:24
**death** [1] - 51:9
**debrief** [1] - 190:2
**December** [1] - 34:7
**decision** [4] - 94:13, 99:3, 100:9, 139:17
**decisions** [4] - 123:11, 129:20, 179:11, 196:19
**decrease** [1] - 172:3
**deep** [1] - 8:1
**Defendant** [2] - 1:8, 2:6
**defendant** [2] - 1:12, 3:5
**Defendant's** [28] - 4:2, 4:3, 5:1, 12:12, 12:14, 59:14, 59:16, 59:18, 60:10, 84:4, 84:6, 84:8, 86:5, 86:7, 89:22, 90:1, 91:19, 93:10, 93:14, 98:10, 98:12, 100:19, 100:21, 107:23, 108:2, 108:24, 119:12, 133:12
**defensive** [1] - 46:17

**degree** [5] - 33:3, 113:19, 113:20, 113:21, 113:22
**degrees** [1] - 113:17
**delay** [2] - 131:9, 131:15
**delve** [1] - 8:1
**demands** [1] - 170:8
**demolished** [1] - 174:22
**demoted** [1] - 172:8
**denied** [1] - 154:9
**departed** [1] - 50:1
**Department** [1] - 110:13
**depose** [1] - 199:7
**deposed** [1] - 7:5
**deposition** [11] - 3:3, 3:8, 3:11, 6:5, 7:12, 7:16, 199:7, 199:8, 199:9, 199:11, 199:12
**DEPOSITION** [1] - 198:18
**Deposition** [3] - 1:11, 3:8, 199:10
**describe** [12] - 42:23, 45:3, 65:5, 102:1, 147:19, 147:20, 148:2, 148:4, 182:23, 194:24, 195:1, 196:6
**described** [7] - 66:18, 68:16, 68:18, 69:22, 87:11, 148:21, 196:12
**describing** [1] - 134:6
**description** [6] - 106:14, 138:14, 161:1, 166:17, 195:3, 196:4
**detail** [3] - 13:21, 19:8, 95:8
**details** [7] - 52:20, 136:14, 180:15, 180:17, 190:5, 194:3, 198:14
**determination** [1] - 105:6
**determined** [1] - 105:8
**determining** [1] - 95:4
**Detroit** [20] - 29:23, 31:17, 31:21, 31:23, 32:2, 32:20, 33:23, 34:1, 34:5, 34:6, 34:9, 35:12, 36:1, 48:9, 48:10, 48:12, 56:21, 56:22, 169:24, 170:11
**develop** [1] - 38:20

**developing** [1] - 159:24
**device** [1] - 10:3
**died** [4] - 31:11, 45:17, 64:8, 137:12
**Diet** [1] - 191:4
**difference** [3] - 45:11, 183:19, 183:20
**different** [20] - 8:20, 32:19, 44:21, 46:18, 48:9, 51:4, 51:13, 51:14, 53:11, 55:20, 57:2, 98:3, 98:4, 137:24, 152:3, 152:9, 157:1, 164:9, 171:22, 177:17
**differential** [1] - 111:9
**difficult** [4] - 72:2, 97:16, 167:2, 195:20
**difficulty** [2] - 6:11, 6:17
**dinner** [2] - 160:5
**direct** [2] - 66:9, 74:1
**directly** [2] - 131:4, 159:13
**director** [1] - 165:1
**Disabatino** [1] - 15:12
**disabatino** [2] - 15:13, 15:14
**disability** [1] - 21:22
**disagreements** [1] - 188:18
**disappeared** [1] - 56:20
**disclosed** [3] - 34:2, 42:13, 163:9
**disclosing** [1] - 164:5
**disclosure** [2] - 11:9, 24:10
**discomfort** [3] - 145:13, 149:23, 149:24
**Discovery** [1] - 12:1
**discriminated** [1] - 173:13
**discrimination** [5] - 30:18, 31:21, 31:23, 33:9, 35:14
**discriminatory** [6] - 18:21, 38:5, 38:11, 128:14, 129:15, 180:4
**discuss** [19] - 10:5, 69:20, 70:8, 70:13, 70:18, 71:4, 71:9, 71:14, 74:7, 80:12, 80:14, 94:12, 94:17, 94:21, 141:5, 155:12, 155:17, 161:8, 163:5

**discussed** [8] - 80:9, 106:20, 142:1, 159:6, 163:9, 181:2, 181:9, 181:17
**discussing** [3] - 84:16, 133:19, 163:23
**discussion** [1] - 110:3
**Discussion** [1] - 10:18
**discussions** [1] - 181:15
**disgruntled** [2] - 164:15, 165:12
**dismissal** [2] - 194:6, 194:8
**dismissed** [3] - 134:8, 159:22, 176:1
**Disneyland** [3] - 37:15, 37:19, 37:20
**disparaging** [1] - 26:17
**dispose** [1] - 24:5
**disrespectful** [4] - 40:19, 62:10, 64:12, 64:19
**disruption** [2] - 131:8, 131:15
**Distasio** [14] - 37:10, 37:12, 37:13, 38:3, 43:19, 44:19, 44:20, 49:21, 161:16, 161:17, 162:6, 162:7, 162:21, 192:7
**distinctly** [1] - 68:23
**distract** [2] - 39:18, 185:2
**DISTRICT** [2] - 1:1, 1:1
**diverse** [2] - 128:8, 138:19
**Division** [7] - 118:15, 120:13, 121:11, 121:12, 121:17, 121:19, 131:13
**division** [2] - 42:10, 100:5
**DIVISION** [1] - 1:2
**divisive** [1] - 63:4
**divorce** [1] - 34:23
**divorced** [1] - 35:10
**doctor** [1] - 22:9
**doctors** [3] - 17:15, 17:20, 22:1
**document** [4] - 52:20, 52:23, 53:2, 60:16
**documentation** [2] - 131:14, 132:14
**documented** [1] - 187:20
**documents** [6] - 19:16, 58:24, 91:16,

133:1, 151:7, 177:22
**dog** [2] - 145:10, 145:19
**dogs** [1] - 146:17
**Doll** [20] - 82:20, 83:12, 83:18, 83:22, 84:15, 85:7, 85:15, 87:3, 87:14, 88:20, 89:6, 89:12, 91:5, 91:12, 94:18, 94:22, 95:16, 95:20, 96:10, 98:18
**Doll's** [2] - 85:3, 97:22
**done** [12] - 36:24, 112:10, 119:4, 122:1, 144:15, 146:7, 152:23, 156:8, 170:20, 179:4, 190:11
**double** [2] - 197:15, 197:17
**doubt** [5] - 97:21, 97:24, 106:24, 118:1
**down** [9] - 98:22, 119:24, 129:9, 147:14, 158:18, 172:17, 172:24, 191:24, 195:5
**downloaded** [1] - 60:5
**Dr** [3] - 18:5, 18:9, 19:17
**drastically** [1] - 111:13
**drink** [1] - 191:4
**drinker** [1] - 160:13
**drive** [3] - 104:17, 188:3, 188:8
**drive-through** [2] - 188:3, 188:8
**driver** [1] - 139:17
**driving** [1] - 42:12
**drugs** [1] - 9:10
**duly** [3] - 7:4, 199:5, 199:7
**during** [13] - 23:13, 30:11, 36:1, 65:12, 67:10, 78:17, 83:10, 87:24, 116:5, 137:21, 154:19, 169:24
**duties** [17] - 105:5, 137:22, 143:7, 143:8, 152:23, 153:3, 153:5, 154:12, 154:14, 166:8, 167:3, 167:12, 167:13, 191:11, 194:10, 195:7, 196:6
**duty** [4] - 27:7, 27:9,

96:4, 195:24
**dynamics** [1] - 42:8

# E

**E-b-y** [1] - 52:12
**E-mail** [15] - 4:5, 4:9, 4:12, 4:13, 4:15, 4:16, 4:18, 4:19, 4:21, 4:22, 4:24, 5:3, 5:4, 5:6, 5:7
**e-mail** [44] - 9:14, 59:8, 84:14, 85:7, 89:13, 90:6, 90:10, 90:24, 91:8, 91:12, 92:5, 95:16, 98:17, 99:8, 100:1, 100:11, 101:3, 101:7, 104:20, 105:16, 105:20, 106:14, 109:19, 111:18, 115:1, 115:4, 115:17, 117:4, 119:18, 120:5, 120:10, 122:17, 125:19, 125:22, 125:23, 131:7, 133:16, 134:11, 135:10, 142:13, 142:14, 177:14, 177:16, 198:13
**e-mails** [13] - 82:19, 82:23, 91:8, 93:18, 93:22, 98:23, 114:16, 119:20, 134:2, 177:18, 177:24, 178:10, 178:18
**early** [4] - 18:7, 20:10, 48:18, 189:23
**ease** [1] - 89:3
**easier** [3] - 43:11, 108:13, 185:19
**East** [2] - 1:17, 2:9
**eat** [2] - 41:23, 46:1
**Ebersole** [1] - 15:18
**Eby** [2] - 52:12, 52:15
**economic** [1] - 172:7
**Ed** [2] - 57:11, 57:14
**education** [1] - 113:20
**educational** [2] - 113:15, 113:16
**EEO** [13] - 18:18, 25:15, 35:24, 54:6, 57:3, 105:22, 105:24, 163:1, 163:5, 163:9, 163:24, 164:5, 180:21

**EEOs** [3] - 24:21, 24:22, 102:22
**effect** [4] - 41:8, 41:11, 41:13, 175:5
**effects** [1] - 42:6
**efficient** [1] - 105:3
**eight** [1] - 166:2
**either** [10] - 86:19, 88:13, 103:21, 126:12, 141:21, 144:6, 147:13, 152:1, 166:23, 172:20
**Elaine** [7] - 82:20, 83:11, 87:14, 90:12, 90:20, 94:10, 100:2
**electronic** [1] - 27:15
**electronically** [3] - 9:22, 9:24, 58:2
**element** [1] - 44:5
**elements** [2] - 73:14, 73:18
**eligible** [3] - 175:9, 175:17, 175:23
**Elizabeth** [1] - 2:3
**email** [1] - 110:7
**emergency** [2] - 20:1, 20:3
**emotion** [3] - 182:13, 183:13, 183:16
**emotional** [14] - 63:3, 65:3, 181:23, 181:24, 182:1, 182:4, 182:5, 182:6, 182:8, 182:14, 182:24, 183:10
**emotionally** [2] - 173:10, 174:8
**employed** [3] - 117:9, 141:15, 173:6
**employee** [12] - 18:21, 32:9, 34:1, 78:21, 79:3, 87:14, 102:23, 110:18, 110:20, 117:8, 178:21, 199:14
**employee's** [4] - 70:8, 70:13, 71:4, 78:23
**employees** [19] - 32:2, 64:8, 66:22, 67:1, 67:5, 69:14, 69:16, 69:21, 103:13, 122:7, 163:6, 164:15, 186:19, 186:21, 189:20, 192:13, 193:20
**employment** [1] - 141:18
**employments** [1] - 173:16

**encompassed** [1] - 60:23
**end** [5] - 40:16, 116:10, 157:8, 160:6, 190:1
**ended** [2] - 187:12, 189:2
**enforcement** [1] - 105:5
**engage** [2] - 39:10
**enjoy** [4] - 167:19, 176:12, 176:15, 176:16
**enjoyed** [1] - 176:8
**enter** [1] - 117:24
**entire** [5] - 41:13, 132:19, 175:11, 191:9, 191:24
**entirely** [1] - 58:1
**entirety** [1] - 78:4
**entrusted** [1] - 75:20
**entry** [1] - 106:9
**environment** [4] - 30:18, 127:8, 137:24, 138:20
**equipment** [2] - 28:5, 192:24
**Eric** [1] - 15:18
**Errol** [1] - 33:1
**especially** [7] - 48:23, 78:7, 128:7, 146:21, 148:10, 149:15, 162:11
**Esq** [2] - 2:3, 2:7
**essay** [1] - 166:21
**essential** [2] - 105:2, 105:7
**essentially** [1] - 69:23
**establish** [1] - 157:6
**established** [1] - 145:11
**esteem** [1] - 174:17
**et** [1] - 62:4
**evaluate** [3] - 43:8, 78:12, 78:21
**evaluating** [1] - 78:9
**evaluation** [10] - 74:7, 74:19, 77:14, 83:7, 83:19, 83:23, 85:8, 87:1, 87:8, 90:11
**event** [1] - 42:24
**eventually** [2] - 188:6, 190:18
**evidence** [1] - 119:4
**evidenced** [1] - 67:7
**ex** [1] - 34:24
**ex-husband's** [1] - 34:24
**exacerbated** [1] - 45:9
**exact** [2] - 25:21,

25:24
**examination** [4] - 1:13, 3:6, 3:13, 199:13
**EXAMINATION** [1] - 7:6
**examined** [1] - 7:5
**example** [5] - 126:14, 126:20, 156:14, 180:12, 188:3
**examples** [5] - 67:22, 84:16, 127:6, 136:16, 181:5
**excelled** [2] - 75:5, 75:19, 77:4
**excellent** [5] - 61:7, 61:11, 73:3, 73:5, 75:20
**excellents** [1] - 73:19
**except** [1] - 11:7
**exchanged** [2] - 37:18, 93:18
**excited** [2] - 167:24, 168:1
**excuse** [2] - 55:17, 161:16
**excuses** [1] - 188:6
**Exhibit** [45] - 12:12, 12:14, 22:1, 37:2, 59:18, 60:10, 72:23, 76:2, 82:14, 84:4, 84:6, 84:8, 85:24, 86:5, 86:7, 89:22, 90:1, 91:19, 91:22, 93:10, 93:14, 95:14, 98:8, 98:10, 98:12, 100:19, 100:21, 101:3, 101:7, 107:23, 108:2, 108:20, 108:22, 108:24, 109:18, 115:3, 117:2, 119:8, 119:10, 119:12, 119:17, 122:18, 133:8, 133:10, 133:12
**exhibit** [2] - 10:4, 14:12
**Exhibits** [7] - 4:2, 5:1, 59:14, 59:16, 93:8, 93:17, 100:17
**exhibits** [2] - 9:14, 10:15
**expect** [3] - 6:6, 16:7, 65:5
**expected** [1] - 126:7
**expecting** [1] - 89:4
**experience** [22] - 33:9, 57:4, 80:18, 124:5, 130:11, 137:20,

137:21, 138:2, 138:24, 139:3, 139:4, 139:7, 139:15, 139:16, 139:21, 143:4, 143:7, 143:8, 143:17, 143:19, 160:21, 160:23
**experienced** [7] - 29:17, 31:20, 31:22, 67:2, 85:17, 120:19, 172:3
**experiences** [2] - 81:10, 143:10
**experiencing** [1] - 35:14
**expert** [1] - 51:7
**EXPIRES** [1] - 199:19
**explain** [3] - 41:10, 43:4, 120:15
**explained** [1] - 134:7
**exponential** [1] - 45:11
**expressed** [2] - 115:19, 195:22
**extend** [1] - 127:13
**extended** [1] - 96:6
**extensive** [2] - 123:18, 137:20
**extremely** [1] - 38:4
**eye** [2] - 187:24, 191:10
**eyes** [1] - 145:21

# F

**F-e-c-i-c-h** [1] - 31:2
**face** [1] - 69:1
**facets** [1] - 154:19
**facilitating** [1] - 160:16
**facing** [2] - 18:13, 172:7
**fact** [5] - 55:19, 55:23, 150:2, 150:4, 150:5
**factual** [2] - 19:5, 39:22
**faculty** [1] - 176:9
**fair** [22] - 6:8, 50:7, 50:14, 50:18, 50:23, 51:1, 51:8, 51:16, 62:11, 64:21, 81:1, 81:4, 83:23, 96:9, 113:12, 148:9, 150:24, 166:11, 182:9, 182:17, 196:18
**fairly** [4] - 11:12, 71:7, 78:21, 104:2

**fairness** [1] - 64:22
**faith** [1] - 24:3
**fall** [4] - 28:17, 28:19, 159:14
**fallopian** [2] - 20:5, 20:19
**falls** [1] - 153:4
**false** [2] - 37:11, 47:9
**familiar** [11] - 7:24, 24:12, 25:1, 61:9, 84:13, 104:2, 104:5, 118:18, 131:20, 143:6, 179:15
**family** [1] - 16:3
**far** [2] - 6:20, 74:20
**fast** [1] - 192:20
**favor** [2] - 64:23, 64:24
**favorable** [1] - 84:22
**favorably** [1] - 77:5
**FBI** [26] - 7:10, 7:18, 20:24, 30:21, 61:9, 102:24, 103:7, 103:18, 105:9, 112:5, 114:13, 141:15, 144:23, 159:19, 169:11, 169:14, 170:7, 171:12, 171:17, 171:23, 173:7, 174:16, 176:1, 176:22, 177:7, 178:20
**Fecich** [6] - 31:1, 31:3, 31:5, 57:12, 189:16
**federal** [1] - 7:10
**Federal** [3] - 1:13, 3:6, 13:17
**feedback** [3] - 83:1, 85:7, 87:2
**Felder** [3] - 17:12, 28:24
**fell** [1] - 154:13
**felt** [22] - 36:17, 36:18, 40:19, 63:10, 63:23, 64:1, 64:12, 69:7, 69:10, 88:1, 88:24, 115:22, 115:24, 116:16, 126:9, 150:7, 150:11, 157:15, 165:17, 168:5, 184:17, 196:8
**female** [15] - 18:20, 27:17, 38:8, 48:16, 63:11, 64:9, 64:13, 68:10, 72:20, 127:1, 138:22, 139:2, 189:12, 189:20, 192:13
**females** [10] - 30:19,

**few** [8] - 11:7, 28:22, 41:18, 67:6, 141:4, 146:10, 153:15, 189:1
**field** [8] - 34:1, 35:13, 36:1, 37:17, 53:11, 122:8, 123:10, 196:8
**fight** [2] - 162:8, 167:5
**fights** [1] - 38:23
**figure** [2] - 9:2, 36:23
**figured** [1] - 97:16
**fil** [1] - 188:2
**file** [1] - 18:12
**filed** [4] - 7:10, 13:17, 172:8, 180:21
**files** [1] - 186:17
**filing** [1] - 14:5, 18:18, 105:24
**filings** [1] - 11:8
**fills** [1] - 74:2
**final** [1] - 36:3
**financial** [2] - 55:6, 55:8
**financially** [1] - 173:8
**financials** [1] - 173:15
**fine** [5] - 80:1, 85:16, 114:23, 140:16, 183:8
**finish** [1] - 79:17
**finishing** [1] - 158:19
**first** [20] - 7:4, 11:8, 12:8, 19:24, 43:6, 52:14, 59:3, 79:17, 101:16, 105:23, 106:3, 119:23, 150:19, 158:18, 169:3, 190:19, 199:7
**First** [1] - 4:3
**firsthand** [3] - 54:24, 55:2, 130:11
**fit** [2] - 138:14, 138:20
**five** [7] - 57:22, 58:12, 73:19, 91:24, 103:3, 166:3, 186:6
**five-minute** [1] - 57:22
**fix** [2] - 55:7, 139:5
**flipped** [1] - 53:20
**Floor** [1] - 2:5
**focus** [1] - 101:15
**focused** [1] - 79:4
**folder** [1] - 60:2
**Foley** [1] - 57:11
**follow** [4] - 49:11, 114:20, 186:13, 197:22
**follow-up** [1] - 186:13

**following** [9] - 44:22, 44:23, 52:22, 54:5, 95:20, 96:11, 138:10, 169:22, 187:22
**follows** [1] - 7:5
**football** [1] - 181:14
**foregoing** [1] - 199:8
**forever** [1] - 176:18
**forget** [1] - 185:7
**form** [1] - 123:23
**formal** [1] - 144:7
**former** [22] - 14:14, 15:15, 15:23, 16:2, 17:4, 17:7, 17:8, 17:9, 17:10, 17:11, 17:12, 17:13, 17:14, 25:11, 25:16, 30:10, 31:6, 31:16, 36:8, 41:14, 88:17, 184:17
**formulate** [1] - 126:1
**forth** [2] - 1:16, 199:11
**forum** [1] - 29:16
**forward** [6] - 11:17, 23:14, 23:19, 36:22, 147:8, 177:24
**forwarded** [3] - 94:9, 178:11, 178:17
**forwarding** [2] - 122:19, 131:12
**four** [1] - 172:4
**Fourth** [2] - 1:18, 2:9
**frame** [1] - 195:12
**fraud** [1] - 54:13
**Freking** [1] - 2:4
**frequently** [1] - 137:5
**Friday** [1] - 117:5
**friend** [3] - 13:12, 14:23, 62:1
**friendly** [1] - 13:13
**friends** [9] - 16:3, 31:10, 34:22, 41:14, 45:16, 45:19, 45:21, 45:24, 46:3
**front** [13] - 9:18, 9:19, 24:9, 82:18, 90:5, 93:17, 98:17, 101:8, 104:21, 105:18, 117:22, 156:7, 190:16
**fruition** [1] - 116:9
**fueled** [1] - 191:8
**full** [1] - 153:4
**full-time** [1] - 153:4
**fully** [2] - 111:24, 112:2
**fun** [1] - 63:12
**function** [1] - 155:2
**functioning** [1] - 155:5

**funny** [1] - 128:23
**furious** [2] - 162:4, 166:5

## G

**G-e-a-r-t-y** [1] - 31:14
**gage** [1] - 131:22
**Garden** [1] - 1:23
**garden** [1] - 169:20
**Garvin** [2] - 22:3, 22:7
**gathered** [2] - 82:11, 132:13
**gathering** [1] - 120:10
**gauge** [1] - 52:8
**gears** [1] - 57:20
**Gearty** [1] - 31:14
**gender** [4] - 18:20, 31:20, 31:23, 62:22
**GENERAL** [1] - 1:7
**general** [4] - 14:24, 162:24, 179:16, 196:13
**generally** [6] - 71:16, 72:4, 104:7, 118:9, 159:12, 177:24
**gentleman's** [1] - 191:14
**giant** [1] - 177:3
**GIGLIO** [1] - 1:23
**Giglio** [3] - 1:20, 199:5, 199:18
**given** [9] - 7:12, 31:10, 52:4, 52:7, 61:15, 64:17, 67:5, 105:1, 199:8
**Gladd** [3] - 56:15, 56:18, 56:19
**Glennis** [3] - 53:17, 54:2, 54:9
**gossip** [10] - 179:19, 179:21, 179:24, 180:2, 180:5, 180:8, 181:20, 183:21, 184:2, 184:3
**gossiped** [1] - 183:24
**government** [2] - 177:1, 177:2
**grab** [2] - 84:2, 160:7
**grade** [1] - 117:18
**grades** [1] - 114:2
**gravy** [1] - 38:11
**great** [3] - 85:21, 140:20, 197:14
**grew** [1] - 20:13
**grief** [1] - 52:9
**grievances** [1] - 188:22
**ground** [1] - 198:6

**group** [4] - 164:21, 189:24, 190:1, 190:7
**grown** [2] - 21:7, 191:1
**grown-up** [1] - 191:1
**GS-11** [2] - 160:22, 196:1
**GS-12** [2] - 152:10, 154:4
**GS-13** [2] - 152:12, 154:4
**GS-24** [3] - 63:9, 127:18, 129:12
**guess** [9] - 15:21, 55:22, 127:13, 130:4, 144:21, 147:1, 167:17, 169:15, 171:22
**guy** [1] - 138:12
**guys** [6] - 6:11, 58:4, 109:8, 140:7, 197:6, 198:11

## H

**H.R** [4] - 103:23, 110:18, 193:23, 194:5
**half** [2] - 109:12, 140:12
**Hamilton** [11] - 31:12, 39:4, 39:8, 39:15, 40:1, 40:9, 41:3, 46:6, 49:15, 66:2, 66:4
**HAMILTON** [1] - 199:4
**Hamilton's** [1] - 181:7
**hammer** [1] - 59:2
**hand** [3] - 11:5, 126:23, 199:16
**handle** [2] - 52:6, 167:16
**handled** [3] - 51:22, 52:1, 124:7
**handling** [1] - 52:9, 155:7
**hands** [3] - 113:9, 114:6, 166:14
**handwritten** [1] - 133:23
**harassing** [1] - 62:22
**hard** [6] - 116:8, 131:12, 148:7, 148:8, 148:9, 148:11
**harder** [1] - 76:15
**hat** [1] - 138:12
**Haven** [1] - 55:14
**head** [3] - 68:21, 122:24, 149:20

**headquarters** [16] - 24:20, 32:5, 96:8, 118:16, 118:17, 118:19, 118:20, 166:22, 168:11, 168:21, 169:1, 176:11, 193:1, 193:10, 195:10, 195:23
**heads** [1] - 162:1
**Health** [1] - 22:13
**health** [3] - 23:13, 23:18, 174:1
**hear** [6] - 8:15, 71:19, 75:10, 109:8, 153:24, 175:4
**heard** [8] - 57:16, 63:19, 88:4, 88:5, 88:7, 127:10, 150:7, 190:17
**hearing** [4] - 6:11, 6:17, 142:8, 169:3
**hearsay** [2] - 78:8, 130:16
**held** [3] - 88:15, 96:14, 166:14
**help** [12] - 6:16, 15:22, 55:7, 96:20, 97:18, 145:15, 155:18, 158:14, 173:22, 174:1, 177:6, 189:8
**helped** [3] - 85:19, 126:1, 181:8
**helpful** [3] - 115:8, 115:24, 116:5
**helping** [2] - 114:21, 139:5
**helps** [1] - 172:14
**Henderson** [3] - 68:17, 68:23, 71:15
**henpecking** [1] - 191:3
**Herb** [3] - 90:16, 124:16, 141:24
**Herbert** [4] - 61:20, 72:17, 134:3, 141:21
**hereby** [1] - 199:6
**herein** [3] - 1:12, 3:4, 7:3
**hereinafter** [2] - 1:16, 7:4
**hereinbefore** [1] - 199:11
**hereunto** [1] - 199:16
**herself** [1] - 147:17
**hierarchy** [1] - 123:3
**high** [3] - 26:14, 114:4, 158:11
**highest** [1] - 123:9
**highlighted** [1] -

106:22
**highly** [3] - 75:3, 75:18, 85:11
**himself** [2] - 57:15, 94:17
**hints** [1] - 136:22
**hire** [5] - 137:6, 137:14, 143:2, 176:2, 193:5
**hired** [3] - 138:3, 141:10, 187:17
**hobbies** [8] - 169:6, 169:7, 169:17, 170:12, 170:15, 170:18, 171:22, 174:7
**hobby** [2] - 171:1, 171:9
**hold** [1] - 53:19
**holding** [1] - 158:24
**Holliday** [1] - 24:15
**Holyfield** [3] - 56:10, 56:11, 56:13
**home** [6] - 101:24, 102:2, 102:9, 104:18, 158:8
**Home** [6] - 102:6, 102:17, 104:11, 104:12, 104:22, 105:2
**Home-to-Work** [5] - 102:17, 104:11, 104:12, 104:22, 105:2
**honest** [2] - 9:7, 84:22
**honestly** [3] - 34:18, 50:20, 153:17
**hope** [1] - 9:15
**horns** [1] - 165:16
**hot** [1] - 157:10
**hour** [2] - 109:12, 140:13
**hours** [4] - 48:18, 166:2, 166:3
**house** [6] - 121:7, 121:13, 121:15, 181:8, 181:10, 192:10
**housed** [1] - 157:3
**Houston** [1] - 56:20
**HRD** [1] - 110:8
**hugging** [1] - 149:3
**Hugh** [2] - 52:12, 52:15
**human** [7] - 41:1, 41:2, 41:4, 49:3, 49:9, 61:24, 110:13
**humiliated** [1] - 174:16
**humor** [1] - 196:16

**husband** [11] - 33:16, 33:18, 56:22, 172:7, 178:12, 178:21, 179:2, 179:11, 179:20, 180:10, 180:24
**husband's** [1] - 34:24
**hysterectomy** [1] - 21:10

**I**

**ID** [3] - 4:2, 5:1, 39:12
**idea** [9] - 97:14, 110:10, 115:10, 116:9, 131:19, 132:2, 132:4, 132:5, 151:8
**ideal** [1] - 108:10
**identification** [13] - 12:16, 59:20, 84:10, 86:9, 90:3, 91:21, 93:12, 98:14, 100:23, 108:4, 109:2, 119:14, 133:14
**identified** [1] - 195:12
**idle** [3] - 112:24, 113:2, 113:9
**III's** [1] - 112:10
**ill** [1] - 89:3
**imitate** [1] - 128:8
**impact** [10] - 42:18, 43:8, 43:11, 43:13, 43:20, 50:5, 70:10, 70:15, 175:2, 175:6
**impacted** [14] - 43:23, 44:1, 44:2, 44:16, 50:10, 110:4, 110:22, 110:24, 111:1, 111:2, 111:3, 111:4, 111:5, 111:7
**impacting** [1] - 145:6
**impacts** [2] - 71:5, 96:5
**important** [3] - 44:14, 95:4, 188:7
**impose** [1] - 151:3
**impression** [2] - 91:7, 147:10
**improve** [2] - 77:18, 189:8
**improvement** [5] - 47:20, 47:21, 47:23, 48:4, 84:23
**IN** [1] - 199:16
**in-house** [3] - 121:7, 121:13, 121:15
**in..** [1] - 118:20

**inaccurate** [1] - 184:20
**inappropriate** [6] - 124:10, 125:3, 127:11, 128:3, 128:21, 129:6
**inappropriately** [1] - 126:24
**incident** [1] - 189:22
**incidents** [5] - 35:17, 35:22, 38:6, 54:14, 173:12
**include** [1] - 19:9
**included** [3] - 76:11, 111:9, 160:14
**includes** [3] - 41:3, 104:8, 151:20
**income** [2] - 63:12
**incorporate** [1] - 157:2
**increase** [1] - 157:7
**independent** [1] - 149:7
**Indianapolis** [3] - 29:23, 30:1, 30:5
**indicated** [3] - 6:15, 54:3, 90:13
**indicates** [1] - 85:7
**indication** [1] - 186:16
**individual** [16] - 15:6, 26:16, 36:7, 39:3, 40:24, 44:15, 47:22, 88:12, 110:16, 118:23, 128:18, 141:10, 149:5, 149:6, 160:18, 160:21
**individual's** [1] - 50:5
**individually** [2] - 43:13, 187:15
**individuals** [17] - 13:1, 13:3, 23:7, 24:14, 37:8, 45:17, 53:11, 53:15, 54:5, 83:1, 89:4, 122:6, 122:10, 137:18, 139:1, 151:1, 189:11
**ineffectiveness** [1] - 39:19
**infection** [1] - 20:20
**inferred** [1] - 90:23
**inflection** [1] - 124:10
**inflict** [1] - 150:18
**influence** [2] - 9:9, 192:3
**information** [32] - 13:4, 13:15, 17:16, 18:8, 19:5, 22:10, 23:23, 29:15, 30:9, 31:4, 31:9, 31:18,

36:12, 37:11, 47:9, 55:10, 56:23, 82:11, 99:22, 117:22, 118:1, 120:11, 130:14, 130:23, 132:22, 134:16, 143:23, 144:3, 148:12, 179:1, 179:9, 196:19
**informed** [1] - 89:11
**infrequent** [1] - 34:19
**initiate** [1] - 106:2
**initiating** [1] - 106:1
**input** [5] - 87:13, 95:3, 142:3, 142:4
**insert** [2] - 32:9, 125:3
**inserting** [1] - 124:9
**inside** [1] - 149:19
**inspection** [2] - 118:15, 125:4
**Inspection** [5] - 120:13, 121:11, 121:12, 121:17, 121:19
**instance** [6] - 78:16, 79:3, 80:3, 80:7, 155:14, 187:24
**instances** [4] - 22:21, 80:12, 125:24, 167:14
**instead** [4] - 11:22, 32:9, 33:5, 147:23
**instigating** [1] - 69:24
**instructed** [1] - 188:5
**instructing** [1] - 111:22
**instruction** [2] - 33:4, 113:22
**insubordinate** [1] - 191:20
**intelligence** [1] - 105:4
**intending** [1] - 150:1
**intention** [2] - 149:17, 149:22
**interact** [1] - 44:4
**interacted** [1] - 146:8
**interacting** [2] - 46:10, 50:9
**interaction** [5] - 26:15, 30:16, 44:21, 123:14, 189:17
**interactions** [14] - 26:23, 27:1, 38:16, 40:3, 44:2, 45:9, 66:16, 66:17, 77:6, 79:19, 79:22, 124:3, 174:19, 189:19
**intercede** [1] - 190:22
**interest** [3] - 42:3,

115:19, 199:15
**interesting** [2] - 114:7, 151:9
**interests** [3] - 170:13, 170:16, 170:18
**interference** [2] - 121:22, 121:23
**interject** [1] - 65:14
**interjections** [1] - 65:16
**intermittently** [1] - 170:6
**internal** [4] - 103:9, 103:10, 178:7, 180:10
**interpersonal** [3] - 156:12, 160:1, 160:17
**Interrogatories** [6] - 4:4, 11:19, 37:3, 53:10, 54:4, 197:4
**Interrogatory** [1] - 12:19
**interrogatory** [3] - 12:24, 47:8, 52:11
**interrupt** [2] - 190:6, 190:9
**interrupting** [2] - 20:6, 165:8
**interview** [7] - 25:5, 25:14, 30:15, 31:7, 136:12, 139:2, 139:23
**interviewed** [14] - 25:17, 30:12, 30:13, 53:5, 121:2, 121:4, 132:9, 132:10, 132:17, 137:10, 139:7, 142:2, 143:11, 178:24
**interviewers** [1] - 120:13
**interviews** [4] - 119:2, 131:1, 137:21, 142:1
**intoxicated** [1] - 42:12
**Intranet** [3] - 103:8, 105:10, 136:18
**introducing** [1] - 118:11
**inverted** [1] - 101:10
**investigated** [9] - 52:18, 53:18, 54:5, 54:11, 54:17, 120:19, 120:20, 120:22, 121:13
**investigation** [18] - 18:17, 18:23, 25:15, 25:16, 30:12, 47:24, 53:6, 55:18, 56:18, 118:13, 118:14,

118:24, 120:16, 120:18, 121:15, 121:24, 122:11, 132:19
**investigations** [3] - 121:6, 132:6, 184:6
**investigative** [1] - 54:19
**Investigative** [1] - 117:10
**invited** [1] - 160:4
**involved** [8] - 25:10, 29:1, 30:17, 100:8, 115:18, 151:22, 163:11, 163:13
**IS** [2] - 133:20, 134:13
**issue** [7] - 23:14, 39:8, 52:17, 155:1, 155:16, 161:11, 177:13
**issued** [1] - 61:19
**issues** [24] - 6:7, 45:8, 48:15, 55:6, 55:7, 55:8, 70:8, 70:13, 70:18, 154:21, 155:7, 155:8, 155:12, 161:8, 161:13, 161:14, 165:19, 172:7, 174:1, 187:19, 187:21, 189:1, 189:2, 198:4
**itemize** [1] - 76:11
**items** [1] - 71:10
**itself** [1] - 19:6

## J

**jailhouse** [1] - 112:9
**James** [5] - 17:11, 36:17, 46:23, 110:8, 188:20
**Janes** [1] - 17:10
**Jason** [3] - 37:10, 43:19, 192:6
**Jen** [1] - 111:23
**Jennifer** [5] - 4:7, 59:24, 124:17, 124:23, 186:24
**JENNIFER** [7] - 1:3, 1:11, 3:4, 7:2, 198:16, 199:7, 199:9
**Jesse** [1] - 15:12
**Jim** [7] - 188:19, 189:13, 190:23, 190:24, 191:17, 191:21, 194:16
**job** [18] - 44:10, 117:17, 136:14,

137:16, 143:20, 153:4, 154:12, 156:2, 160:24, 166:7, 167:10, 167:12, 167:22, 170:8, 170:23, 175:10, 176:6, 191:18
**jobs** [6] - 172:4, 175:18, 175:19, 175:20, 175:22
**Joe** [7] - 56:15, 56:19, 181:6, 181:9, 181:10, 181:11
**John** [2] - 55:12, 56:1
**Johnson** [4] - 17:21, 18:9, 19:17, 22:24
**Johnson's** [1] - 18:5
**joke** [6] - 39:20, 63:7, 126:20, 127:19, 128:12
**joked** [1] - 127:5
**jokes** [4] - 127:11, 128:3, 128:5, 129:11
**Jones** [7] - 53:18, 54:2, 54:9, 54:23, 55:1, 55:3
**Joseph** [5] - 31:12, 39:4, 39:8, 46:6, 66:1
**Joy** [1] - 2:12
**Judd** [1] - 110:8
**judging** [1] - 183:5
**judgment** [5] - 85:3, 140:3, 182:2, 182:15, 183:13
**July** [8] - 101:4, 101:7, 101:12, 101:16, 105:17, 106:8, 109:19, 117:5
**jump** [1] - 6:16
**juncture** [1] - 195:14

## K

**K-e-n-n-e-l-l-y** [1] - 26:8
**Karl** [6] - 25:7, 72:14, 190:20, 190:22, 191:13
**keep** [2] - 36:21, 127:21
**keeping** [1] - 92:11
**keeps** [1] - 71:23
**Ken** [8] - 72:13, 127:21, 129:5, 168:13, 168:23, 188:21, 190:20, 193:13

**Kennelly** [3] - 26:5, 26:8, 26:10
**Kenneth** [1] - 17:6
**Kevin** [6] - 56:10, 56:11, 57:5, 193:14, 193:15, 193:17
**kid** [1] - 38:9
**kids** [2] - 9:1, 49:10
**kill** [1] - 45:15
**killed** [1] - 40:17
**kind** [29] - 22:5, 23:16, 29:9, 46:9, 46:14, 51:6, 59:1, 64:7, 67:9, 88:10, 126:21, 136:10, 140:6, 142:4, 151:14, 153:18, 154:18, 154:24, 156:2, 157:4, 158:1, 160:8, 170:24, 174:13, 180:3, 184:14, 184:23, 190:2, 193:1
**kinds** [1] - 174:19
**knowledge** [10] - 53:3, 54:8, 54:23, 55:2, 55:4, 88:18, 112:7, 121:14, 130:11, 130:14
**knowledgeable** [1] - 196:16
**known** [2] - 29:5, 164:14
**knows** [1] - 165:7
**Knull** [1] - 15:5
**Kristi** [2] - 26:5, 26:7
**KSA** [1] - 136:14
**Kuchay** [1] - 106:4

## L

**L.A** [1] - 37:18
**labeled** [1] - 11:3, 11:15, 11:24, 37:2, 82:15, 178:4, 178:5
**lack** [2] - 65:3, 174:17
**lacked** [1] - 63:6
**language** [15] - 65:15, 66:24, 67:3, 67:12, 67:15, 67:18, 67:20, 67:21, 67:23, 68:1, 69:6, 69:14, 70:4, 77:1, 183:1
**large** [1] - 20:3
**Larry** [1] - 32:24
**last** [16] - 8:24, 9:15, 9:21, 23:16, 71:19, 71:24, 78:7, 79:13, 80:24, 108:5, 116:20, 131:6,

134:13, 141:6, 159:16, 168:16
**late** [4] - 20:10, 28:19, 34:16, 159:14
**law** [6] - 86:18, 105:5, 183:9, 183:13, 183:15, 183:16
**lawful** [1] - 7:3
**Lawrence** [4] - 32:21, 32:23, 56:2, 56:4
**lawsuit** [1] - 172:9
**lead** [2] - 89:6, 146:14
**leader** [47] - 25:4, 26:12, 29:6, 45:13, 54:12, 55:5, 55:11, 57:7, 70:17, 125:1, 125:2, 130:1, 133:24, 136:3, 136:5, 136:6, 136:12, 152:7, 152:11, 152:14, 152:20, 153:5, 153:8, 153:23, 154:4, 154:13, 154:20, 154:22, 155:4, 155:5, 155:6, 155:10, 155:16, 155:20, 155:16, 167:12, 167:20, 167:21, 167:23, 168:2, 179:14, 190:10, 195:10, 195:21, 195:24
**leader's** [2] - 153:24, 194:21
**leaders** [2] - 167:3, 180:1
**leading** [1] - 190:8
**learn** [1] - 170:24
**learned** [1] - 97:10
**least** [6] - 7:24, 36:16, 115:23, 157:19, 159:18, 196:18
**leave** [8] - 34:9, 58:3, 96:5, 103:23, 115:9, 116:1, 154:16
**leaving** [2] - 35:12, 37:23
**LeCompte** [1] - 2:12
**led** [2] - 137:14, 138:23, 195:18
**left** [6] - 33:22, 159:19, 169:11, 170:17, 171:12, 171:17
**legally** [1] - 133:3
**legitimate** [1] - 97:23
**length** [1] - 167:13
**Leopold** [6] - 32:21, 32:23, 33:12, 56:2, 56:3, 56:4

**less** [6] - 26:1, 76:16, 81:16, 143:21, 146:1, 146:13
**lesson** [3] - 63:23, 64:1, 64:2
**level** [6] - 8:15, 66:3, 116:12, 116:15, 156:11, 156:22
**levels** [1] - 173:22
**lie** [2] - 83:18, 146:15
**lied** [2] - 49:4, 52:20
**life** [11] - 62:4, 157:24, 169:7, 169:9, 170:9, 170:10, 171:11, 171:16, 173:6, 174:4, 176:14
**light** [1] - 112:8
**likelihood** [2] - 19:15, 110:17
**limit** [1] - 163:16
**limited** [2] - 100:4, 174:12
**line** [2] - 62:5, 131:6
**Lisa** [6] - 68:19, 82:20, 83:12, 87:13, 114:16, 189:14
**list** [12] - 12:24, 16:20, 24:6, 30:7, 31:1, 37:6, 37:8, 53:10, 114:17, 124:16, 134:15, 188:22
**listed** [3] - 19:22, 28:23, 39:3
**listened** [1] - 79:11
**litany** [1] - 64:17
**literally** [3] - 44:9, 146:1, 149:19
**lived** [1] - 179:6
**Liza** [3] - 10:14, 59:22, 197:22
**LLC** [1] - 2:4
**load** [2] - 157:20, 157:21
**loaded** [1] - 156:7
**local** [1] - 13:18
**locality** [2] - 111:5, 111:15
**located** [1] - 17:22
**lock** [1] - 165:16
**locks** [2] - 39:10, 39:11
**log** [6] - 139:5, 139:13, 144:15, 144:17, 190:3, 190:4
**logs** [1] - 46:13
**Lois** [1] - 17:8
**look** [19] - 11:8, 11:18, 11:21, 12:18, 17:1, 61:4, 72:22, 76:1, 82:14, 84:12, 119:5,

122:14, 126:15, 134:11, 136:19, 138:18, 148:11, 184:24, 185:22
**looked** [3] - 65:19, 65:20, 81:10
**looking** [15] - 25:6, 26:4, 37:4, 60:16, 75:16, 94:1, 106:8, 122:17, 125:7, 125:8, 131:2, 138:8, 138:9, 184:24, 189:9
**looks** [15] - 76:17, 90:11, 93:22, 94:5, 99:11, 99:24, 100:7, 104:21, 106:13, 110:19, 112:14, 115:17, 119:24, 124:9, 133:18
**lose** [1] - 28:6
**loss** [3] - 174:10, 174:24, 175:6
**lost** [7] - 27:22, 39:12, 67:9, 75:9, 138:15, 174:14, 178:18
**Louis** [2] - 50:2, 163:19
**love** [2] - 136:24, 167:19
**loved** [6] - 167:10, 167:11, 167:22, 168:2, 168:3
**ludicrous** [3] - 184:14, 184:18, 184:20
**lunch** [4] - 56:8, 140:9, 140:22, 157:10
**lying** [2] - 134:8, 134:9

## M

**ma'am** [1] - 16:13
**mad** [1] - 165:20
**magically** [1] - 28:3
**mail** [59] - 4:5, 4:9, 4:12, 4:13, 4:15, 4:16, 4:18, 4:19, 4:21, 4:22, 4:24, 5:3, 5:4, 5:6, 5:7, 9:14, 59:8, 84:14, 85:7, 89:13, 90:6, 90:10, 90:24, 91:8, 91:12, 92:5, 95:16, 98:17, 99:8, 100:1, 100:11, 101:3, 101:7, 104:20, 105:16, 105:20, 106:14, 109:19, 111:18, 115:1, 115:4, 115:17, 117:4,

119:18, 120:5, 120:10, 122:17, 125:19, 125:22, 125:23, 131:7, 133:16, 134:11, 135:10, 142:13, 142:14, 177:14, 177:16, 198:13
**mails** [13] - 82:19, 82:23, 91:8, 93:18, 93:22, 98:23, 114:16, 119:20, 134:2, 177:18, 177:24, 178:10, 178:18
**main** [5] - 68:16, 126:17, 138:24, 139:16, 146:7
**maintained** [1] - 116:14
**major** [1] - 29:10
**maker** [1] - 38:8
**male** [16] - 32:8, 32:9, 63:9, 63:19, 63:20, 65:9, 65:14, 65:19, 66:22, 67:1, 67:5, 127:1, 127:3, 129:18, 129:20, 138:11
**males** [4] - 64:10, 64:24, 67:3, 68:2
**man** [1] - 65:5
**manage** [1] - 173:22
**managed** [1] - 166:10
**manner** [1] - 149:3
**Manual** [2] - 103:16, 103:18
**manual** [1] - 103:20
**March** [1] - 199:20
**Margaret** [2] - 2:7, 7:9
**mark** [10] - 59:13, 84:3, 85:23, 93:7, 98:7, 100:16, 107:20, 108:19, 119:7, 133:7
**marked** [29] - 12:15, 59:4, 59:19, 60:10, 61:5, 61:6, 76:1, 82:14, 84:9, 86:8, 90:2, 91:20, 92:3, 93:11, 95:14, 98:13, 100:22, 101:2, 101:6, 108:3, 109:1, 109:18, 111:18, 115:3, 117:2, 119:13, 119:16, 122:18, 133:13
**Marked** [2] - 4:2, 5:1
**married** [3] - 34:23, 171:18, 171:19

**Mary** [4] - 31:1, 57:12, 57:17, 189:15
**mask** [1] - 6:13
**mass** [5] - 20:4, 20:14, 20:16, 21:4, 21:6
**master's** [2] - 33:3, 113:21
**matches** [1] - 192:8
**maternity** [2] - 115:8, 116:1
**math** [4] - 114:1, 114:10, 114:11, 181:8
**matter** [4] - 126:5, 134:10, 150:1, 150:5
**matters** [3] - 7:18, 179:11, 180:10
**mean** [36] - 9:21, 13:13, 38:17, 38:18, 61:9, 85:17, 96:7, 97:13, 99:7, 102:23, 104:15, 110:12, 112:2, 112:11, 131:18, 133:1, 135:1, 139:11, 139:23, 146:4, 146:8, 146:23, 147:3, 147:4, 161:23, 166:15, 166:19, 169:7, 170:22, 174:10, 174:18, 180:7, 181:6, 184:13, 185:14, 195:22
**meaning** [2] - 153:15, 196:7
**means** [4] - 64:22, 104:16, 107:4, 191:15
**meant** [1] - 145:10
**mediate** [3] - 154:24, 155:1, 155:18
**mediation** [1] - 105:23
**medical** [17] - 17:15, 17:16, 17:19, 18:13, 18:14, 19:5, 19:19, 21:18, 22:2, 22:11, 22:17, 23:5, 23:22, 24:2, 179:8, 196:24, 197:10
**medication** [2] - 173:21, 173:24
**medications** [2] - 9:10, 21:1
**medicinally** [1] - 21:13
**meet** [3] - 91:2, 123:16, 190:1
**meeting** [17] - 80:10, 87:3, 87:7, 87:24, 88:4, 88:11, 88:15,

88:24, 89:7, 89:10, 89:12, 89:16, 91:1, 91:6, 91:10, 149:12, 162:12
**meetings** [5] - 124:4, 124:5, 126:3, 126:4, 126:10
**member** [8] - 30:11, 32:24, 40:11, 43:12, 44:24, 49:12, 49:24, 180:11
**members** [42] - 16:3, 29:15, 30:13, 31:7, 40:17, 41:9, 41:14, 41:22, 43:9, 43:18, 45:21, 46:4, 46:10, 46:22, 51:21, 52:6, 55:24, 57:14, 137:11, 145:4, 145:11, 156:13, 156:18, 160:2, 160:19, 161:8, 161:9, 161:13, 162:20, 162:24, 163:24, 166:10, 179:20, 183:22, 184:1, 184:17, 188:19, 189:15, 192:4, 194:24, 196:1, 196:11
**memo** [1] - 4:10
**memorandum** [3] - 120:1, 125:9, 125:19
**Memphis** [1] - 29:22
**men** [5] - 62:17, 62:19, 64:20, 64:22, 65:18
**mental** [3] - 23:13, 23:17, 174:1
**mention** [1] - 106:17
**mentioned** [5] - 18:16, 18:17, 148:24, 174:24, 189:22
**mentions** [1] - 29:24
**mentor** [2] - 189:4, 189:6
**mentoring** [1] - 161:2
**met** [1] - 74:6
**Michael** [6] - 17:9, 55:1, 55:3, 128:5, 128:19, 129:8
**Michigan** [1] - 172:12
**microphone** [2] - 8:14, 8:21
**middle** [1] - 192:8
**might** [18] - 16:17, 17:5, 17:7, 17:8, 17:9, 17:10, 17:11, 17:12, 17:13, 17:14, 22:21, 24:24, 41:7, 58:3, 97:3, 146:19,

177:6, 194:21
**mike** [1] - 58:7
**mind** [5] - 22:4, 42:2, 92:23, 152:17, 186:2
**mine** [3] - 25:12, 103:15, 129:19
**minimally** [1] - 73:20
**minimum** [1] - 100:7
**minute** [2] - 57:22, 76:3
**minutes** [6] - 58:12, 58:13, 140:14, 185:22, 186:1, 186:6
**minutia** [1] - 46:11
**misapplies** [1] - 184:22
**misquoted** [1] - 65:21
**missing** [3] - 27:20, 49:24, 95:8
**mix** [1] - 155:23
**mobile** [1] - 164:24
**moment** [2] - 57:20, 185:9
**Monday** [2] - 95:20, 105:17
**month** [8] - 65:12, 65:24, 67:10, 67:11, 81:13, 126:6, 139:3, 144:5
**mood** [1] - 195:4
**Moore** [1] - 17:8
**Morgan** [1] - 17:9
**morin** [1] - 123:5
**Morin** [12] - 73:6, 73:7, 98:18, 98:24, 99:12, 99:17, 111:19, 111:21, 115:7, 115:23, 130:18, 130:20
**morning** [1] - 90:17
**most** [8] - 40:14, 45:20, 68:11, 103:6, 151:22, 175:19, 176:16, 196:16
**motivation** [2] - 46:14, 46:15
**mourning** [1] - 50:15
**move** [7] - 15:22, 16:6, 19:2, 39:2, 52:10, 80:23, 117:21
**moved** [1] - 121:1
**moving** [1] - 146:6
**MS** [103] - 6:1, 6:9, 6:10, 6:22, 7:7, 10:14, 10:16, 10:17, 10:22, 11:14, 11:16, 11:20, 11:21, 11:23, 12:2, 12:3, 12:4, 12:8, 12:17, 16:14, 35:4, 58:1, 58:8,

58:14, 58:18, 59:13, 59:21, 59:22, 59:24, 60:8, 81:20, 82:3, 84:3, 84:11, 85:23, 86:1, 86:2, 86:3, 86:12, 86:13, 86:16, 86:22, 89:23, 90:4, 91:22, 91:24, 92:4, 92:7, 92:9, 92:10, 92:12, 92:14, 92:16, 92:17, 92:18, 93:7, 93:15, 98:6, 98:15, 100:16, 101:1, 107:20, 108:7, 108:19, 109:3, 109:7, 109:14, 109:15, 109:16, 119:7, 119:15, 133:7, 133:15, 140:6, 140:10, 140:11, 140:14, 140:18, 140:20, 140:23, 142:10, 142:15, 168:17, 185:17, 185:21, 186:5, 186:11, 186:12, 196:20, 197:2, 197:3, 197:9, 197:12, 197:15, 197:19, 197:20, 197:21, 197:23, 197:24, 198:7, 198:10, 198:12, 198:13
**MST** [3] - 28:10, 164:23, 166:9
**muddy** [1] - 79:18
**muffled** [2] - 71:21, 75:13
**multi** [1] - 152:13
**multi-team** [1] - 152:13
**multiple** [18] - 20:22, 21:14, 23:1, 25:14, 26:2, 32:2, 39:9, 63:1, 136:7, 137:24, 159:7, 162:20, 166:6, 168:9, 188:4, 189:21, 190:14, 190:23
**multitude** [1] - 54:10
**Munafo** [14] - 26:15, 26:17, 26:24, 31:11, 36:19, 45:2, 49:19, 161:16, 162:22, 180:24, 181:1, 181:2, 181:3, 192:6
**mute** [1] - 186:7
**MY** [1] - 199:19
**Myers** [1] - 2:4

**N**

**name** [21] - 14:1, 14:10, 25:6, 26:4, 30:6, 30:24, 31:13, 32:5, 32:11, 34:24, 36:4, 43:17, 52:22, 59:4, 69:22, 70:5, 118:22, 165:2, 165:4, 168:16, 172:21
**named** [1] - 155:5
**names** [9] - 24:11, 28:22, 36:21, 37:7, 69:16, 83:15, 168:18, 168:24
**narrative** [2] - 74:14, 75:17
**national** [2] - 158:12, 159:7
**natural** [1] - 109:10
**necessarily** [4] - 134:15, 134:24, 176:12, 182:10
**necessary** [2] - 70:20, 71:9
**need** [21] - 8:3, 19:8, 21:19, 23:6, 42:4, 43:22, 96:20, 97:18, 99:4, 125:1, 125:2, 129:22, 144:17, 156:20, 168:24, 184:24, 191:2, 195:13, 195:14
**needed** [12] - 39:17, 64:1, 64:2, 77:18, 135:16, 137:23, 160:20, 166:13, 166:17, 166:19, 166:20, 194:5
**needs** [4] - 36:22, 79:1, 112:10, 195:11
**negative** [14] - 63:4, 66:17, 66:24, 67:21, 67:23, 68:1, 76:10, 76:18, 76:24, 77:14, 77:15, 145:1, 149:9, 149:10
**neighborhood** [2] - 161:20, 192:9
**nerdy** [1] - 170:22
**never** [16] - 7:18, 25:17, 37:20, 47:20, 47:21, 48:3, 53:2, 63:18, 65:15, 67:2, 68:3, 113:10, 135:23, 136:1, 155:11, 184:8
**New** [3] - 17:13, 55:14,

57:12
**new** [9] - 8:23, 113:5, 113:6, 145:13, 146:21, 147:7, 165:1, 165:4, 198:8
**newer** [1] - 158:21
**NEWMAN** [27] - 6:9, 10:16, 11:14, 11:20, 11:23, 12:3, 59:21, 59:24, 86:1, 86:3, 86:13, 91:22, 92:7, 92:10, 92:14, 92:17, 109:15, 140:10, 140:14, 140:20, 142:10, 197:2, 197:9, 197:15, 197:20, 197:23, 198:12
**Newman** [2] - 2:3, 196:22
**next** [13] - 14:1, 14:10, 25:6, 26:4, 31:13, 39:3, 53:9, 73:13, 74:13, 76:18, 98:22, 190:20, 192:2
**nice** [1] - 85:19
**Nickell** [2] - 22:3, 22:7
**Nicole** [7] - 30:7, 31:14, 186:24, 187:4, 187:16, 188:24, 189:1
**night** [3] - 9:15, 9:21, 111:9
**nitpicked** [1] - 191:1
**NO** [1] - 1:5
**nobody** [1] - 165:7
**noise** [1] - 142:8
**nonagent** [1] - 102:5
**none** [7] - 6:20, 16:4, 139:6, 139:8, 139:15, 163:11
**nonexpert** [1] - 11:10
**nonresponsive** [1] - 19:1
**Norfolk** [1] - 137:9
**normal** [4] - 65:21, 66:3, 153:6, 153:7
**normally** [3] - 50:11, 99:21, 183:16
**Northeast** [1] - 172:15
**Nos** [7] - 59:18, 93:10, 93:14, 100:19, 100:21, 107:23, 108:2
**notably** [1] - 44:20
**notary** [4] - 1:20, 3:9, 3:14, 199:5
**Notary** [1] - 199:18
**notes** [5] - 81:10, 86:24, 126:16,

133:23, 185:23
**nothing** [4] - 27:22, 181:17, 193:6, 199:8
**notice** [1] - 131:3
**Notice** [3] - 3:7, 122:20, 199:10
**noticeable** [1] - 45:11
**noticed** [1] - 197:3
**notified** [1] - 120:20
**November** [1] - 35:9
**NPR** [1] - 14:22
**number** [11] - 11:4, 61:4, 86:1, 107:12, 112:20, 158:5, 158:9, 160:11, 178:10, 187:18
**Number** [2] - 82:15, 92:15
**numbers** [2] - 101:10, 148:12
**numeric** [1] - 60:3

**O**

**oath** [3] - 58:22, 141:2, 186:15
**obligated** [1] - 19:21
**obligation** [1] - 19:13
**observations** [2] - 87:13, 144:9
**obtain** [2] - 19:19, 21:18
**obtained** [1] - 134:13
**obviously** [7] - 22:11, 28:5, 124:5, 155:24, 162:9, 173:11, 179:6
**occasions** [1] - 166:7
**occur** [1] - 28:7
**occurred** [10] - 28:20, 36:15, 50:14, 50:19, 54:23, 55:3, 88:11, 163:15, 163:19, 163:21
**October** [5] - 60:21, 90:6, 119:19, 119:23, 120:5
**OF** [4] - 1:1, 1:7, 199:2, 199:4
**offensive** [9] - 63:24, 179:23, 180:3, 181:20, 181:23, 182:7, 183:1, 183:6, 183:11
**offer** [3] - 16:8, 24:24, 154:5
**offered** [2] - 79:9, 116:22
**offering** [2] - 65:8, 84:22

**Office** [2] - 2:8, 123:1
**office** [78] - 27:11, 29:3, 29:7, 29:19, 29:20, 31:21, 31:23, 32:3, 34:1, 34:10, 35:13, 36:1, 36:9, 37:17, 52:16, 54:12, 55:8, 55:15, 57:13, 68:17, 81:13, 82:10, 102:5, 115:12, 115:13, 115:15, 121:1, 122:8, 123:10, 123:17, 124:18, 127:23, 128:13, 134:4, 136:8, 137:9, 137:17, 137:23, 141:19, 143:5, 143:9, 145:6, 145:14, 146:3, 146:7, 146:21, 151:15, 151:19, 152:9, 152:10, 152:13, 152:19, 152:21, 153:1, 153:6, 153:7, 154:3, 154:5, 155:3, 157:4, 157:22, 158:8, 158:21, 161:22, 163:15, 163:19, 163:21, 170:11, 170:12, 170:17, 170:18, 177:13, 193:1, 194:4, 199:16
**office's** [1] - 193:10
**officer** [2] - 36:10, 68:20
**offices** [11] - 1:17, 53:11, 137:19, 138:1, 143:15, 152:24, 153:12, 154:7, 154:8, 166:23, 181:12
**official** [12] - 32:16, 73:7, 74:2, 123:9, 123:11, 141:18, 141:20, 142:6, 142:13, 178:6, 190:4, 199:16
**offish** [1] - 148:21
**offset** [1] - 29:11
**offsite** [3] - 39:6, 39:9, 115:12
**often** [11] - 38:11, 39:18, 41:18, 41:22, 64:15, 65:13, 126:20, 149:12, 180:17, 188:20, 190:6
**OHIO** [2] - 1:1, 199:2

**Ohio** [9] - 1:18, 1:21, 1:24, 2:5, 2:10, 151:20, 199:6, 199:17, 199:18
**on-call** [1] - 167:8
**onboard** [1] - 142:17
**once** [5] - 38:9, 126:6, 160:21, 173:20
**one** [106] - 11:8, 11:11, 11:15, 11:23, 16:9, 16:16, 16:19, 21:12, 27:3, 27:19, 29:13, 29:18, 31:6, 36:3, 36:16, 39:13, 43:23, 53:24, 54:12, 54:13, 55:15, 55:24, 59:3, 59:7, 63:7, 64:5, 64:7, 65:22, 68:16, 69:2, 74:10, 77:8, 78:15, 78:16, 79:3, 79:17, 80:2, 80:7, 88:20, 94:6, 94:24, 98:3, 98:4, 100:13, 101:15, 102:21, 103:22, 107:13, 108:6, 114:16, 114:20, 115:18, 119:23, 120:10, 120:12, 122:13, 127:17, 127:20, 129:11, 134:2, 137:8, 137:17, 137:19, 137:23, 138:4, 141:22, 143:5, 143:9, 143:14, 145:5, 147:17, 152:10, 152:19, 152:21, 153:1, 153:7, 153:12, 153:21, 154:3, 154:8, 155:3, 155:13, 157:19, 162:19, 163:15, 163:19, 165:19, 166:23, 172:12, 172:19, 172:21, 173:3, 177:12, 177:21, 181:11, 185:5, 185:9, 188:3, 189:15, 190:15, 192:5
**one-on-one** [2] - 69:2, 190:15
**one-team** [20] - 29:18, 54:12, 55:15, 137:8, 137:17, 137:19, 137:23, 143:5, 143:9, 143:14, 152:10, 152:19,

152:21, 153:1, 153:7, 153:12, 154:3, 154:8, 155:3, 166:23
**ones** [4] - 17:19, 76:10, 84:2, 163:12
**online** [4] - 112:19, 112:20, 112:21, 149:15
**op** [4] - 96:14, 97:2, 97:5, 97:11
**open** [13] - 29:16, 52:23, 59:12, 82:16, 89:20, 91:17, 92:22, 92:24, 98:2, 100:14, 103:11, 103:12
**opening** [1] - 52:23
**openness** [1] - 157:15
**operated** [1] - 195:18
**operation** [1] - 97:12
**operational** [4] - 100:1, 153:10, 154:14, 188:11
**operationally** [1] - 138:7
**operations** [5] - 102:3, 102:9, 102:10, 144:14, 144:15
**opinion** [17] - 38:2, 38:14, 38:15, 38:20, 39:2, 39:14, 39:23, 39:24, 48:6, 48:20, 61:21, 78:6, 123:23, 124:6, 124:9, 125:3, 126:1
**opinions** [4] - 40:2, 40:4, 156:1, 196:19
**opportunities** [2] - 75:4, 75:19
**opportunity** [11] - 9:15, 38:19, 38:21, 88:3, 88:7, 111:10, 111:11, 123:22, 158:7, 158:16, 161:3
**opposed** [1] - 150:17
**OPR** [19] - 18:17, 18:22, 25:15, 30:11, 37:14, 47:19, 53:4, 53:5, 53:7, 54:5, 54:18, 55:17, 56:18, 57:2, 118:13, 121:6, 124:21, 184:2, 184:3
**OPR'd** [1] - 180:20
**OPRs** [1] - 131:21
**opted** [1] - 158:21
**options** [1] - 174:12
**orally** [2] - 134:18, 136:1
**order** [2] - 60:3, 114:6
**ordinary** [1] - 181:18

**organization** [4] - 24:3, 165:6, 178:1, 178:2
**organize** [1] - 156:21
**organized** [3] - 157:16, 176:10, 195:19
**organizing** [5] - 153:9, 154:1, 154:11, 154:15, 154:18
**origin** [1] - 20:4
**original** [2] - 106:23, 189:15
**originated** [1] - 122:4
**Oscar** [2] - 35:8, 35:9
**outside** [9] - 24:2, 89:4, 115:12, 161:19, 161:21, 169:7, 177:24, 178:2, 192:10
**outstanding** [1] - 73:19
**ovary** [4] - 20:4, 20:19, 20:23, 21:5
**overall** [7] - 61:16, 79:2, 84:18, 84:20, 111:2, 119:3, 165:11
**overly** [8] - 63:2, 63:3, 181:24, 182:1, 182:5, 182:7, 183:10, 183:19
**overqualified** [1] - 168:8
**overreacted** [1] - 63:3
**oversaw** [1] - 25:2
**overtime** [1] - 111:10
**own** [9] - 39:18, 40:7, 87:12, 91:2, 103:19, 103:20, 107:6, 135:16, 149:19

**P**

**P.M** [1] - 198:18
**Page** [4] - 12:20, 37:4, 53:22, 53:23
**page** [14] - 53:9, 53:19, 60:15, 73:13, 74:13, 76:19, 80:24, 98:23, 101:13, 103:20, 125:12, 125:15, 136:19
**pages** [2] - 114:21, 125:7
**paid** [2] - 113:1, 166:1
**pain** [1] - 108:16
**Pam** [4] - 6:15, 81:21, 109:8, 198:13
**Pamela** [3] - 1:20,

199:5, 199:18
**pandemic** [2] - 126:22, 149:1
**paper** [6] - 134:16, 135:1, 135:6, 136:1, 136:2, 191:4
**paperwork** [1] - 193:9
**PAR** [1] - 193:23
**paragraph** [3] - 79:9, 79:10, 82:6
**pardon** [1] - 20:6
**part** [19] - 23:16, 40:14, 45:20, 71:19, 77:11, 80:10, 80:21, 88:13, 105:11, 106:22, 116:20, 131:20, 148:8, 150:19, 160:24, 161:7, 166:19, 170:23, 197:11
**partake** [1] - 171:24
**particular** [7] - 51:24, 78:15, 79:3, 80:3, 80:7, 142:24, 159:20
**particularly** [3] - 145:4, 149:1, 149:2
**parties** [2] - 3:3, 199:14
**pass** [2] - 136:12, 147:15
**passed** [1] - 32:3
**passes** [1] - 155:10
**passport** [1] - 39:12
**past** [2] - 28:17, 103:2
**patient** [1] - 18:4
**PAU** [1] - 110:8
**pay** [15] - 110:4, 110:22, 110:24, 111:1, 111:2, 111:3, 111:4, 111:5, 111:7, 111:14, 111:15, 117:18, 117:22, 172:3
**PC** [3] - 96:14, 97:1, 97:5
**PDF** [2] - 11:3, 59:5
**PDFs** [1] - 9:24
**pending** [1] - 164:5
**people** [40] - 29:13, 30:14, 30:16, 31:11, 38:24, 41:13, 41:15, 42:9, 48:1, 62:10, 62:14, 62:16, 62:19, 81:11, 82:9, 100:8, 119:1, 121:22, 122:3, 128:10, 128:17, 129:11, 132:11, 138:13, 138:19, 142:2, 143:11, 146:19,

148:20, 149:16,
150:7, 150:11,
150:16, 155:13,
165:11, 168:12,
168:24, 169:21,
174:20, 181:12
**people's** [2] - 115:14,
127:4
**per** [1] - 157:19
**perfect** [2] - 8:16,
34:18
**Performance** [2] - 4:7,
110:14
**performance** [44] -
32:16, 44:1, 44:7,
44:16, 45:4, 45:7,
46:8, 47:1, 47:3,
47:19, 47:21, 47:22,
48:4, 50:6, 50:10,
60:11, 60:18, 70:8,
70:13, 70:16, 71:4,
72:23, 74:7, 74:15,
75:7, 75:17, 76:4,
78:2, 83:2, 83:6,
83:19, 83:23, 87:1,
87:8, 105:3, 144:2,
144:4, 144:9,
144:23, 145:1,
187:19, 188:23,
193:24, 194:1
**performed** [1] - 196:6
**performing** [2] - 66:3,
194:10
**perhaps** [3] - 29:23,
127:5, 139:13
**period** [13] - 20:10,
23:14, 25:22, 60:19,
60:24, 114:15,
145:2, 146:13,
159:8, 159:12,
159:16, 187:12,
194:3
**perished** [1] - 41:15
**permanently** [1] -
187:17
**permissible** [2] -
164:3, 164:4
**permitted** [2] - 16:17,
177:23
**person** [24] - 25:3,
36:3, 41:1, 42:23,
51:3, 62:6, 69:24,
74:1, 105:22, 106:3,
108:13, 114:23,
122:15, 126:21,
126:23, 147:10,
147:11, 147:12,
149:3, 149:7, 150:8,
150:11, 154:9
**personal** [4] - 16:3,

54:22, 161:8, 188:9
**personalities** [3] -
42:11, 44:3, 156:1
**personality** [10] -
40:15, 46:19, 46:20,
139:20, 140:1,
147:7, 147:9,
154:21, 188:14,
196:14
**personality-wise** [2] -
139:20, 196:14
**personally** [1] - 56:5
**personnel** [3] - 18:12,
118:2, 179:10
**phase** [1] - 160:13
**phone** [3] - 45:12,
128:12, 161:15
**phonetic** [3] - 32:20,
33:1, 172:14
**phrase** [4] - 64:16,
112:4, 145:9, 184:22
**phrasing** [1] - 191:16
**physical** [1] - 113:24
**physics** [4] - 113:20,
113:21, 113:24,
114:11
**picked** [2] - 13:18,
78:15
**picky** [2] - 63:3, 65:3
**piece** [7] - 28:5,
134:15, 135:1,
135:6, 135:24,
136:2, 162:6
**place** [3] - 1:15, 41:6,
199:9
**Plaintiff** [1] - 2:2
**plaintiff** [4] - 1:4, 1:12,
3:4, 7:3
**plaintiff's** [1] - 11:9
**Plaintiff's** [3] - 4:3,
11:18, 11:24
**plan** [6] - 47:20, 47:21,
47:23, 48:4, 138:15,
156:4
**planned** [1] - 96:14
**planning** [2] - 19:16,
156:6
**plans** [1] - 158:1
**platform** [1] - 177:23
**platforms** [2] - 177:17,
178:20
**play** [2] - 169:19,
172:23
**played** [5] - 167:15,
172:21, 172:22,
173:2
**pleasant** [1] - 85:11
**plowing** [1] - 36:21
**point** [22] - 10:4,
21:20, 26:19, 26:21,

27:3, 39:13, 42:13,
60:6, 63:7, 64:5,
81:13, 81:14,
109:10, 113:13,
114:20, 140:7,
145:5, 153:18,
178:9, 181:11,
195:14, 197:8
**points** [4] - 6:16,
84:22, 141:4, 196:22
**poking** [1] - 192:6
**policies** [4] - 104:2,
104:6, 177:8, 177:11
**policy** [15] - 96:12,
102:17, 102:19,
103:1, 103:10,
103:24, 104:8,
105:10, 105:12,
106:19, 106:23,
107:1, 107:2, 177:7
**politics** [1] - 62:4
**pondering** [1] -
149:13
**poor** [2] - 72:7, 72:8
**population** [1] - 128:8
**portion** [4] - 75:17,
82:1, 172:5, 185:12
**position** [16] - 43:2,
43:7, 48:15, 55:21,
56:21, 73:15, 81:16,
113:6, 117:9,
120:23, 129:10,
138:23, 152:5,
166:24, 167:20
**positive** [14] - 66:7,
66:14, 66:15, 67:18,
67:20, 75:2, 75:7,
75:22, 76:8, 77:6,
79:19, 81:3, 146:16,
195:8
**possession** [1] -
106:21
**possible** [2] - 96:20,
97:19
**possibly** [3] - 18:6,
57:22, 196:3
**post** [1] - 136:22
**posted** [1] - 14:6
**pot** [1] - 181:13
**potential** [2] - 16:21,
76:18
**pouring** [1] - 142:11
**practice** [2] - 22:12,
161:2
**Prater** [15] - 133:20,
133:21, 133:23,
134:13, 135:10,
135:19, 137:6,
137:7, 138:22,
139:22, 141:7,

141:11, 142:17,
142:23, 143:4
**Prater's** [2] - 137:13,
138:2
**prefer** [2] - 43:15,
176:19
**preferred** [1] - 88:14
**preliminary** [1] - 119:2
**prepared** [1] - 131:17
**presence** [3] - 3:10,
3:14, 15:1
**present** [2] - 2:11,
91:5
**presented** [1] - 107:2
**presenting** [1] - 19:16
**pressure** [1] - 195:23
**presume** [1] - 104:1
**pretty** [3] - 64:6,
85:10, 118:9
**primarily** [3] - 106:16,
115:12, 127:2
**primary** [2] - 22:9,
139:18
**print** [1] - 9:16
**priority** [2] - 26:14,
158:11
**privileges** [1] - 104:16
**privy** [2] - 120:17,
132:7
**proactive** [5] - 155:22,
156:5, 156:14,
159:24, 160:16
**probationary** [4] -
186:19, 186:21,
187:12, 194:3
**problem** [1] - 28:4
**problems** [1] - 20:23
**Procedure** [2] - 1:14,
3:7
**proceeding** [2] - 7:19,
164:6
**proceedings** [3] -
163:9, 163:10,
163:24
**process** [3] - 8:1,
8:13, 120:16
**Production** [1] - 4:4
**production** [1] -
197:11
**professional** [17] -
44:7, 45:4, 45:8,
46:8, 47:1, 47:3,
70:7, 75:5, 76:24,
77:19, 85:12,
101:23, 123:23,
124:3, 126:2, 127:8,
127:9
**professionalism** [3] -
63:6, 65:4, 116:12
**professionally** [12] -

42:19, 43:21, 43:24,
44:6, 44:14, 50:6,
137:14, 171:13,
171:16, 174:5,
175:3, 175:7
**professionals** [1] -
23:22
**program** [19] - 24:19,
25:1, 25:2, 83:10,
88:13, 88:18, 89:5,
89:10, 104:22,
136:17, 136:19,
136:21, 139:5,
139:13, 164:14,
167:22, 168:4,
179:14
**programming** [1] -
114:19
**prohibited** [1] -
158:24
**prohibitions** [1] -
177:15
**project** [3] - 63:22,
84:16, 114:20
**projects** [13] - 81:12,
94:24, 95:1, 109:24,
110:21, 112:6,
112:8, 112:12,
112:21, 114:15,
116:23, 117:13,
121:1
**promoted** [1] - 34:11
**pronounce** [1] -
101:17
**pronouncing** [2] -
15:12, 31:1
**pronouncing)** [1] -
31:3
**properly** [1] - 51:21
**prospective** [1] -
29:18
**protective** [1] - 105:4
**protocol** [1] - 74:20
**protocols** [1] - 187:22
**provide** [8] - 12:9,
19:7, 22:15, 23:3,
23:8, 23:22, 24:10,
92:1
**provided** [14] - 13:5,
47:9, 55:9, 85:7,
87:15, 116:4,
130:15, 130:17,
130:23, 131:3,
133:20, 134:18,
135:10, 161:3
**providers** [1] - 22:2
**provides** [1] - 24:20
**providing** [2] - 75:5,
76:24, 77:19
**psychological** [1] -

51:7

**public** [8] - 1:20, 3:9, 3:15, 97:8, 103:11, 103:12, 136:15, 199:5

**Public** [1] - 199:18

**public-court** [2] - 3:9, 3:15

**published** [2] - 102:18, 103:21

**pull** [5] - 9:24, 10:4, 107:10, 107:16, 133:5

**pulled** [5] - 9:22, 12:7, 12:22, 38:6, 124:17

**purposes** [1] - 190:3

**pursuant** [5] - 1:13, 1:14, 3:6, 3:7, 199:10

**push** [1] - 33:5

**put** [11] - 47:19, 47:20, 47:21, 48:3, 48:4, 55:20, 186:6, 194:5, 194:8, 194:20, 195:24

**putting** [2] - 120:11, 198:3

## Q

**qualification** [1] - 143:4

**qualified** [4] - 32:10, 33:1, 33:2, 199:5

**quarterback** [2] - 124:8, 124:19

**Queen** [2] - 172:18, 172:19

**questioned** [1] - 57:7

**questioning** [1] - 7:21

**questions** [30] - 6:19, 8:6, 8:12, 11:13, 25:4, 85:19, 87:24, 88:2, 88:8, 103:23, 124:17, 131:8, 133:20, 133:22, 133:23, 134:1, 134:12, 134:14, 134:17, 135:11, 135:24, 136:1, 136:4, 136:5, 136:12, 136:15, 137:4, 185:24, 186:14, 196:21

**quick** [3] - 57:22, 186:3, 186:6

**quickly** [5] - 11:13, 19:3, 37:8, 41:8, 59:2

**quiet** [1] - 149:14

**quit** [1] - 173:4

**quite** [4] - 21:13, 153:15, 171:21, 191:15

**quote** [2] - 66:9, 105:12

**quoted** [1] - 63:1

## R

**radio** [5] - 27:10, 27:19, 27:22, 28:4, 188:1

**radios** [3] - 27:12, 27:15, 37:18

**raise** [1] - 88:8

**raised** [1] - 100:2

**raises** [1] - 113:12

**ranking** [1] - 123:9

**rapport** [1] - 157:6

**rating** [19] - 60:12, 60:18, 61:5, 61:6, 61:8, 61:12, 61:13, 61:15, 61:16, 61:17, 61:18, 73:3, 73:4, 84:19, 84:21, 87:12, 106:17, 144:22, 144:23

**RDO** [1] - 38:1

**reach** [2] - 162:2, 162:14

**reached** [1] - 56:8

**react** [1] - 156:2

**reacting** [1] - 182:16

**reactionary** [2] - 155:20, 156:10

**read** [13] - 76:7, 81:21, 81:24, 103:11, 135:5, 169:20, 169:21, 170:2, 185:8, 185:11, 191:4, 198:12

**reading** [5] - 22:6, 128:11, 130:9, 151:7, 181:8

**ready** [13] - 10:3, 12:6, 12:21, 17:2, 58:19, 59:6, 59:10, 92:19, 92:20, 93:16, 136:16, 191:8

**real** [3] - 108:16, 157:12, 157:22

**realized** [1] - 106:18

**really** [9] - 69:13, 72:2, 97:23, 125:2, 127:24, 128:13, 171:5, 176:7, 179:22

**reappeared** [1] - 28:3

**reason** [18] - 9:6, 74:22, 83:17, 83:21, 85:2, 87:18, 87:22, 97:21, 105:1, 106:24, 107:5, 118:1, 121:18, 121:21, 136:4, 136:11, 138:3, 178:15

**reasonable** [2] - 131:24, 185:15

**reasons** [3] - 138:5, 138:6, 188:14

**reassurance** [1] - 117:8

**receive** [1] - 144:5

**received** [6] - 73:19, 106:14, 132:11, 132:18, 132:22, 161:15

**receiving** [1] - 22:18

**recently** [1] - 172:20

**recess** [3] - 58:17, 140:22, 186:10

**recognize** [1] - 36:4

**recollection** [1] - 96:22

**recommendation** [1] - 141:23

**reconvene** [1] - 140:9

**record** [8] - 6:2, 7:8, 10:19, 35:3, 60:12, 176:1, 177:4

**records** [9] - 19:19, 19:20, 21:18, 22:11, 23:5, 48:2, 118:2, 196:24, 197:10

**recovery** [2] - 22:17, 179:8

**red** [1] - 145:22

**refer** [1] - 78:16

**referenced** [6] - 41:5, 83:8, 110:8, 127:17, 134:12, 135:11

**references** [1] - 155:10

**referencing** [1] - 125:21

**referred** [5] - 64:14, 68:19, 84:19, 90:9, 184:12

**referring** [19] - 18:15, 21:3, 26:20, 47:14, 47:16, 67:16, 76:20, 76:22, 77:12, 80:7, 102:11, 115:1, 115:5, 117:8, 117:17, 118:19, 124:13, 125:9, 159:11

**reflected** [1] - 63:10

**reflective** [1] - 165:13

**reflects** [1] - 78:2

**refused** [3] - 25:13, 166:7, 190:24

**regal** [1] - 128:20

**Regal** [3] - 128:5, 128:19, 129:9

**regard** [3] - 22:19, 155:20, 187:16

**regarding** [5] - 18:12, 38:12, 101:16, 121:3, 161:9

**regina** [1] - 17:13

**regular** [4] - 37:24, 40:15, 160:19, 161:6

**regularly** [4] - 111:8, 156:15, 189:24, 192:7

**reiterating** [1] - 70:2

**relate** [3] - 78:12, 78:14, 78:22

**related** [9] - 14:14, 24:16, 26:10, 29:9, 30:9, 31:5, 134:5, 169:16, 179:13

**relating** [5] - 76:23, 77:2, 77:19, 78:3, 78:11

**relationship** [1] - 85:14

**relationships** [4] - 155:21, 156:13, 160:1, 160:17

**relative** [2] - 199:13, 199:14

**relayed** [1] - 56:23

**release** [1] - 23:4

**released** [1] - 187:11

**releases** [1] - 197:17

**relevancy** [1] - 95:6

**relevant** [14] - 18:9, 19:12, 19:14, 21:16, 22:15, 22:22, 23:8, 31:19, 36:13, 43:5, 44:7, 139:14, 152:18, 152:22

**relieve** [1] - 27:5

**remarks** [3] - 38:12, 75:7, 77:8

**remediated** [1] - 193:22

**remember** [12] - 49:14, 52:21, 53:8, 68:20, 68:22, 81:17, 96:8, 96:17, 137:1, 144:19, 168:20, 179:12

**remind** [3] - 58:21, 141:1, 186:14

**removal** [1] - 106:20

**remove** [3] - 20:3, 20:18

**removed** [9] - 20:24, 21:8, 27:13, 28:9, 28:12, 28:18, 55:16, 120:22, 143:22

**reoccurrence** [2] - 20:23, 21:3

**REOs** [1] - 154:16

**repeat** [5] - 16:15, 23:15, 75:15, 168:18, 175:13

**repeating** [1] - 22:4

**rephrase** [1] - 66:6

**rephrased** [1] - 66:13

**replacing** [1] - 137:11

**report** [20] - 35:17, 35:19, 35:21, 53:4, 53:7, 54:20, 55:15, 60:11, 61:15, 120:11, 122:19, 128:20, 129:1, 129:3, 131:17, 132:19, 132:23, 133:2, 139:4, 161:23

**Report** [2] - 4:7, 122:20

**reported** [9] - 34:7, 36:14, 36:16, 37:12, 72:13, 72:14, 72:17, 192:19

**reporter** [7] - 3:9, 3:15, 12:10, 14:11, 81:24, 98:7, 185:11

**REPORTER** [18] - 12:11, 16:12, 35:2, 59:15, 84:5, 86:4, 89:21, 92:2, 93:13, 98:9, 100:18, 107:22, 108:21, 109:5, 119:9, 133:9, 168:15, 185:9

**reporters** [1] - 13:19

**reporting** [1] - 48:16

**REPORTING** [1] - 1:23

**reports** [4] - 35:23, 37:14, 87:15, 156:7

**representing** [1] - 7:9

**reputation** [2] - 164:11, 174:21

**request** [6] - 94:9, 99:21, 142:14, 193:10, 193:11, 193:19

**requested** [4] - 32:5, 82:1, 94:2, 185:12

**requesting** [2] - 93:23, 166:22

**requests** [1] - 82:24

**Requests** [1] - 4:4
**requirements** [1] - 191:18
**reserved** [1] - 126:21
**Resources** [1] - 110:13
**respect** [8] - 40:20, 40:24, 41:1, 49:3, 49:8, 61:23, 166:6, 194:19
**respectful** [2] - 62:6, 62:9
**respective** [1] - 3:3
**respects** [1] - 199:9
**respond** [4] - 45:14, 63:17, 156:10, 167:7
**responded** [7] - 50:12, 51:11, 51:18, 51:21, 90:16, 94:6, 95:20
**responding** [1] - 50:11
**responds** [1] - 51:9
**Response** [2] - 4:3, 11:19
**response** [13] - 12:24, 47:7, 50:14, 50:18, 50:21, 50:23, 51:1, 51:2, 52:11, 54:4, 75:8, 79:9, 145:17
**responses** [1] - 37:3
**Responses** [1] - 12:1
**responsive** [1] - 85:12
**rest** [1] - 51:20
**restaurant** [1] - 29:16
**result** [3] - 19:13, 42:24, 199:15
**resume** [2] - 175:10, 175:21
**resurfaced** [1] - 56:21
**retained** [1] - 117:17
**retaliated** [2] - 47:24, 173:13
**retaliation** [1] - 151:3
**retired** [1] - 36:9
**returned** [1] - 41:20
**returning** [1] - 27:14
**Reul** [1] - 2:4
**revamped** [1] - 66:5
**revenge** [5] - 150:12, 150:18, 184:9, 184:12, 184:18
**review** [12] - 9:17, 10:5, 66:1, 72:24, 75:17, 76:4, 78:17, 81:14, 83:2, 87:14, 87:19, 144:6
**reviewed** [1] - 9:21
**reviewing** [3] - 32:16, 73:7, 74:2
**reviews** [5] - 32:17,

65:13, 67:10, 67:11, 144:23
**revoked** [1] - 178:19
**right-hand** [1] - 11:5
**Ritenour** [8] - 137:18, 141:9, 141:23, 142:23, 143:1, 144:1, 163:18
**Ritenour's** [2] - 141:18, 143:17
**Road** [1] - 172:14
**Robert** [3] - 16:18, 32:22, 56:22
**role** [5] - 152:6, 152:20, 153:24, 154:20, 155:19
**roles** [1] - 48:11
**Romeo** [1] - 35:8
**Ron** [2] - 32:13, 33:4
**Ronald** [2] - 34:3, 35:20
**room** [4] - 20:1, 58:4, 124:22, 129:23
**Rose** [4] - 32:13, 33:4, 34:3, 35:20
**rotated** [1] - 161:5
**round** [1] - 106:3
**rounds** [1] - 158:20
**rub** [1] - 192:3
**rude** [1] - 150:3
**ruined** [1] - 175:11
**rule** [1] - 96:8
**rules** [2] - 8:2, 96:7
**Rules** [2] - 1:14, 3:6
**run** [4] - 115:13, 161:4, 194:20, 196:2
**running** [4] - 127:19, 143:9, 154:17, 161:2
**Ryan** [6] - 16:18, 32:22, 33:14, 33:16, 34:14, 56:22

---

# S

**S-t-o-s-u-r** [1] - 13:8
**sad** [1] - 42:24
**safe** [2] - 105:3, 157:5
**Samaritan** [1] - 17:23
**sandwiches** [1] - 157:10
**SAP** [1] - 193:18
**sat** [5] - 65:13, 65:24, 67:10, 87:3, 141:24
**Saturday** [1] - 94:6
**saw** [7] - 22:16, 34:20, 53:2, 124:4, 144:13, 146:10, 186:16
**scale** [1] - 61:10
**schedule** [2] - 111:9,

111:12
**scheduled** [3] - 64:6, 83:10, 154:17
**school** [1] - 114:4
**science** [3] - 114:10, 114:22, 148:11
**sciences** [1] - 113:24
**sciency** [1] - 170:22
**scorings** [1] - 142:2
**screaming** [4] - 161:18, 161:20, 192:8, 192:10
**scroll** [2] - 98:22, 119:24
**seal** [1] - 199:16
**search** [1] - 103:10
**searched** [2] - 124:18, 134:4
**searching** [1] - 60:6
**season** [1] - 173:3
**second** [1] - 79:24
**section** [2] - 74:14, 105:10
**secure** [1] - 28:5
**securing** [2] - 39:9, 177:13
**security** [11] - 36:10, 36:14, 39:6, 39:19, 174:10, 175:1, 175:7, 175:8, 175:14, 175:24, 177:3
**see** [58] - 11:14, 20:12, 31:13, 37:6, 37:10, 53:4, 53:7, 54:19, 55:15, 60:10, 60:13, 61:10, 63:16, 73:16, 74:16, 75:1, 75:18, 76:17, 77:4, 82:23, 84:14, 84:18, 84:24, 86:16, 90:10, 94:1, 95:17, 95:19, 98:23, 99:6, 105:16, 109:3, 109:23, 110:2, 110:6, 111:18, 111:21, 114:16, 115:17, 116:9, 117:4, 117:7, 122:15, 122:18, 122:21, 134:12, 135:13, 138:9, 139:13, 145:16, 146:13, 146:18, 155:19, 160:19, 178:5, 185:23, 197:13
**seeing** [4] - 22:24, 33:20, 79:8, 144:19
**seek** [6] - 23:12, 23:17, 24:1, 150:12,

184:9, 184:17
**sees** [1] - 22:11
**select** [2] - 137:15, 138:23
**selected** [4] - 77:24, 137:7, 142:18, 142:20
**selecting** [3] - 141:17, 141:20, 193:7
**self** [1] - 174:17
**self-esteem** [1] - 174:17
**send** [4] - 121:12, 193:9, 197:7, 197:18
**sending** [1] - 21:17
**sense** [4] - 8:10, 139:24, 147:15, 196:16
**sensitive** [2] - 95:2
**sent** [17] - 89:13, 89:14, 90:23, 90:24, 91:8, 120:6, 120:13, 121:10, 122:3, 122:5, 132:24, 178:11, 193:13, 193:15, 193:22, 194:2
**sentence** [3] - 78:7, 79:13, 80:6
**separate** [6] - 10:9, 56:7, 103:19, 134:9, 134:17, 142:1
**September** [6] - 41:7, 60:12, 60:21, 61:1, 98:19, 99:9
**serious** [1] - 41:12
**serve** [2] - 161:5, 195:21
**served** [1] - 26:2
**service** [2] - 75:5, 76:24
**SERVICES** [1] - 1:23
**services** [2] - 77:20, 105:5
**set** [15] - 1:16, 11:2, 39:11, 84:1, 96:3, 100:13, 107:9, 117:20, 139:20, 143:17, 157:7, 192:21, 199:11, 199:16
**Set** [1] - 4:3
**setting** [1] - 154:17
**setup** [1] - 8:20
**several** [2] - 53:10, 82:19
**severe** [2] - 20:2, 20:20
**severely** [1] - 20:20
**sex** [1] - 35:14

**SF50's** [1] - 118:3
**shake** [1] - 126:23
**share** [5] - 9:20, 179:1, 179:3, 179:10, 180:17
**shattered** [1] - 175:11
**Shaw** [3] - 55:12, 55:13, 56:1
**shift** [4] - 37:16, 46:1, 160:6, 190:1
**shit** [1] - 162:6
**shocked** [1] - 50:16
**short** [6] - 58:16, 106:13, 140:21, 165:21, 165:24, 186:9
**shortly** [3] - 60:24, 61:2, 158:5
**shoulders** [2] - 126:24, 127:4
**shout** [1] - 59:5
**show** [4] - 48:3, 124:12, 182:13, 190:16
**showed** [2] - 64:23, 133:23
**showing** [1] - 37:23
**shown** [1] - 64:23
**shows** [1] - 134:3
**sic** [1] - 141:9
**side** [2] - 120:17, 162:4
**Sierra** [1] - 35:8
**sign** [6] - 19:18, 21:17, 23:6, 73:10, 121:4, 198:11
**signature** [4] - 3:13, 197:1, 199:13
**signed** [1] - 24:21, 37:13, 47:9, 47:12, 47:18, 48:5, 63:2, 65:22, 66:10, 136:13, 197:5
**significant** [1] - 50:5
**signs** [1] - 74:3
**silence** [2] - 149:15, 188:1
**similar** [6] - 29:7, 29:17, 68:22, 89:15, 90:24, 133:24
**similar-sized** [1] - 29:7
**similarly** [3] - 29:3, 89:16, 91:9
**similarly-sized** [1] - 29:3
**simple** [1] - 48:2
**simply** [1] - 144:8
**single** [1] - 190:17
**SIS** [1] - 75:3

**sit** [3] - 90:14, 152:2, 191:4
**sitting** [4] - 90:21, 91:12, 152:4, 188:8
**situation** [32] - 14:5, 14:15, 14:23, 15:8, 15:15, 15:19, 18:13, 18:14, 18:19, 42:7, 52:4, 52:7, 57:15, 57:16, 71:13, 71:14, 71:17, 112:23, 115:14, 124:6, 124:21, 137:2, 147:7, 149:20, 151:14, 155:17, 178:24, 180:23, 182:13, 182:21, 183:14, 183:17
**situations** [3] - 29:17, 115:15, 178:23
**six** [10] - 58:13, 61:5, 65:12, 65:24, 67:10, 67:11, 81:13, 139:3, 144:5, 166:3
**six-month** [7] - 65:12, 65:24, 67:10, 67:11, 81:13, 139:3, 144:5
**sized** [2] - 29:3, 29:7
**skill** [5] - 139:20, 143:17, 144:16, 156:22, 157:7
**skilled** [2] - 75:3, 75:19
**skills** [5] - 116:17, 144:14, 156:19, 157:4, 161:1
**slanted** [1] - 66:13
**slash** [1] - 110:8
**sleep** [1] - 174:14
**sleeping** [1] - 27:4
**Smith** [2] - 17:14, 57:5
**sniffing** [3] - 145:9, 145:18, 146:17
**snippets** [1] - 125:21
**so..** [1] - 109:4
**socially** [1] - 34:21
**someone** [13] - 18:11, 68:15, 88:18, 89:9, 95:21, 149:11, 149:18, 179:17, 182:1, 182:6, 182:7, 184:9, 195:13
**sometime** [2] - 25:20, 109:11
**sometimes** [1] - 46:2, 63:5, 126:24, 149:15, 154:6, 157:9, 157:20, 157:23, 160:9, 161:12, 162:13,

182:17, 196:15
**somewhat** [7] - 95:22, 145:21, 151:9, 179:23, 180:3, 184:21, 196:15
**somewhere** [1] - 28:2
**soon** [2] - 113:3, 113:7
**sorry** [38] - 16:22, 18:3, 21:2, 22:6, 23:15, 26:19, 47:15, 50:24, 53:19, 67:14, 67:19, 71:23, 74:12, 75:15, 86:10, 86:19, 87:11, 88:1, 99:7, 107:3, 107:12, 108:9, 124:19, 125:12, 131:10, 141:13, 142:10, 142:11, 148:15, 164:16, 164:17, 165:8, 169:12, 171:14, 171:15, 175:4, 175:12, 185:5
**sort** [6] - 39:6, 45:23, 47:6, 120:16, 150:18, 151:3
**sought** [3] - 75:4, 75:19, 173:17
**sound** [2] - 87:16, 99:16
**sounds** [13] - 50:4, 66:19, 85:10, 96:9, 106:18, 112:22, 114:10, 115:6, 120:9, 159:8, 166:9, 191:21, 194:1
**SOUTHERN** [1] - 1:1
**southern** [1] - 151:19
**speaking** [3] - 78:22, 80:20, 149:12
**special** [9] - 36:9, 37:16, 81:12, 109:24, 110:21, 114:15, 117:13, 121:1, 164:20
**Special** [6] - 52:15, 73:8, 102:3, 116:6, 120:8, 123:1
**Specialist** [1] - 117:10
**specific** [11] - 18:20, 27:11, 40:22, 42:5, 112:6, 125:24, 126:13, 138:21, 143:16, 180:17, 189:7
**specifically** [8] - 17:18, 32:4, 42:17, 76:7, 128:16, 129:14, 129:17,

188:19
**specifics** [1] - 137:16
**specified** [1] - 79:13
**spell** [3] - 35:2, 35:5, 136:21
**spelling** [1] - 35:6
**spend** [1] - 151:13
**spin** [1] - 159:21
**spin-off** [1] - 159:21
**spit** [1] - 193:2
**spot** [1] - 194:21
**spouse** [4] - 16:10, 16:11, 16:16, 172:6
**spouse's** [1] - 63:12
**spring** [2] - 8:24, 20:11
**spun** [1] - 193:1
**squad** [1] - 63:9
**SS** [1] - 199:3
**SSA** [4] - 120:6, 120:7, 130:22, 135:11
**SSG** [5] - 28:10, 102:8, 164:13, 164:16, 164:18
**St** [2] - 50:2, 163:19
**stack** [1] - 58:24
**staff** [4] - 77:7, 79:20, 79:22, 79:23
**stake** [1] - 124:20
**stamped** [1] - 11:4
**stand** [3] - 16:22, 120:7, 148:21
**stand-offish** [1] - 148:21
**standard** [1] - 35:6
**stands** [2] - 110:15, 164:24
**Stapleton** [60] - 61:20, 64:18, 65:2, 66:5, 66:16, 68:11, 69:22, 70:22, 71:12, 72:5, 72:18, 73:2, 73:21, 74:6, 74:21, 74:23, 79:21, 81:8, 82:4, 82:19, 82:24, 83:6, 84:15, 86:24, 87:10, 87:11, 87:19, 87:23, 88:9, 88:16, 90:12, 94:5, 95:17, 98:18, 98:23, 99:9, 99:11, 101:4, 106:15, 106:19, 109:20, 111:19, 111:22, 123:5, 127:18, 129:7, 129:10, 129:19, 130:21, 134:3, 141:21, 141:24, 142:22, 156:16, 157:13, 158:3, 158:4, 159:1,

159:2, 178:19
**stapleton** [2] - 61:22, 62:21
**Stapleton's** [2] - 84:20, 99:17
**STAR** [1] - 136:24
**star** [1] - 187:7
**start** [8] - 8:13, 13:7, 26:6, 44:19, 53:17, 60:9, 77:2, 174:13
**started** [7] - 9:13, 19:24, 20:22, 40:15, 46:11, 170:7, 192:6
**starting** [2] - 61:2, 113:6
**starts** [1] - 59:7
**State** [3] - 1:21, 199:6, 199:18
**state** [1] - 47:8
**STATE** [1] - 199:2
**statement** [17] - 37:14, 47:12, 47:18, 48:5, 50:7, 66:10, 85:4, 96:10, 106:4, 121:5, 136:13, 145:18, 146:16, 166:11, 184:13, 184:20, 184:21
**statements** [7] - 24:21, 24:22, 31:8, 63:2, 65:23, 128:21, 136:7
**states** [1] - 30:17
**STATES** [2] - 1:1, 1:7
**States** [1] - 1:17
**stating** [3] - 71:6, 142:14, 150:4
**stationed** [2] - 24:20, 115:11
**status** [1] - 110:3
**stein** [1] - 187:7
**stenotype** [2] - 3:9, 199:11
**step** [2] - 131:11, 196:2
**Stephanie** [8] - 133:21, 133:22, 134:5, 134:7, 134:8, 135:10, 135:19, 141:7
**Stephen** [2] - 17:21, 32:20
**stepped** [1] - 129:9
**steps** [1] - 189:18
**stereotypical** [2] - 64:4, 64:15
**Steven** [2] - 15:5, 22:23
**stick** [2] - 42:3, 152:18
**still** [23] - 19:21,

20:24, 24:18, 25:13, 30:21, 49:24, 58:22, 60:6, 86:10, 117:9, 117:12, 129:8, 141:2, 142:18, 159:22, 170:4, 171:18, 171:19, 172:16, 173:11, 173:14, 179:15, 186:15
**stipulate** [1] - 6:3
**stipulated** [1] - 3:2
**stipulations** [2] - 1:16, 199:10
**stoic** [1] - 196:15
**stolen** [1] - 39:13
**stood** [4] - 137:2, 143:1, 143:10, 143:18
**stop** [3] - 8:4, 158:2, 191:2
**stopped** [5] - 46:9, 161:17, 161:19, 161:24
**stopping** [1] - 140:7
**story** [1] - 15:16
**Stosur** [2] - 13:8, 13:9
**straight** [2] - 166:2, 167:18
**stray** [2] - 145:10, 145:18
**Street** [3] - 1:18, 2:4, 2:9
**stress** [5] - 20:13, 167:6, 173:14, 173:18, 173:22
**stressful** [4] - 159:8, 159:15, 173:14, 173:16
**strictly** [1] - 152:15
**strike** [1] - 18:24
**string** [1] - 119:20
**strong** [1] - 125:1
**struck** [1] - 145:1
**subject** [8] - 7:21, 18:20, 18:22, 52:23, 52:24, 56:18, 128:7, 188:1
**subject's** [1] - 161:20
**subjective** [1] - 51:6
**submit** [1] - 190:3
**submitted** [3] - 3:12, 52:21, 199:12
**subordinate** [4] - 36:18, 36:19, 77:8, 77:9
**subordinates** [14] - 45:21, 65:4, 65:14, 69:5, 69:20, 78:13, 78:23, 79:1, 79:12,

80:20, 129:19,
155:12, 155:21,
179:2
**suburbs** [1] - 18:2
**successful** [4] -
73:20, 144:21,
144:22
**suddenly** [1] - 56:20
**suit** [1] - 138:12
**Suite** [2] - 1:18, 2:9
**suited** [2] - 64:11,
168:5
**summary** [6] - 61:6,
73:4, 80:2, 84:19,
84:21, 119:3
**summer** [2] - 28:19,
113:11
**supervised** [4] - 77:7,
79:19, 79:22, 79:23
**supervising** [6] -
76:19, 76:22, 79:16,
80:24, 81:15, 82:5
**supervision** [1] -
199:12
**supervisor** [52] -
25:11, 25:19, 25:23,
27:18, 32:8, 32:12,
32:14, 32:18, 34:3,
34:12, 35:20, 38:7,
42:20, 48:13, 61:20,
68:12, 70:19, 71:9,
71:12, 72:5, 72:7,
72:9, 74:1, 78:20,
85:17, 88:17, 98:24,
99:17, 99:22,
102:13, 102:16,
104:1, 127:14,
127:15, 127:24,
128:5, 129:5, 129:8,
154:23, 156:3,
156:16, 163:4,
166:18, 187:8,
188:21, 190:18,
192:12, 194:11,
195:14
**supervisor's** [1] -
162:12
**supervisors** [17] -
25:16, 32:19, 42:14,
68:16, 69:13, 72:11,
83:9, 83:11, 102:4,
126:7, 127:20,
127:21, 128:3,
156:17, 157:13,
168:9, 168:22
**Supervisory** [1] -
117:9
**supervisory** [5] -
81:15, 120:8, 126:4,
129:10, 161:1

**support** [1] - 154:6
**supposed** [12] - 78:9,
78:12, 78:20, 121:8,
121:16, 125:4,
133:2, 133:3, 137:3,
153:8, 155:7, 162:13
**supposedly** [1] -
27:14
**surgeries** [1] - 23:2
**surgery** [4] - 20:3,
22:20, 23:1, 26:21
**Surikov** [4] - 17:4,
72:15, 168:14,
168:23
**surprised** [9] - 130:2,
130:4, 130:6,
148:14, 148:20,
150:6, 150:10,
150:13, 150:15
**surprising** [1] - 151:1
**surveillance** [17] -
138:8, 144:14,
146:10, 151:8,
154:17, 154:18,
154:19, 161:18,
161:24, 164:9,
164:20, 164:24,
167:11, 167:23,
176:21, 187:23,
192:9
**surveillances** [1] -
151:23
**survey** [1] - 18:21
**Susan** [3] - 14:1,
14:15, 24:15
**Swenson** [5] - 25:7,
25:18, 72:14,
190:21, 190:22
**switch** [1] - 57:20
**sworn** [14] - 7:1, 7:4,
7:20, 24:21, 37:14,
47:12, 47:18, 48:5,
63:2, 65:22, 66:10,
121:4, 136:13, 199:7
**sympathetically** [1] -
64:7
**system** [2] - 39:11,
103:9

**T**

**T-III's** [1] - 112:10
**take-home** [1] - 102:2
**talks** [1] - 190:23
**tall** [1] - 114:5
**Tana** [1] - 14:19
**target's** [1] - 192:9
**taught** [2] - 64:1, 64:2
**taxing** [2] - 167:4,

170:9
**TDY** [26] - 26:13,
26:18, 27:6, 27:7,
28:16, 29:8, 32:7,
33:5, 38:1, 41:21,
56:7, 57:1, 57:6,
57:9, 66:8, 95:21,
96:3, 96:7, 96:8,
158:13, 160:3,
168:23, 179:4,
181:12
**TDYs** [5] - 41:18,
158:6, 158:10,
159:7, 168:12
**tea** [1] - 142:11
**teacher** [2] - 113:7,
176:5
**teaching** [4] - 113:23,
176:7, 176:8, 176:12
**team** [196] - 25:3,
26:12, 26:13, 27:5,
27:12, 29:6, 29:7,
29:14, 29:18, 30:11,
30:13, 30:14, 31:6,
32:24, 36:15, 37:17,
38:24, 40:11, 40:17,
41:9, 41:13, 41:15,
41:21, 42:8, 42:11,
42:18, 42:23, 43:9,
43:12, 43:17, 44:3,
44:4, 44:6, 44:8,
44:9, 44:17, 44:21,
45:1, 45:13, 45:20,
46:5, 46:21, 47:22,
48:11, 48:17, 49:12,
50:9, 51:21, 52:6,
54:12, 55:4, 55:11,
55:15, 55:24, 57:7,
57:13, 63:17, 64:9,
68:11, 68:15, 70:10,
70:16, 70:17, 71:5,
78:8, 133:24, 136:3,
136:4, 136:6,
136:12, 137:8,
137:11, 137:17,
137:19, 137:23,
137:24, 143:5,
143:9, 143:14,
145:4, 145:7, 151:8,
152:6, 152:10,
152:11, 152:13,
152:14, 152:15,
152:19, 152:20,
152:21, 153:1,
153:4, 153:5, 153:7,
153:8, 153:10,
153:12, 153:23,
153:24, 154:3,
154:4, 154:8,
154:13, 154:15,

154:20, 154:22,
155:2, 155:3, 155:4,
155:5, 155:6, 155:9,
155:13, 155:15,
155:19, 156:13,
156:18, 156:21,
156:23, 157:5,
157:6, 160:1, 160:5,
160:7, 160:19,
161:2, 161:4, 161:7,
161:9, 161:12,
162:11, 162:20,
162:23, 163:17,
163:24, 164:24,
165:12, 165:14,
165:16, 165:21,
165:23, 166:9,
166:19, 166:23,
167:2, 167:4, 167:7,
167:12, 167:20,
167:21, 167:23,
168:2, 179:7,
179:14, 179:20,
180:1, 180:10,
180:11, 180:16,
183:22, 184:1,
184:17, 186:18,
187:23, 188:17,
188:18, 189:11,
189:13, 189:23,
190:10, 191:9,
191:11, 191:18,
191:24, 192:4,
192:21, 192:22,
194:21, 194:23,
195:5, 195:10,
195:11, 195:17,
195:18, 195:21,
195:24, 196:1,
196:2, 196:11
**teams** [6] - 27:6,
28:16, 143:9,
154:21, 158:13,
164:9
**technical** [2] - 197:6,
198:4
**technicians** [1] -
27:15
**Telephonically** [1] -
2:12
**temporarily** [2] -
82:10, 85:18
**temporary** [4] - 27:7,
27:9, 83:10, 96:4
**ten** [1] - 153:16
**tennis** [4] - 169:19,
172:1, 172:10,
172:24
**Tennis** [2] - 172:15,
172:18

**term** [2] - 181:20,
181:22
**terminate** [3] - 193:8,
193:12, 193:20
**terms** [12] - 61:9,
69:21, 123:3,
130:22, 146:12,
156:12, 159:5,
159:18, 162:15,
162:23, 170:12,
170:15
**test** [1] - 157:4
**testified** [4] - 19:11,
64:19, 71:3, 130:7
**testify** [2] - 51:10,
130:3
**testimony** [16] - 6:8,
7:16, 7:17, 9:7, 9:11,
16:8, 16:17, 19:16,
22:15, 23:9, 24:23,
68:5, 71:17, 82:2,
142:19, 185:13
**THE** [38] - 1:7, 6:20,
10:20, 12:11, 16:12,
35:2, 58:6, 58:12,
58:15, 59:15, 60:4,
84:5, 86:4, 86:10,
86:20, 89:21, 92:2,
93:13, 98:9, 100:18,
100:24, 107:22,
108:5, 108:21,
109:5, 109:13,
119:9, 133:9,
140:16, 142:7,
142:12, 168:15,
185:9, 185:14,
186:3, 186:8, 198:5,
198:8
**theme** [1] - 92:8
**themselves** [2] -
51:23, 152:5
**thereafter** [1] - 158:5
**therefore** [1] - 183:15
**thinking** [4] - 149:14,
149:19, 149:20
**thinks** [1] - 85:10
**thoughtful** [1] - 148:6
**threaten** [1] - 184:9
**threatened** [2] - 36:17,
36:18
**threatening** [1] -
45:15
**threats** [1] - 45:14
**three** [8] - 1:23, 29:9,
32:19, 48:18, 100:8,
159:21, 172:4, 186:1
**throughout** [2] -
53:12, 116:13
**throw** [1] - 170:24
**tie** [1] - 114:12

**Tiffany** [5] - 120:6, 122:13, 124:15, 125:18
**time-wise** [1] - 170:9
**timecard** [2] - 54:13, 55:6
**timecards** [1] - 46:12
**timeline** [1] - 106:7
**timing** [1] - 159:6
**timothy** [2] - 35:1, 35:6
**Timothy** [1] - 35:7
**tire** [1] - 28:2
**title** [3] - 117:12, 117:17, 164:19
**TJ** [2] - 17:11, 28:24
**to..** [1] - 66:11
**today** [7] - 6:23, 7:9, 9:7, 9:11, 159:17, 176:5, 198:3
**together** [5] - 44:6, 44:17, 120:11, 156:23, 179:6
**tom** [1] - 56:24
**Tom** [2] - 57:1, 163:14
**tomorrow** [1] - 90:17
**took** [14] - 41:6, 46:14, 46:19, 61:14, 79:2, 87:1, 97:17, 129:14, 129:18, 131:17, 142:16, 146:22, 147:4, 183:18
**top** [3] - 118:6, 123:4, 166:16
**touch** [2] - 126:22, 126:24
**touching** [2] - 127:4, 149:2
**tournaments** [2] - 172:22, 172:24
**toward** [5] - 62:13, 64:19, 68:6, 68:8, 79:18
**towards** [9] - 38:22, 64:4, 64:21, 66:24, 67:3, 68:1, 77:6, 95:15, 160:10
**track** [2] - 92:11, 127:21
**traffic** [1] - 37:18
**tragic** [4] - 42:24, 50:18, 51:9
**trainer's** [1] - 136:20
**training** [26] - 29:4, 32:5, 32:6, 33:3, 33:6, 33:7, 75:4, 93:23, 94:2, 95:5, 95:7, 95:22, 99:4, 99:12, 100:10, 112:19, 139:12,

139:13, 148:9, 156:18, 156:21, 156:22, 158:20, 176:9, 176:10, 192:20
**trainings** [8] - 32:4, 112:20, 112:21, 139:11, 157:16, 157:17, 158:24, 176:11
**transcribed** [4] - 3:10, 3:11, 199:11, 199:12
**transcript** [2] - 132:11, 132:18
**transcriptions** [1] - 112:9
**transcripts** [1] - 128:11
**transferred** [1] - 141:16
**transition** [1] - 6:7
**transportation** [1] - 104:13
**Transportation** [1] - 105:2
**treat** [2] - 20:21, 21:13
**treating** [2] - 19:24, 22:24
**treatment** [6] - 20:12, 21:16, 22:18, 22:21, 23:13, 23:18
**treatments** [1] - 21:1
**tremendously** [2] - 50:10, 144:24
**Trencher** [1] - 119:4
**tried** [16] - 21:13, 27:20, 32:8, 33:5, 39:18, 40:10, 40:12, 41:1, 48:22, 49:3, 116:8, 139:11, 157:19, 158:7, 160:20, 196:18
**trifecta** [1] - 166:20
**TriHealth** [1] - 17:23
**trip** [1] - 37:21
**trouble** [9] - 8:5, 50:8, 78:10, 86:11, 92:21, 118:11, 169:3, 188:16, 189:16
**true** [2] - 95:23, 151:10
**truth** [3] - 199:7, 199:8
**try** [16] - 49:8, 58:10, 59:1, 61:23, 70:3, 148:7, 148:8, 148:9, 148:11, 150:12, 150:17, 160:4, 160:18, 170:2, 172:5, 190:14
**trying** [13] - 9:1, 19:4,

43:4, 49:14, 102:24, 112:22, 124:19, 136:5, 156:6, 170:24, 185:2, 189:3
**tube** [2] - 20:5, 20:19
**Tuesday** [2] - 99:8, 109:18
**turn** [14] - 37:1, 45:12, 55:1, 58:7, 59:4, 73:13, 74:13, 85:21, 91:15, 105:14, 109:17, 111:17, 114:24, 117:1
**turned** [1] - 162:21
**turning** [3] - 30:6, 53:9, 104:20
**twice** [2] - 36:16, 127:3
**two** [21] - 29:9, 31:11, 40:17, 45:16, 48:18, 71:24, 82:24, 119:1, 122:3, 122:10, 122:15, 137:11, 137:18, 148:3, 177:17, 186:1, 186:17, 186:18, 192:13, 192:15, 193:20
**type** [17] - 67:12, 67:15, 69:5, 69:14, 115:20, 126:22, 147:9, 147:11, 149:3, 149:6, 150:11, 151:15, 151:16, 171:2, 179:9, 183:16, 184:12
**types** [3] - 65:1, 65:16, 116:23
**typewriting** [1] - 199:12
**Typewritten** [1] - 4:10
**typical** [1] - 138:10
**typically** [1] - 138:8

## U

**U.S** [2] - 2:8, 103:16
**UC** [2] - 22:13, 110:8
**unbiased** [1] - 125:5
**unclassified** [3] - 177:21, 177:23, 178:5
**uncomfort** [1] - 145:13
**uncomfortable** [4] - 69:7, 128:10, 149:16, 149:18
**under** [11] - 9:9, 55:17,

58:22, 81:12, 82:15, 83:9, 85:18, 129:10, 141:2, 186:15, 199:12
**undermine** [2] - 48:22, 190:9
**undersigned** [1] - 199:5
**understood** [3] - 8:9, 9:4, 105:14
**unease** [1] - 146:18
**unfair** [1] - 77:15
**unique** [1] - 151:9
**unit** [3] - 24:17, 24:18, 110:14
**UNITED** [2] - 1:1, 1:7
**United** [1] - 1:17
**unknown** [2] - 20:3, 20:14
**unless** [1] - 154:5
**unlike** [1] - 40:15
**unpredictable** [1] - 157:21
**unprofessional** [4] - 69:17, 69:20, 124:11, 128:1
**unrelated** [2] - 56:7, 134:9
**up** [52] - 6:14, 9:22, 9:24, 10:5, 11:2, 12:7, 12:22, 13:18, 20:24, 23:16, 37:23, 41:18, 47:15, 59:12, 61:3, 79:18, 89:20, 92:24, 96:7, 98:2, 107:10, 107:17, 114:6, 116:1, 125:6, 129:21, 133:5, 147:11, 154:17, 155:9, 158:12, 158:19, 159:17, 161:10, 161:13, 162:2, 167:18, 168:23, 186:13, 189:2, 190:1, 191:1, 191:8, 192:21, 194:5, 194:8, 195:5, 196:2, 197:22, 198:4
**ups** [1] - 82:8
**upset** [3] - 65:19, 66:4, 146:18
**upsetting** [1] - 145:20
**USA** [1] - 175:18
**useful** [2] - 115:7, 116:22

## V

**vacation** [1] - 96:6

**vacillated** [1] - 153:18
**vague** [1] - 120:24
**valid** [1] - 84:21
**values** [1] - 74:10
**variable** [1] - 111:8
**variety** [1] - 151:21
**various** [2] - 74:14, 117:22
**vary** [1] - 151:15
**vehicle** [3] - 101:21, 102:2, 104:17
**vehicles** [4] - 102:6, 103:24, 151:23, 192:23
**vengeful** [1] - 150:7
**venue** [2] - 9:21, 14:24
**verbal** [7] - 35:23, 78:17, 87:2, 129:2, 129:3, 134:21, 134:22
**verbally** [4] - 79:6, 80:10, 80:13, 80:15
**verification** [1] - 197:7
**versus** [1] - 170:17
**via** [1] - 9:20
**video** [1] - 6:4
**views** [1] - 62:4
**Vine** [1] - 2:4
**violations** [1] - 36:15
**violence** [1] - 45:15
**visiting** [1] - 181:13
**volunteered** [2] - 64:3, 64:6
**vs** [1] - 1:5

## W

**wait** [3] - 76:3, 98:6, 152:2
**waiting** [2] - 131:14, 152:4
**waiver** [1] - 19:18
**walk** [1] - 128:24
**Wall** [9] - 17:6, 72:13, 127:21, 129:5, 168:13, 168:23, 188:21, 190:20, 193:14
**Washington** [2] - 56:6, 118:21
**watched** [1] - 181:14
**ways** [2] - 159:23, 160:15
**web** [2] - 114:21, 136:18
**websites** [1] - 175:20
**Wednesday** [1] - 1:19
**week** [4] - 41:20, 96:14, 126:6, 134:13

**weeks** [1] - 41:18
**Weingartner** [1] - 14:19
**weird** [2] - 75:12, 142:8
**well-suited** [1] - 168:5
**Wendy** [5] - 17:4, 72:14, 72:19, 168:13, 168:23
**WESTERN** [1] - 1:2
**WHEREOF** [1] - 199:16
**white** [1] - 138:11
**whole** [6] - 79:9, 136:18, 148:10, 176:14, 184:13, 199:7
**wiggle** [2] - 124:22, 129:23
**William** [1] - 119:4
**WILLIAM** [1] - 1:6
**Williams** [1] - 2:12
**Wilson** [20] - 36:17, 46:23, 47:8, 48:7, 48:8, 48:21, 49:17, 161:17, 162:6, 162:7, 162:19, 162:21, 162:22, 165:20, 188:19, 188:20, 189:14, 189:19, 191:21, 194:7
**wise** [4] - 139:20, 170:9, 196:14
**Wisecarver** [3] - 186:24, 187:2, 192:16
**withdrawn** [1] - 145:3
**WITNESS** [20] - 6:20, 10:20, 58:6, 58:12, 58:15, 60:4, 86:10, 86:20, 100:24, 108:5, 109:13, 140:16, 142:7, 142:12, 185:14, 186:3, 186:8, 198:5, 198:8, 199:16
**witness** [17] - 3:11, 3:12, 7:20, 13:23, 14:8, 14:17, 15:3, 15:10, 16:21, 19:22, 24:7, 66:21, 68:1, 68:4, 73:24, 89:15, 199:13
**witnessed** [2] - 67:6, 68:9
**witnesses** [5] - 11:10, 15:24, 16:5, 22:1, 24:11
**woman** [1] - 63:24

**women** [10] - 38:22, 48:24, 62:17, 62:20, 64:20, 64:22, 68:8, 186:17, 186:18, 187:11
**Women's** [1] - 17:23
**wondering** [1] - 194:7
**word** [11] - 20:16, 21:23, 68:22, 70:2, 89:2, 95:12, 105:7, 179:22, 180:2, 180:4, 183:18
**worded** [1] - 89:16
**words** [8] - 65:1, 65:4, 71:24, 76:7, 76:12, 107:7, 129:18, 147:24
**work-related** [1] - 169:16
**Work-to-Home** [1] - 102:6
**workplace** [4] - 127:7, 127:8, 154:24, 174:19
**works** [4] - 10:7, 14:22, 90:17, 120:16
**world** [1] - 157:12
**worst** [1] - 72:9
**worth** [1] - 160:22
**worthwhile** [1] - 41:7
**wow** [1] - 114:5
**write** [2] - 82:8, 144:17
**write-ups** [1] - 82:8
**writer** [1] - 190:5
**writing** [4] - 34:4, 106:5, 107:8, 139:3
**written** [4] - 106:11, 107:6, 135:24, 136:2
**wrongdoing** [4] - 53:16, 55:13, 56:3, 56:13
**wrote** [7] - 18:11, 74:18, 80:7, 142:6, 142:12, 142:13, 166:21
**Wullenweber** [5] - 14:2, 14:3, 14:10, 14:13, 14:15

## Y

**year** [6] - 21:11, 25:18, 26:1, 35:10, 131:24, 157:20
**year's** [1] - 160:22
**years** [5] - 21:14, 46:20, 103:3, 117:23, 153:19
**yelling** [2] - 162:5,

166:5
**yoga** [1] - 169:20
**York** [1] - 57:13
**your's** [1] - 50:23
**yourself** [3] - 147:19, 148:4, 183:3

## Z

**Zachary** [1] - 2:12
**Zoom** [2] - 1:11, 9:1