## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**JENNIFER BOUGHTON,**

      **Plaintiff,**

                             **Case No. 1:19-cv-154**
     **v.**                        **JUDGE DOUGLAS R. COLE**

**MERRICK GARLAND,**
**ATTORNEY GENERAL OF THE**
**UNITED STATES,**

      **Defendant.**

## OPINION AND ORDER

This cause comes before the Court on Defendant's Motion For Summary Judgment (Doc. 33) on Plaintiff Jennifer Boughton's Amended Complaint (Doc. 11). Because both parties agree that the Court should enter summary judgment in favor of Defendant on Boughton's state law discrimination and retaliation claims, the Court **GRANTS** Defendant's Motion (Doc. 33) as to Counts Two and Four of the Amended Complaint (Doc. 11). For the reasons that follow, the Court further **GRANTS** Defendant's Motion (Doc. 33) as to the two remaining counts in the Amended Complaint (Doc. 11), Counts One and Three.

## BACKGROUND[1]

Plaintiff Jennifer Boughton began working for the Federal Bureau of Investigation ("FBI") in 2003. In 2008, she was promoted to the position of

---

[1] This background is taken from the parties' proposed statements of undisputed facts (Docs. 33-1,41-1) unless otherwise noted.

Supervisory Investigative Specialist/Team Leader ("SIS/TL") in the Cincinnati Division. In that capacity, she exercised oversight of the Mobile Surveillance Team ("MST") and its Investigative Specialists ("ISs"). Between 2008 and 2013, Boughton received positive feedback from superiors and colleagues about her work ethic and interpersonal skills.

This positive feedback continued when Boughton began reporting to Supervisory Special Agent ("SSA") Herbert Stapleton in the Spring of 2014. Upon his arrival to the Cincinnati Division, Stapleton found the MST to be "running smoothly" under Boughton's leadership. In his first mid-year review of Boughton, which occurred around April 2014, Stapleton did not assign her a specific rating, but noted that Boughton's performance appeared consistent with the high ratings she had received from her previous supervisor. In October 2014, Stapleton completed his first Performance Appraisal Report ("PAR") for Boughton, rating her "Outstanding"—the highest category—in all but two categories, in which she received "Excellent" ratings.

Unrest began to manifest soon after this, however. In late 2014, Boughton reported to Stapleton that she had concerns about some of her subordinates driving FBI vehicles while under the influence of alcohol. She also mentioned that she believed at least one IS, Andrew Munafo, was sleeping on the job. Stapleton declined to take any particular action with respect to these reports from Boughton.

Around December 2014, Munafo made allegedly disparaging remarks about the team's then-current assignment while at dinner with a visiting FBI team. The next day, Munafo and Boughton exchanged texts regarding Munafo's remarks.

Munafo perceived the conversation to be going poorly, and indicated his desire to continue the conversation with another supervisor present. (Screenshot of Munafo Text Messages, Doc. 26-2, #567). He also asked for contact information for the Office of Equal Employment Opportunity ("EEO"). (*Id.*).

Munafo recounted the text conversation to Stapleton in January 2015, and Stapleton scheduled a meeting between Munafo and Boughton to help resolve their differences. (EEO Investigative Summ., Doc. 29-1, #1760–61). That meeting, however, never occurred. Munafo filed an EEO complaint against Boughton on February 11, 2015. (Munafo Statement, Doc. 31-2, #1945). Stapleton said that he canceled the meeting between Boughton and Munafo because of Munafo's EEO complaint. (EEO Investigative Summ., Doc. 29-1, #1761). But Boughton recalled that she and Stapleton were already in the office on the morning of the scheduled meeting when Munafo texted Stapleton to say he would be bringing another IS, Joseph Hamilton. At that point, Stapleton canceled the meeting. (Mot. Ex. 1,[2] Doc. 30-1, #1814–15). Boughton ultimately participated in an EEO mediation with Munafo in April 2015, and the parties reached a mediated settlement. (INSD Referral, Doc. 27-1, #960).

Stapleton met with Boughton's team members in late February 2015 to discuss Boughton's leadership. (EEO Investigative Summ., Doc. 29-1, #1762). Boughton did

---

[2] The Court refers to this document, which contains a timeline of dates and events, generically as "Mot. Ex. 1," because the document does not have a clear title, nor is it otherwise identifiable. However, neither party disputes the document's authenticity, nor raises any evidentiary objection with respect to it. Indeed, although Defendant filed the document as an Exhibit to its Motion for Summary Judgment (Doc. 33), Boughton cites the document in her Proposed Statement of Undisputed Facts. (*See, e.g.*, Doc. 41-1, #2484).

not attend the meetings. (*Id.*). At the meetings, some of Boughton's subordinates expressed concerns about Boughton and her leadership. Stapleton met with Boughton the following day to discuss the conversations he had had with her team members. (Mot. Ex. 1, Doc. 30-1, #1816).

In mid-April 2015, Stephanie Prater and Bethany Ritenour, ISs under Boughton's leadership, met with Stapleton to report more specific concerns about Boughton's conduct. (INSD Referral, Doc. 27-1, #959–61). According to Prater, Boughton told Prater that Boughton would mentor her for an upcoming interview for a "Team Lead" position. Boughton read out loud to Prater questions from a sheet of paper, which Prater noted appeared to be actual interview questions. Prater believed she was prohibited from having advanced knowledge of these questions. (*Id.* at #961). Ritenour also suggested that the questions Boughton read were very similar to the actual interview questions. (*Id.*). Prater and Ritenour also told Stapleton that Boughton had threatened to get "revenge" on Munafo for filing an EEO complaint against her, as well as that Boughton had on multiple occasions made "disparaging remarks about male employees on the team." (*Id.*).

Stapleton passed this information on to the FBI's Inspection Division ("INSD") for investigation of possible violations of FBI Offense Codes 2.11 (Obstruction of an Administrative Matter), 2.12 (Violation of Ethical Guidelines), 5.11 (Insubordination), 5.16 (Retaliation), 5.2 (Dereliction of Supervisory Responsibility), and "other Offense Codes deemed appropriate by the INSD."

4

INSD initiated an investigation into these reports on May 1, 2015. SSAs Tiffany Baker and Melissa Griego directed the investigation for INSD. As part of the investigation, Baker and Griego interviewed and collected sworn statements from twelve individuals, including Stapleton, Boughton, and all of Boughton's direct reports. Boughton contends, however, that INSD refused to interview or collect statements from certain individuals who would have been more favorable to Boughton. (Boughton Dep., Doc. 17, #119–20).

On or around May 11, 2015, Boughton was notified of the investigation and was reassigned from her position as the SIS/TL of MST to a "Special Projects" assignment. Although removing the subject of investigation from their role is not a requirement in all investigations, (Baker Dep., Doc. 40, #2368), Special Agent in Charge ("SAC") Angela Byers stated that she believed removing Boughton from her supervisory position was in the best interest of the office, at least until the allegations were resolved. (Byers EEO Statement, Doc. 31-1, #1910). As a result of the transfer, Boughton relinquished access to her office and began reporting to a different location. (Boughton EEO Statement, Doc. 31-1, #1888).

Boughton felt that her investigation and removal were discriminatory or retaliatory in nature, and she contacted the EEO on June 9, 2015, to file a complaint to that effect. Stapleton first became aware of Boughton's EEO activity on July 16, 2015. (Stapleton EEO Statement, Doc. 28-2, #1604). On July 17, 2015, Boughton was excluded from participating in an award ceremony for an award granted to the MST

5

for a successful operation that ended sometime in May 2015. (Boughton Statement, Doc. 31-1, #1890).

On July 27, 2015, Boughton formalized her EEO complaint, alleging that her transfer to special projects and exclusion from the award given to the MST, among other actions, were discriminatory or retaliatory. The EEO officially filed her complaint on August 3, 2015. (Doc. 29-1, #1734, 1783; Doc. 30-2, #1870–71). On August 28, 2015, Boughton asked Stapleton if she could attend a "career-enhancing" training in September. (Additional Info. re: Boughton EEO Claim, Doc. 30-2, #1831). Stapleton denied that request in early September. (*Id*. at #1832). On October 28, 2015, Stapleton gave Boughton her yearly PAR. This time, he rated her as "Excellent" overall, a one-category decrease from the previous year. He also decreased several constituent ratings, including rating Boughton as "Minimally Successful" in the category of "Supervising." (Boughton Statement, Doc. 31-1, #1900; Boughton PAR, Doc. 32-2, #2017).

Though Boughton was transferred to Special Projects, she remained on the FBI payroll. The Cincinnati Division thus had no formal vacancy to replace her as Team Lead. (Stapleton Dep., Doc. 37, #2212). As a result, Cincinnati management took certain measures to maintain operation of the MST, (Stapleton EEO Statement, Doc. 28-2, #1607), including assigning different MST members to serve as "Acting TL" on a rotating basis in Boughton's absence. (Stapleton Dep., Doc. 37, #2212). Several MST ISs took turns in this "Acting" role, including Bethany Ritenour, Stephanie Prater, and Jason Distasio. (*See id.* at #2308).

To supplement this rotating cast, Cincinnati management requested a temporary duty assignee to cover the TL position for a time. Wayne Williams, a TL from the Indianapolis Division, was "selected by headquarters … to cover for Cincinnati," (Stapleton Dep., Doc. 37, #2308), and served as Acting TL from August 12 to October 7, 2015 (*see* Stapleton Dep., Doc. 37, #2308; Additional Info. re: Boughton EEO Claim, Doc. 30-2, #1830).

While Boughton worked in Special Projects, INSD continued its investigation. After conducting a number of interviews and taking sworn, written statements, Baker issued a report dated October 22, 2015. (Doc. 27-1, #817–22). Baker's report, while summarizing certain findings, did not make conclusions or recommend sanctions. Rather, INSD forwarded the report and underlying materials to the Office of Professional Responsibility ("OPR"). OPR, a separate adjudicatory office, seeks to "maintain the FBI's integrity and professionalism through the impartial and timely adjudication of employee misconduct allegations." (Will EEO Statement, Doc. 28-1, #1241).

William Trencher, Chief of Adjudication Unit II at OPR, was tasked with reviewing INSD's investigative file and determining whether the allegations were substantiated and, if so, assessing an appropriate penalty. (Trencher EEO Statement, Doc. 28-1, #1232). As part of assessing an appropriate penalty, Trencher also considered a document prepared by Cincinnati management addressing the *Douglas* factors.[3] (Trencher EEO Statement, Doc. 28-1, #1233). The SAC of the Cincinnati

---

[3] The Merit Systems Protection Board (MSPB) first articulated what have come to be called the *Douglas* factors in *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 305–06 (1981) (citing,

Division, Byers, was primarily responsible for preparing the *Douglas* factors report. (*See* INSD Notification, Doc. 27-1, #956). However, Byers delegated this duty to Stapleton, who wrote the *Douglas* factors report in Boughton's case. (*See id.* at #809–14).

Stapleton submitted the *Douglas* factors report to OPR on November 3, 2015. Stapleton declined to officially recommend any particular penalty or sanction. However, he wrote that there was "no possibility [Boughton] could be rehabilitated as a supervisor," that Boughton should not work in the Cincinnati office, and that alternative sanctions would be unlikely to deter similar conduct in the future. (*Id.* at #814).

Boughton contends that the *Douglas* factors report contained inaccuracies. For example, Stapleton wrote that Boughton refused to meet with Stapleton and Munafo to resolve Munafo's grievances, but Boughton contends it was Munafo who refused to attend and prevented the meeting's occurrence. (*See id.* at #811).

After reviewing the INSD investigative file, Trencher issued his report on January 20, 2016. In the report, he determined that the allegations against Boughton

---

e.g., 5 C.F.R. § 731.202(c); Fed. Pers. Manual, ch. 751, subch. 1–2 Dec. 21, 1976). There, the MSPB provided a non-exhaustive collection of twelve considerations relevant "in determining the appropriateness of a penalty." The *Douglas* factors report here reflected Cincinnati management's view on those twelve factors: (1) the nature and seriousness of the offense; (2) the employee's job level and type of employment; (3) the employee's past disciplinary record; (4) the employee's past work record; (5) the effect of the offense on the employee's ability to perform at a satisfactory level; (6) consistency of the penalty with those imposed on other employees for similar offenses; (7) consistency of the penalty with the applicable agency table of penalties; (8) the notoriety of the offense; (9) the clarity with which the employee was on notice of the violated rule; (10) potential for rehabilitation; (11) mitigating circumstances surrounding the offense; and (12) the adequacy and effectiveness of alternative sanctions. (Preamble to Offense Codes and Penalty Guidelines, Doc. 28-1, #1331–32).

had been substantiated by a preponderance of the evidence. (Doc. 26-2, #600–04). He further concluded that Boughton had "failed to be forthright in [her] signed, sworn statement," a violation of Offense Code 2.6 (Lack of Candor/Lying—Under Oath). (*Id.* at #583). Neither Stapleton's original referral nor the INSD report included this offense code.

In view of his conclusion that the allegations were substantiated, Trencher proposed dismissing Boughton. In assessing the appropriate penalty, Trencher considered "the circumstances of [the] case," as well as the *Douglas* factors, which included "consistency with precedent, the Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors." (*Id.*). With respect to lying under oath, however, the report noted that the "standard penalty is dismissal." Moreover, Trencher further noted that, in selecting the penalty for that offense, the Bureau is not allowed to consider aggravating or mitigating factors. (*Id.* at #606). Because Trencher proposed dismissal for the "Lack of Candor" offense, he neglected to propose alternate sanctions for the other offenses. (*Id.* at #604–05). At the time Trencher made his recommendation, he was unaware of Boughton's EEO activity, becoming aware of it some seven months later, on August 17, 2016. (Trencher EEO Statement, Doc. 28-1, #1231).

About a week after Trencher filed his OPR recommendation, the FBI suspended Boughton from duty indefinitely "pending the final resolution" of all her appeals. (January 29, 2016, Guthrie Letter, Doc. 26-2, #513). Approximately six months later, on June 14, 2016, Boughton submitted a written appeal to the OPR.

(Boughton Response, Doc. 26-1 #443–54). A week after that, Boughton presented an oral appeal, with counsel present, to Candice Will, Assistant Director of OPR. (*Id.* at #442).

While that appeal was still pending, on June 28, 2016, the FBI posted Boughton's SIS/TL position. Because her appeal was still pending, the SIS/TL position posting was considered an "overstaff"; Stapleton understood this to mean that, if Boughton was ultimately reinstated, Cincinnati would have to "address the overstaffing situation … through attrition." (Stapleton EEO Statement, Doc. 28-2, #1609, 1619 ("Bogacki noted [Human Resources] was accommodating an extra position temporarily while Boughton finished her appeals.")). The new job posting would be "used to hold the employee" while Boughton finished her appeal, allowing Cincinnati to immediately "backfill" Boughton's position if and when the decision on appeal became final. (June 28, 2016, Bogacki Email, Doc. 28-2, #1720).

On July 11, 2016, Will adopted Trencher's recommendation and finalized Boughton's dismissal. (July 11, 2016, Letter, Doc. 26-1 at #409). Will likewise found that Boughton had violated Offense Code 2.6 (Lack of Candor) and dismissed her from the FBI for that reason alone. (*Id.* at #437). Absent that offense, Will would have suspended Boughton for 30 days and demoted her to a non-supervisory role for the "Retaliation" violation, and suspended her an additional 15 days for her "Unprofessional Conduct" violation. (*See id.*; Will EEO Statement, Doc. 28-1, #1244).

Cincinnati management decided to hire Lynn Rogers, a woman, to fill the SIS/TL position in mid-August 2016. (Stapleton EEO Statement, Doc. 28-2, #1609,

1633). Rogers began work as MST SIS/TL in the Cincinnati Division on December 11, 2016.

Boughton filed a Complaint (Doc. 1) in this Court on February 26, 2019, and an Amended Complaint (Doc. 11) on October 2, 2019. The operative Amended Complaint (Doc. 11) asserts claims for Sex Discrimination and Retaliation both under Title VII (Counts I and III) and under Ohio's employment discrimination law (Counts II and IV).

On July 7, 2021, the Attorney General moved for summary judgment on all of Boughton's claims. (Doc. 33). Boughton timely responded, (Doc. 41), and the Attorney General replied on September 29, 2021 (Doc. 46). In her response, Boughton noted that she did "not oppose summary judgment on Counts II and IV of the Amended Complaint" (asserting state law claims). (Doc. 41, #2452). Accordingly, the Court **GRANTS** summary judgment to the Defendant on Boughton's state law claims, and considers only Counts One and Three (Boughton's Title VII sex discrimination and retaliation claims) in this Opinion.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with

significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to search the record sua sponte for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). Instead, the nonmoving party must "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, then the moving party is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution,

the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual either "because of such individual's … sex," 42 U.S.C. § 2000e-2(a)(1), or "because [the individual] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter," 42 U.S.C. § 2000e–3(a). A plaintiff may pursue a discrimination claim (based on the former provision) or a retaliation claim (based on the latter) by adducing either "direct" or "indirect" evidence of discrimination. Here, Boughton relies on "indirect" evidence of both discrimination and retaliation. Thus, her claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

The first step of the *McDonnell Douglas* framework requires the plaintiff to establish her prima facie case. In the status-based discrimination context, the plaintiff can do so by showing that (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or treated less favorably than a similarly situated individual outside of her protected class. *Wheat v. Fifth Third*

13

*Bank*, 785 F.3d 230, 237 (6th Cir. 2015) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014)).

If a plaintiff successfully establishes a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [the adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802. That is, the defendant must provide "reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful retaliation was not the cause of the employment action." *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993)) (internal quotations omitted).

If the defendant can do so, then the burden shifts back to the plaintiff. To overcome the defendant's articulated legitimate, nondiscriminatory reason for its actions, a plaintiff must ultimately "prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Russell v. Geithner*, No. 2:09-cv-00975, 2012 WL 5497769, at *12 (S.D. Ohio Nov. 13, 2012) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)). Of course, a plaintiff need not "prove" anything at the summary judgment stage; rather, Boughton can survive summary judgment by producing evidence sufficient for a reasonable juror to reject the employer's proffered reasons for the adverse action. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (2008)).

Boughton claims that the Defendant discriminated against her because of her sex and retaliated against her because of her participation in statutorily protected

activity (i.e., filing an EEO complaint). The Court will address her claims in that order, utilizing the above-described framework.

**A.     The Attorney General Is Entitled To Summary Judgment On Boughton's Title VII Sex Discrimination Claim.**

The Court begins with Boughton's claim of sex discrimination. Tracking the *McDonnell Douglas* framework, the Attorney General asserts that he is entitled to summary judgment because Boughton cannot establish a prima facie case of sex discrimination under Title VII. The Attorney General goes on to argue that, even if Boughton could establish a prima facie case, that the Attorney General still prevails because he has articulated a "legitimate nondiscriminatory reason for the adverse employment action," and that Boughton cannot show that such reasons were pretextual. (Mot. for Summ. J. ("Mot."), Doc. 33, #2050–51 (quoting *McDonnell Douglas*, 411 U.S. at 792). The Court first turns to Boughton's prima facie case.

**1.     Boughton Has Failed To Establish A Prima Facie Case Of Sex Discrimination Under Title VII.**

The Attorney General says he is entitled to summary judgment on the sex discrimination claim because Boughton has failed to create a genuine dispute of fact with respect to the fourth element of her prima facie case for that claim. In pressing that argument, he does not contest that Boughton meets elements one through three. That is, he concedes (at least for purposes of his Motion) that Boughton is a member of a protected class, suffered an adverse employment action, and was qualified for her position. He argues, however, that Boughton cannot show that similarly situated

15

employees outside the protected class were treated more favorably than she was, and thus falls short on the fourth prong. (*See* Mot., Doc. 33, #2041).

One problem arises with that argument right off the bat—as Boughton notes, a plaintiff may satisfy the fourth element of the prima facie case by "showing *either* that the plaintiff was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably than the plaintiff." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (emphasis in original) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1247 (6th Cir. 1995)). And here, in her opposition, Boughton avails herself of both paths. In particular, she argues that (1) she was replaced by a man when Wayne Williams became Acting TL, (Opp'n, Doc. 41, #2463), and (2) Stapleton treated male MST members more favorably than he treated Boughton, which she contends is "other circumstantial evidence tending to establish an inference of discrimination," (*id.* (citing *Lindsay v. Yates*, 578 F.3d 407, 416 (6th Cir. 2009))). As the Attorney General had not argued the replacement issue in his motion, this could suffice, in and of itself, to establish the fourth element.

In reply, though, the Attorney General engages on both fronts. As to the replacement issue, he argues that Boughton was ultimately replaced by Lynn Rogers, a woman, and thus a person within Boughton's protected class. (Reply, Doc. 46, #2570). Although Rogers did not assume the post until about a year and a half after Boughton's removal, Defendant contends that the temporary assignment of certain individuals—including Williams—to execute Boughton's job duties in the interim

16

does not constitute replacement as a matter of law. (*See id.* at #2570–71). And on the similarly-situated front, the Attorney General argues that Boughton cannot point to evidence that the FBI treated similarly situated, non-protected employees more favorably, because her proposed comparators are not "similarly situated." (*Id.* at #2568–69). As described below, the Court agrees with the Defendant on both counts.

> **a.    Boughton Has Failed To Create A Genuine Dispute Of Material Fact With Respect To Whether She Was Replaced By A Person Outside The Protected Class.**

Start with the replacement argument. For purposes of a prima facie case, the plaintiff is "replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (citing *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1117 (6th Cir. 1980)). To be sure, to qualify as a replacement, that reassignment need not be "permanent." The Sixth Circuit has made clear that the fourth element of a prima facie discrimination case can be met "even where the new hire, who is a member of the non-protected class, has the title of 'temporary' employee." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 318 (6th Cir. 2007). That is, "where the new hire takes on the plaintiff's former job responsibilities, merely designating the new hire 'temporary' will not defeat the fourth element." *Id.* If that were not the case, employers could insulate themselves from liability by reassigning the terminated employee's responsibilities to a person outside the protected class and simply labeling it "temporary." *See Tolbert v. Briggs & Stratton Corp.*, 510 F. Supp. 2d 549, 554 (M.D. Ala. 2007) ("If an employer could insulate itself from a Title VII suit merely by reassigning a discharged employee's

duties to a white employee but never formally call it a replacement, Congress's intent in enacting Title VII would be thwarted.").

Nevertheless, the first person to deal with a plaintiff's responsibilities after her firing "does not become a 'replacement' for the purpose of her prima facie case." *Clevidence v. Wayne Sav. Cmty. Bank*, 143 F. Supp. 2d 901, 908 (N.D. Ohio 2001) (citing *Barnes*, 896 F.2d at 1465). And the value in requiring a plaintiff to show that she was actually "replaced" by a person outside the protected class is that "a company's hiring practices may reveal its underlying motivation." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir. 1989). That is, hiring a replacement from outside the protected class might evince the discriminatory intent a plaintiff ultimately seeks to prove. *See id.* At least one court has thus concluded that, insofar as hiring practices reflect the employer's underlying motivations, the plaintiff's permanent replacement—as opposed to any temporary fill-in—"offers the more reliable barometer of the presence or absence of invidious intent." *Sheets v. Nat'l Comput. Sys., Inc.*, No. Civ. 3-99-CV-30091, 2000 WL 33364120, at *6 (S.D. Iowa Dec. 7, 2000).

In this case, no reasonable jury could conclude that Williams "replaced" Boughton. Boughton therefore cannot establish her prima facie case in this manner. She was removed from her TL position in May 2015. However, she had not yet been terminated, and thus remained, at least nominally, in her SIS/TL position during the pendency of the investigation. Stapleton testified that because Boughton remained on the payroll, Cincinnati Division management had no formal vacancy allowing it to

hire a permanent replacement. (*See* Stapleton Dep., Doc. 37, #2212 ("We did not have a vacancy that we could fill.")).

As a result, the Cincinnati management assigned a rotating cast of different MST members to serve as Acting Team Lead between the time of Boughton's removal and her ultimate dismissal. (Stapleton Dep., Doc. 37, #2212 ("And so we had, for a period of time, to place people in an acting team leader role, and that was filled by various individuals during that time period.")). Several Cincinnati MST members took turns in this "Acting" TL role, including Bethany Ritenour, Stephanie Prater, and Jason Distasio (two of whom are women). (*Id.* at #2308). In fact, Ritenour, a woman, was the first MST member Stapleton asked to act as team leader in Boughton's absence. (Ritenour Statement, Doc. 27-1, #944). Williams joined this cast when he was transferred from the Indianapolis Division to perform Boughton's duties for roughly six weeks, from August 12 to October 7, 2015.

Formal efforts to fill Boughton's SIS/TL job did not occur until a posting was approved on June 28, 2016. At this point, although Boughton had already been proposed for dismissal, she still had appeals pending, and therefore still occupied "her" SIS/TL position on the organizational chart. (Stapleton Dep., Doc. 37, #2296 ("Ms. Boughton was still occupying … the funded staffing level position number that was the Cincinnati team leader job ….")). Thus, to facilitate the hiring while there remained no formal "vacancy," the new position posting was deemed "temporary." (*See* June 28, 2016, Bogacki Email, Doc. 28-2, #1720). But all evidence shows that this "temporary" position was in fact intended to "hold the [new] employee" while

Boughton finished her appeal, allowing Cincinnati to "backfill" Boughton's position. (*Id.*). Cincinnati management—apparently including Stapleton—made the decision to hire Rogers, a woman, to fill that posting in mid-August 2016. (Stapleton EEO Statement, Doc. 28-2, #1609). Rogers began work as MST SIS/TL on December 11, 2016. (*Id.* at #1633).

Against that factual backdrop, Boughton does not dispute that Williams was tapped as Acting TL on only an interim basis, nor that Rogers was hired explicitly, and through much bureaucratic rigamarole, to take Boughton's position. In fact, in other parts of her argument, Boughton seeks to take advantage of Rogers' hiring as Boughton's permanent replacement. In particular, she argues that posting the position was inappropriate precisely *because* it amounted to seeking a replacement for Boughton before Boughton's OPR appeals were finalized—that is, before Boughton was formally terminated. (*See* Opp'n, Doc. 41, #2468 (arguing "that it was 'premature and highly irregular[]' … to post Boughton's job before Will's [final] decision")). This is inconsistent with the notion that Williams, who filled the acting TL spot for less than two months (while Boughton was still on the payroll as Team Lead), constituted Boughton's "replacement."

Boughton's reliance on *Raadschelders v. Columbus State Community College*, 377 F. Supp. 3d 844 (S.D. Ohio 2019), in support of her argument on the replacement issue is unavailing. There, the court held that the female plaintiff had created a genuine dispute on the fourth prong of her discrimination claim where, immediately after firing the plaintiff, the employer assigned all of the plaintiff's job duties to a

man. The employer argued that it hired the man only on an "interim basis," and that he therefore did not qualify as the female plaintiff's "replacement." But the court distinguished the cases on which the employer relied, noting that, in those cases, courts were "satisfied with the brief amounts of time it took the defendants to permanently hire or reassign the plaintiffs' replacements after firing the plaintiffs," which ranged from a few days to two months. *Id.* at 857–58. In *Raadschelders*, on the other hand, the interim hire executed the plaintiff's former duties for ten months, and another employee took over for the interim only after he "resigned." *Id.* at 858 n.5. Moreover, no "official" replacement was made for at least three years after the plaintiff's termination. *Id.* at 858. As such, the court reasoned, a reasonable jury could find that the plaintiff was "replaced" by the male notwithstanding his "interim" status. *Id.*

This case differs from *Raadschelders* in important ways. First, as noted, Boughton had not yet been "fired" when Williams began as Acting TL, nor did he take over immediately after Boughton's removal. Indeed, to the extent Boughton argues the temporal proximity between Boughton's removal and Williams' assignment is probative of Stapleton's sexist animus, (*see* Opp'n, Doc. 41, #2463), the Court notes that the first Acting TL selected by Stapleton after Boughton's removal was Bethany Ritenour, a member of the same protected class as Boughton. What is more, Williams' assignment to the role, even once he was selected, was explicitly limited to ninety days, (*see* Stapleton EEO Statement, Doc. 28-2, #1607), and Williams ultimately executed Boughton's duties for less than two months, as opposed to the ten months

in *Raadschelders*. Boughton points to no evidence that Williams' appointment was in fact meant to be permanent, or that the Defendant termed it "temporary" to defeat an inference of discrimination.

Boughton *does*, however, point to the nearly nineteen-month delay between her removal and Rogers' assumption of SIS/TL duties, arguing that this weakens the inference that Rogers was her "replacement." (Opp'n, Doc. 41, #2463). But undisputed evidence shows that this delay was attributable to Boughton's continued employment during the pendency of the OPR adjudication. FBI management made efforts to hire a "permanent" SIS/TL as soon as Trencher proposed Boughton's dismissal. Candace Will finalized Boughton's dismissal from the FBI on July 11, 2016. Stapleton and Byers made the decision to hire Rogers to fill the posting in mid-August 2016, just one month after Boughton's formal dismissal. Rogers began work as Cincinnati SIS/TL on December 11, 2016. (Stapleton EEO Statement, Doc. 28-2, #1609; Holliday EEO Statement, Doc. 28-2, #1633).

Ultimately, Boughton's argument on this point boils down to the fact that *a* man (in the context of a "rotating cast" that also included several women) executed her SIS/TL duties for *some* amount of time—before Boughton was even dismissed. That is not enough. In light of the undisputed facts, a reasonable juror could not conclude that Williams, rather than Rogers, "replaced" Boughton. Thus, Boughton cannot rely on the replaced-by-a-person-outside-the-protected-class avenue to meet the fourth prong of her prima facie case.

22

b.   **Boughton Has Failed To Create A Genuine Dispute Of Material Fact With Respect To Whether Similarly Situated Individuals Were Treated More Favorably, Nor Has She Pointed To "Other Circumstantial Evidence" Of Discrimination.**

That being said, a plaintiff can establish the fourth element of her prima facie case by "showing *either* that the plaintiff was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably than the plaintiff." *Clayton*, 281 F.3d at 610 (emphasis in original). Having failed on the former, Boughton separately argues she can meet her burden on this prong by pointing to "Stapleton's more favorable treatment of the male MST members," which shows that the FBI "took men's complaints seriously and ignored men's bad behavior." (Opp'n, Doc. 41, #2463–64). But instead of categorizing such evidence as directed at the "similarly situated" prong head-on, Boughton merely proffers it as "other circumstantial evidence of discrimination," which she appears to believe is a sort of residual category of evidence on which plaintiffs can rely to satisfy the fourth element of the prima facie case.

In fairness to Boughton, several courts have emphasized that the *McDonnell Douglas* framework is merely an analytical tool, useful only insofar as it "sharpen[s] the inquiry" with respect to the "ultimate question": whether the plaintiff suffered invidious discrimination. *See Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). The *McDonnell Douglas* court itself indicated that the prima facie case must be flexible enough to account for the highly varied factual circumstances plaintiffs might present. *McDonnell Douglas*, 411 U.S. at 802 n.13 ("The facts

necessarily will vary in Title VII cases, and the specification above of the prima facie proof required ... is not necessarily applicable in every respect to differing factual situations."); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (describing the fourth prima facie element as requiring "circumstances that support an inference of discrimination" (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002))).

Consistent with these admonitions, the Court concludes that Boughton *could* satisfy the fourth element with "other circumstantial evidence." That is, she might point to evidence that fits into neither the "similarly situated" nor "replacement" categories, but nevertheless gives rise to an inference of discrimination. That being said, the gist of Boughton's argument and the substance of her evidence appear more readily analyzed by reference to the more traditional formulation of the fourth element: that "similarly situated non-protected employees were treated more favorably." *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012) (citation omitted). And, thus, the Court largely views her evidence through that lens.

Analyzed that way, Boughton's evidence on this front likewise fails to establish her prima facie case. That is because the Sixth Circuit has made clear that, to draw the appropriate inference of discrimination, the comparators must be similarly situated "in all relevant respects." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (citation and emphasis omitted). Stated more fully, courts must consider whether individuals with whom a plaintiff seeks to compare his or her treatment "have dealt with the same supervisor, have been subjected to the same

24

standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* By contrast, differences in job title, responsibilities, experience, and work record would tend to show that two employees are not similarly situated. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).

Here, Boughton points to Stapleton's failure to discipline other MST members—Boughton's male subordinates—for offenses that were, in her view, serious. But these proposed comparators are not similarly situated to her in almost *any* respect, much less in *all* relevant ones. Perhaps most importantly, none was a "Team Lead." Boughton's supervisory position is a reasonable ground on which Stapleton may have distinguished his response to reports of her wrongdoing. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Indeed, the "offense codes" Stapleton referred to INSD for investigation included "Dereliction of Supervisory Responsibility" and "Retaliation." Neither of those codes seemingly would apply to FBI employees in non-supervisory roles. Beyond that, these employees did not report to the same supervisor that Boughton did. *See Wright*, 455 F.3d at 710. To the contrary, as Stapleton noted in his deposition, these male subordinates in fact reported *to Boughton*. (*See* Stapleton Dep., Doc. 37, #2257 ("I would actually expect that [Boughton] would be the person who would turn that over to OPR, as she was their direct supervisor.")).

To be sure, the conduct to which Boughton vaguely points—sleeping on duty and driving FBI vehicles under the influence of alcohol[4]—is reprehensible. But "allegations regarding other employees not being" referred to INSD "for different, but what [Boughton] subjectively believes to be more serious, misconduct simply does not satisfy" the final element of the prima facie case. *See Mitchell*, 964 F.2d at 583. Sleeping and drinking on duty are allegations markedly different than those for which Boughton was referred to INSD, e.g., possible retaliation and improper disclosure of information to assist an interviewee.

And, notably, Boughton also neglects to identify any comparator by name, save for Munafo. She argues in her Opposition that she "shared concerns about *Munafo* drinking and driving a bucar," (Doc. 41, #2463 (emphasis added)), but the record does not disclose any reference specific to Munafo except for that she believed him to be sleeping on duty. (*See* Stapleton Dep., Doc. 37, #2245 ("She talked about how she felt that sometimes—I think it was Mr. Munafo specifically, but I don't recall—would not be available on the radio and she believed that they were sleeping on the job.")).

---

[4] What is more, Boughton overstates the "articulable" nature of her allegations in this respect. The seemingly unidentified document Boughton cites to support Stapleton's knowledge of this misconduct states that Boughton "relayed that she was rather sure most of them were drinking and driving their bucars … but did not have any proof, nor was she interested in finding out." (Mot. Ex. 1, Doc. 30-1, #1800). Stapleton's deposition tells a slightly different, if not irreconcilable, story on this count. He testified that Boughton relayed a worry that "if she did not keep tabs on them, that they would do things they weren't supposed to, including drinking on the job. But she never made any allegation to [Stapleton] that she had actually witnessed or knew about drinking on the job." (Stapleton Dep., Doc. 37, #2244). Even if this raised a genuine dispute, though, it would not be a material one. *See Mitchell*, 964 F.2d at 583.

The Court recognizes that the "similarly situated" inquiry does not require a precisely identical comparator. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) ("[I]f the non-protected employee to whom the plaintiff compares himself or herself must be *identically* situated to the plaintiff in every single aspect of their employment, a plaintiff whose job responsibilities are unique to his or her position will never successfully establish a prima facie case ….") (emphasis added). But, at the same time, the relevant inference of discrimination can be drawn only *because* of the similarity between the plaintiff and the proposed comparator. *Accord Dartmouth Rev. v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared with apples."). Boughton's proposed comparators here fall short on that front.

In sum, Boughton has failed to establish either (1) that she was replaced by a person outside the protected class or (2) that similarly situated, non-protected individuals were treated more favorably. As such, she has not made out her prima facie case of sex discrimination under Title VII, and that claim fails as a matter of law. The Court accordingly **GRANTS** the Defendant's Motion for Summary Judgment (Doc. 33) with respect to that claim.

## B. The Attorney General Is Entitled To Summary Judgment On Boughton's Title VII Retaliation Claim.

That leaves Boughton's retaliation claim. Title VII prohibits an employer from discriminating against its employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under this subchapter." 42 U.S.C. § 2000e–3(a). A Title VII retaliation case based on indirect evidence proceeds along the same *McDonnell Douglas* framework identified above. As such, Boughton must start by establishing a prima facie case of retaliation. Then, should the Attorney General succeed in articulating legitimate, nondiscriminatory reasons for the complained-of actions, Boughton must rebut those reasons by adducing evidence that the articulated reasons were merely pretextual cover for retaliation.

Boughton points to six actions she argues were taken in retaliation for her protected conduct: (1) her exclusion from an MST team award; (2) Stapleton's submission of a statement in her INSD investigation; (3) Stapleton's denial of Boughton's training request; (4) the "bad" PAR rating she received from Stapleton in 2015; (5) the *Douglas* factors report Stapleton submitted in the course of her OPR review (which Boughton claims was riddled with errors); and (6) her termination. (Opp'n, Doc. 41, #2465). Because Boughton's theory of liability with respect to the last of these, i.e., her termination, is different, and somewhat more complicated, than her theory regarding the other adverse actions she identifies, the Court will start there, and also consider her termination separately from the other allegedly adverse actions.

### 1. Boughton Has Failed To Establish That She Was Terminated In Retaliation For Her Protected Activity.

Importantly, Boughton does not argue that the FBI officials who recommended and upheld her termination (Trencher and Will, respectively) acted with retaliatory animus in taking those actions. Instead, Boughton claims that her direct supervisor,

28

Stapleton, acted with improper animus, and then she seeks to impute Stapleton's allegedly illicit motives to Trencher and Will. (Opp'n, Doc. 41, #2466 ("Stapleton's retaliatory motive can be imputed to Trencher and Will, the OPR officials who formalized the dismissal.")).

In taking this tack, Boughton relies on what is known as the "cat's paw" theory of liability. The "cat's paw" doctrine applies to "situations in which decisionmakers unthinkingly adopt the recommendations of their biased lower-level supervisors" and also "forecloses a strategic option for employers who might seek to evade liability ... through willful blindness as to the source of reports and recommendations." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 378 (6th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)).

Lacking *direct* evidence of retaliation even under a cat's paw theory, however, Boughton seeks to prove the retaliation claim relating to her termination by circumstantial evidence, for which courts utilize the *McDonnell Douglas* burden-shifting framework. That creates a bit of a wrinkle right at the outset, though, as whether—and how—the cat's paw theory fits with the *McDonnell Douglas* framework is not an entirely settled issue within the Sixth Circuit.

Nevertheless, the Sixth Circuit has at least twice indicated that the proper (or, at least, not improper) approach is to analyze the three steps of *McDonnell Douglas*, and then separately analyze whether the cat's paw doctrine applies. *See, e.g.*, *Marshall*, 854 F.3d at 379–80 (analyzing the *McDonnell Douglas* framework before proceeding to the cat's paw theory); *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339,

29

347 (6th Cir. 2012) (same); *see also Southern v. BASF Corp.*, No. 1:19-CV-00067, 2020 WL 1322842, at *8 (N.D. Ohio Mar. 20, 2020) (Ruiz, M.J.) (following this approach and finding it unnecessary to analyze the cat's paw theory because plaintiff had failed to establish prima facie case of race discrimination). In the FMLA retaliation context, for example, the *Marshall* court stated that a plaintiff must "satisfy the requirements of the *McDonnell Douglas* framework *and* prove that the decisionmaker was the cat's paw of a biased subordinate, so it makes sense to analyze each issue separately." *Marshall*, 854 F.3d at 379–80.

However analyzed, though, the bottom line is that Boughton cannot succeed on the retaliation claim relating to her termination unless she can establish that Stapleton's allegedly illicit motives should be imputed to Defendant. Thus, the Court begins its inquiry of that retaliation claim by exploring the substantive law of the "cat's paw" doctrine. And, because the Court ultimately concludes that the doctrine does not provide a basis for liability on the facts here, the Court need not consider any other aspects of the *McDonnell Douglas* framework in connection with Boughton's termination-based claim.

> a. **Boughton Has Failed To Establish A Genuine Dispute Regarding Whether Trencher Or Will Acted As Stapleton's Cat's Paw.**

Boughton argues that, in recommending and approving her dismissal from the FBI, Trencher and Will merely acted at Stapleton's behest, and thus operationalized

his alleged animus, a construct that the law refers to as the cat's paw doctrine.[5] "Cat's paw" describes a situation where "a biased subordinate, who lacks decision making power, uses a formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall*, 854 F.3d at 377.

Note, however, that the subordinate must, in fact, be "biased." *See Marshall*, 854 F.3d at 377. Thus, as "a predicate to cat's paw, [Boughton must] establish that the record supports *[retaliatory] animus*" on the part of Stapleton. *See Voltz v. Erie Cnty.*, 617 F. App'x 417, 424–25 (6th Cir. 2015) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422–23 (2011)). But "evidence of animus is difficult to demonstrate." *Id.* (quoting *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 F. App'x 620, 626 (6th Cir. 2010)). It "requires a showing of prejudice, spite, or ill will." *Id.* (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012)).

Additionally, because the Court is analyzing the cat's paw doctrine in the context of Boughton's retaliation claim, the Court must consider the causation standard embodied in the antiretaliation, rather than the antidiscrimination, provision of Title VII. That matters because the causation standard in the former is higher than in the latter. In *Staub*, the Supreme Court observed that an employee asserting discrimination need only show that discrimination was a "motivating factor" in the adverse action. 562 U.S. at 417. Thus, the Sixth Circuit has applied the

---

[5] Judge Posner is frequently credited with introducing the cat's paw concept to the legal mainstream in a 1990 ADEA case. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (Posner, J.). The term apparently comes from a 15th Century fable, in which "a monkey convinces an unwitting cat to pull chestnuts from a hot fire. As the cat scoops the chestnuts from the fire one by one, burning his paws in the process, the monkey eagerly gobbles them up, leaving none for the cat." *Roberts v. Principi*, 283 F. App'x 325, 333 n.4 (6th Cir. 2008).

same proximate cause standard in Title VII sex discrimination claims that rely on the cat's paw doctrine. *See DeNoma v. Hamilton Cnty. Ct. of Common Pleas*, 626 F. App'x 101, 104 (6th Cir. 2015).

The antiretaliation provision of Title VII, on the other hand, "require[s] proof that the desire to retaliate was the *but-for* cause of the challenged employment action." *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 585 n.7 (6th Cir. 2014) (emphasis added). "Thus, … at a minimum, the cat's paw theory of liability must be modified in Title VII retaliation cases." *Id.*; *Seoane-Vazquez v. Ohio State Univ.,* 577 F. App'x 418, 428 (6th Cir. 2014) ("If the retaliatory actions of non-decisionmakers were nothing more than a motivating factor of [the decisionmaker's] decision, then retaliation could not have been a but-for cause of the ultimate employment action.") (applying but-for standard to cat's paw retaliation claim).

With respect to her cat's paw retaliation claim, then, Boughton must establish a genuine dispute of material fact regarding whether (1) Stapleton, motivated by retaliatory animus (2) took actions intended to cause Boughton's termination, and (3) those actions were the *but-for* cause of Trencher's decision to propose dismissal or Will's decision to uphold it. *See Seoane-Vazquez,* 577 F. App'x at 428. If Stapleton's allegedly retaliatory actions were nothing more than a motivating factor in Will's decision, then retaliation could not have been a but-for cause of Boughton's termination, and her retaliation claim will fail.

When measured against this stricter standard, Boughton's cat's paw theory fails as a matter of law. Even assuming that Stapleton had retaliatory intent and

took actions designed to cause Boughton's termination (elements one and two), Boughton has not created a genuine dispute of material fact as to whether Stapleton's actions were the *but-for* cause of her termination. That is, she has not created a genuine dispute of material fact on whether she would not have been terminated in the absence of Stapleton's INSD statement and *Douglas* factors report, the only two pieces of evidence she offers as to Stapleton's influence on her termination.[6] *See Seoane-Vazquez*, 577 F. App'x at 428 ("Plaintiff's claim will therefore fail if [the decisionmaker] decided to deny tenure based on factors untainted by retaliatory animus, even if [the decisionmaker's] decision was also based on factors that were tainted by retaliation.").

According to Boughton, Stapleton poisoned the investigatory well because his "*Douglas* factors report contained … a dishonest account of Munafo's grievance with Boughton, citing the brokered meeting's non-occurrence as an example of her failings when he elsewhere admitted that he decided to cancel it." (Opp'n, Doc. 41, #2466). He also expressed his belief that Boughton "'could [not] be rehabilitated as a supervisor,' and that she should not work in the Cincinnati office, even in a non-supervisory capacity." (*Id.*).

To be sure, if Stapleton made "a biased report to the ultimate decisionmaker, it may be a causal factor in the adverse action." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 352 (6th Cir. 2012). Misinformation or selective reporting of

---

[6] Boughton briefly suggests that Byers also "steered" the investigation, (Opp'n, Doc. 41, #2467), perhaps attempting to argue that Byers' retaliatory animus, too, should be considered in the discussion of cat's paw. However, Boughton fails to raise any inference of retaliatory animus on the part of Byers, and the Court therefore neglects to consider this argument.

information by a biased non-decisionmaker supervisor can thus result in liability to the employer. *See id.* at 352–53.

But evidence of a biased recommendation is not always sufficient to sustain a cat's paw theory. "A supervisor who conducts an in-depth and truly independent investigation is not being manipulated by biased lower-level supervisors, but rather making a decision based on an independent evaluation of the situation." *Marshall*, 854 F.3d at 380. Thus, an employer can effectively cleanse its decision if the ultimate decisionmaker conducts his or her own investigation that "results in an adverse action for reasons *unrelated* to the supervisor's original biased action." *Id.* (quoting *Staub*, 562 U.S. at 421); *see also Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 797 (6th Cir. 2013) (concluding that "independent fact gathering" is necessary to defeat a cat's paw claim).

Here, INSD conducted just such an independent investigation. After Stapleton referred Boughton to INSD, INSD opened an investigation helmed by an independent officer, Tiffany Baker. Baker interviewed eleven fact witnesses from two Divisions, including Boughton. (*See* October 22, 2015, Comm., Doc. 27-1, #817). Upon completing that investigation, INSD forwarded the investigative file to OPR, where Trencher determined the allegations were substantiated and made a recommendation of dismissal. (Trencher Rpt., Doc. 26-2, #606). Boughton, in addition to her interview and written statement during the INSD investigation, was permitted to provide a written response. (Will EEO Statement, Doc. 28-1, #1241–42). On June 21, 2016, Boughton and her attorney made an oral appeal to Candace Will at OPR.

34

On July 11, 2016, Will issued a final decision, based upon the investigative file, the *Douglas* factors, and Boughton's submissions, in which she adopted the recommendation and dismissed Boughton.

INSD's investigation did involve Stapleton, to be sure, but the investigation also included interviews with ten other witnesses, including Boughton and all of Boughton's direct reports. (*See* October 22, 2015, Comm., Doc. 27-1, #817). As far as Stapleton's INSD statement is concerned, he did no more than act as a fact witness. And Trencher's recommendation of dismissal explicitly hinged only on Boughton's purported lack of candor in the investigatory process, an independent basis for dismissal unrelated to any aspect of Stapleton's statement. Indeed, Stapleton testifies that he was not interviewed on the lack of candor allegation, (Stapleton Dep., Doc. 37, #2297), nor does his sworn statement make any mention to that effect. Even if it did, Trencher's report states that Trencher found Boughton's contentions that she did not have access to the questions "implausible given the direct correlation between the notes taken by IS #6 during her meeting with [Boughton] and the official questions used." (Trencher Rpt., Doc. 26-2, #602).

Although Stapleton's alleged misinformation in his *Douglas* factors report might engender slightly more concern, Boughton likewise points to no evidence from which a jury could conclude that the *Douglas* factors report was the "but-for" cause of her termination. While Boughton argues that Trencher relied on the *Douglas* factors in proposing her dismissal, Trencher's actual report belies that claim. Specifically, although it states that Trencher considered the *Douglas* factors in connection with

the "Retaliation" and "Unprofessional Conduct" penalties, Trencher makes no such assertion as to the "Lack of Candor" penalty that ultimately formed the basis for his recommendation. (*Compare id.* at #605, *with id.* at #606). To the contrary, the report makes clear that Offense Code 2.6 "does not include a mitigated or aggravated range" (a primary issue to which the *Douglas* factors are addressed) (*Id.* at #606). Thus, once Trencher determined that Boughton violated the rule regarding candor, a proposal of dismissal was his only option. In short, Boughton's complaints about the *Douglas* factors report—that Stapleton mischaracterized the failed meeting with Munafo and suggested that Boughton could not be rehabilitated as a supervisor—are separate and apart from the ultimate cause of her dismissal.

At bottom, INSD conducted an independent investigation helmed by Baker. This investigation involved extensive "independent fact gathering." *See Sharp*, 726 F.3d at 797 (finding insufficient an "investigation" that "consisted simply of comparing information submitted by [the biased supervisor] to other information submitted by [the biased supervisor]"). And Boughton cannot "establish a genuine issue of fact that most, if not all" of the INSD report on which Trencher relied was "tainted by retaliation." *Seoane-Vazquez*, 577 F. App'x at 428, 429. Even viewing the record in a light most favorable to Boughton (and assuming that Stapleton's actions evince retaliatory intent to cause her dismissal), Stapleton's participation in the investigation does not meet the but-for causation standard necessary under the antiretaliation provision of Title VII. *Cf. Whitfield v. CSX Transp., Inc.*, No. 1:20 CV 2301, 2021 WL 4772817, at *14 (N.D. Ohio Oct. 13, 2021) (finding investigation

sufficiently independent where decisionmaker "reviewed the entire investigation record for their decision," which included seven written statements, one of which was from the allegedly biased individual).

Thus, Boughton's claim that Trencher and Will acted as cat's paw(s) in recommending and upholding her dismissal, respectively, is unavailing. The record does not permit an inference that either Trencher or Will merely "rubber-stamped" Stapleton's biased recommendation (indeed, Stapleton made no recommendation), or that they acted as conduits for his retaliatory animus. As a result, her retaliation claim fails, as well, insofar as it is predicated on her dismissal.[7]

### 2. Boughton Has Failed To Establish A Genuine Dispute As To Whether The Other Allegedly Materially Adverse Actions Were Taken In Retaliation For Her Protected Activity.

Even if Boughton's dismissal will not support a retaliation claim, though, she has also advanced other alleged "materially adverse" actions in connection with meeting the prima facie case for her retaliation claim. These include: (1) her exclusion from an MST team award; (2) Stapleton's submission of a statement in her INSD investigation; (3) Stapleton's denial of Boughton's training request; (4) the "bad" PAR rating she received from Stapleton in 2015; and (5) the *Douglas* factors report Stapleton submitted in the course of her OPR review (which Boughton claims was riddled with errors). Because Stapleton himself took these actions, they may be

---

[7] Although the Sixth Circuit has suggested that a court should analyze *McDonnell Douglas* separately from cat's paw, and that success on both fronts is required for a plaintiff to survive summary judgment, Boughton's failure to establish cat's paw liability in this case may also be conceived as a failure of her prima facie case. That is, with respect to her termination, Boughton has failed to make any causal connection between her protected activity and the adverse action.

analyzed in the traditional *McDonnell Douglas* fashion, without reference to "cat's paw" theory. And these actions—if they are "materially adverse"—could potentially support a retaliation claim, even if her dismissal could not.

> **a. The Court Assumes, With One Exception, That Boughton Has Established A Prima Facie Case Of Retaliation With Respect To The Remaining Actions.**

To establish a prima facie case of retaliation, a plaintiff must, among other thing, point to one or more "materially adverse" actions. An employment action is "materially adverse" if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination," even if it does not strictly affect the terms, conditions, or status of the plaintiff's employment. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006). That makes meeting this element easier than meeting the "adverse employment action" element of a prima facie case of discrimination. *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014); *see also Burlington*, 548 U.S. at 69 (suggesting that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement" might qualify as a materially adverse action).

In considering whether an action is adverse enough to "dissuade" participation in a protected activity, a court considers the "reaction[] of a reasonable employee," rather than the subjective reaction of the plaintiff herself. *Lahar v. Oakland Cnty.*, 304 F. App'x 354, 357 (6th Cir. 2008) (quoting *Burlington*, 548 U.S. at 68–69) (emphasis omitted). Importantly, the antiretaliation provision—despite its slightly lower threshold—does not protect employees from "petty slights" or "minor

annoyances"; it protects only against "retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67–68.

The only one of the five remaining identified actions that Defendant argues is insufficiently adverse to form the basis of a retaliation claim is the performance review. According to Defendant, Boughton "received an overall performance rating of 'Excellent,' a good rating that does not trigger any personnel action," and that "one rating factor out of eight, in one performance review out of many such years of reviews, is a trivial harm." (Mot., Doc. 33, #2046). The Court agrees.

The Sixth Circuit has held that negative performance evaluations can sometimes constitute materially adverse actions for purposes of a Title VII retaliation claim. *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) (unpublished). However, such an evaluation must be "markedly" worse than reviews made prior to the plaintiff's protected activity, and the negative evaluation must have some effect on the plaintiff's professional advancement or earnings. *See id.*; *James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 79 (6th Cir. 2007).

Here, Boughton's "bad" 2015 PAR does not qualify. In 2014, Stapleton gave Boughton an overall rating of "Outstanding," the highest summary rating. Of eight "critical elements," it appears that Stapleton gave Boughton six "Outstanding" ratings (the highest category) and two "Excellent" ratings (the second highest category). (*See* Doc. 27-1, #899). In 2015, Stapleton rated Boughton "Excellent" overall, comprised of one "Outstanding," five "Excellent," one "Successful" (the third highest category) and one "Minimally Successful" (the fourth highest category). (Doc.

39

32-2, #2016–17). This might qualify as "markedly" worse, particularly with respect to the "Minimally Successful" rating, which Boughton received in the element of "Supervising."[8] But even so, Boughton points to no evidence that this performance review affected (or would have affected) her professional advancement or earnings. Indeed, Boughton offers no argument at all regarding this "adverse" action, except to state that it happened. (*See* Opp'n, Doc. 41, #2465 ("In October, [Stapleton] gave Boughton a bad rating in supervising on her PAR."). As such, it does not constitute a "materially adverse" employment action for purposes of her prima facie case of retaliation.

Because Defendant offers no argument with respect to Boughton's other "adverse actions," though, and because the standard for "materially adverse" is relaxed in the retaliation context, *see Laster*, 746 F.3d at 731, the Court assumes for purposes of this motion that the four other proffered actions are sufficiently materially adverse: (1) Boughton's exclusion from an MST team award; (2) Stapleton's submission of a sworn statement to the INSD; (3) Stapleton's denial of Boughton's training request; and (4) the negative *Douglas* factors report Stapleton submitted in Boughton's OPR review. Thus, as to those actions, the Court assumes, for purposes of summary judgment, that Boughton has met her prima facie case.

---

[8] Defendant represents that Boughton's "Minimally Successful" rating in the critical element of "Supervising" was increased by SAC Byers after Boughton appealed it. However, Defendant offers no record citation for that fact.

### b. Defendant Offers Legitimate, Nondiscriminatory Reasons For The Other Alleged Materially Adverse Actions.

As to these four actions, then, the burden shifts at the second stage of the *McDonell Douglas* inquiry to the Attorney General. To satisfy his burden of production, the Attorney General must provide "reasons for [his] actions which, if believed by the trier of fact, would support a finding that unlawful retaliation was not the cause of the employment action." *Bryson*, 498 F.3d at 571 (6th Cir. 2007) (quoting *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 506-07 (1993)).

Here, the Attorney General offers legitimate, nondiscriminatory reasons the actions Boughton identifies. In particular, the Attorney General contends that, considering the ongoing INSD investigation, Boughton's removal from the MST (which resulted in each of the four actions described above) was "driven by … concerns of the effectiveness of the MST, its ability to carry out the FBI's mission, and the well-being of its employees that had been supervised by Plaintiff." (Mot., Doc. 33, #2050).[9] That is, the Attorney General argues that the complained-of actions resulted naturally from Boughton's reassignment from the MST, (*id.*), and from the INSD investigation, which "advanced expeditiously and without variance from typical

---

[9] The Court understands Defendant to offer this reason in connection with the "materially adverse actions" of Stapleton's INSD statement and denial of Boughton's training request. (*See* Mot., Doc. 33, #2050; Reply, Doc. 46, #2574 ("[D]enial of MST-specific … training [was] a direct result of [Boughton's] temporary reassignment from the MST ….")).

procedure," (Reply, Doc. 46, #2574).[10] If believed, these concerns constitute legitimate, nondiscriminatory reasons for the Defendant's actions.

> ### c.    Boughton Has Failed To Create A Genuine Dispute As To Whether The Reasons For Stapleton's Other "Materially Adverse" Actions Were Pretext For Retaliation.

The Attorney General having met his burden, the burden once again shifts to Boughton, who must show that the proffered reason is merely pretext for retaliation. To so do, she must offer evidence sufficient to create reasonable disbelief of Defendant's proffered reason. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 547 (6th Cir. 2010)). Boughton fails in that task here.

There are generally three ways to establish pretext: by showing that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate Defendant's action, or (3) the proffered reason was insufficient to motivate the action. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). As another court in this district thoroughly explained:

> The first method of rebuttal is a garden variety contest of the defendant's facts. The second method of rebuttal is based on a showing of pretext. There, the plaintiff, while conceding the truth of defendant's facts and even admitting that such facts otherwise allow for the adverse action, argues that the excuse was not the motivating factor in the defendant's decision. In the third method of rebuttal, as with the second method, the plaintiff may concede the truth of the defendant's facts, but here the plaintiff offers evidence that such a fact, even if true, could not justify taking the action. This might be shown by evidence that other similarly situated employees engaged in the same action but suffered no

---

[10] Although Defendant advances this argument more directly in his discussion of Boughton's prima facie case, the Court considers it more appropriately discussed in relation to Boughton's ability to show pretext.

> adverse action. It could also be shown, for example, by the existence of clear language in an employee handbook stating that such conduct is perfectly acceptable in the workplace. In any of these events, if the plaintiff is successful in his rebuttal, a genuine issue of material fact is presented for the trier of fact.

*Bush v. Am. Honda Motor Co.*, 227 F. Supp. 2d 780, 789–90 (S.D. Ohio 2002). In analyzing whether the stated reason is merely pretextual, the Court notes that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Montell*, 757 F.3d 497, 508 (6th Cir. 2014) (quoting *Chen*, 580 F.3d at 400 n. 4).

Thus, to proceed past summary judgment, Boughton must offer at least some evidence that the Attorney General's proffered reasons are pretextual. But on that issue, Boughton does not offer tailored arguments as to why the reasons are pretextual cover for retaliation as to these four actions. Rather, Boughton dedicates most of her briefing on pretext to her ultimate dismissal; indeed, Boughton heads this section of her brief "The record contains evidence of pretext sufficient to rebut Defendant's proffered reasons *for Boughton's termination.*" (Opp'n, Doc. 41, #2467 (emphasis added)). Setting that aside, though, the Court gleans two arguments potentially applicable to these other actions, neither of which succeeds.

First, Boughton argues that "[d]eviations in protocol and procedure" can demonstrate pretext, and points to evidence that it was somewhat unusual for the Cincinnati division to have posted an opening for Boughton's job "prior to the final OPR adjudication." (Opp'n, Doc. 41, #2468). But the Sixth Circuit "has not held that 'deviat[ion] from ... normal procedures' in itself permits a jury finding of pretext."

43

*Roschival v. Hurley Med. Ctr.*, 695 F. App'x 923, 929–30 (6th Cir. 2017) (quoting *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 422 (6th Cir. 1999)).

And, in any case, the Court fails to see how the deviation here, if any, casts doubt on the rationale for Stapleton's allegedly adverse actions. First, Boughton attributes the "campaign to post an opening for Boughton's job" to Byers, not Stapleton, (*see* Pl. Prop. Undisputed Facts, Doc. 41-1, #2502), and a Human Resources representative indicated that the decision to post the opening was "based solely on feedback [he] received from the SAC [Byers]." (*Id.* at #2503). The only person that Boughton alleges to have retaliated against her, though, is Stapleton. Moreover, the actions of which Boughton complains occurred well before the Cincinnati Division posted an opening for Boughton's position, which did not occur until Trencher had already proposed Boughton's dismissal. Thus, Boughton cannot rely on this "deviation," even if it is one, to support a retaliation claim directed at the four earlier allegedly adverse actions.

Second, Boughton argues that the Court may consider "an employer's biased culture as evidence of pretext." (Opp'n, Doc. 41, #2469 (citing *Fijalkowski v. Belmont Cnty. Bd. of Comm'rs*, No. 2:17-cv-0195, 2021 WL 1964478, at *11 (S.D. Ohio May 17, 2021))). While this may be true, the evidence Boughton cites mostly echoes the evidence considered in her prima facie case of sex discrimination: that Stapleton favored male MST employees. Not only did the Court already conclude that this evidence fails to give rise to an inference of discrimination, it likewise does nothing to undercut the proffered reason for the complained-of actions, which Boughton

44

claims here were undertaken in retaliation for protected activity, rather than based on her sex. Moreover, this case is distinguishable from *Fijalkowski*. The "circumstantial evidence" considered in *Fijalkowski* differed in both kind and degree from that which Boughton offers. *See Fijalkowski*, 2021 WL 1964478, at *10–11. And, what is more, the court in *Fijalkowski* did not conclude that evidence of the employer's "biased culture" alone sufficed to show pretext; rather, it considered that evidence alongside other "circumstantial evidence," including the employer's disregard of the plaintiff's qualifications and other irregularities in the decision making process. *See id.* at *7–11. Boughton has offered no such other evidence here.

Thus, even to the extent that Stapleton's actions following Boughton's removal from the MST could be considered materially adverse actions sufficient to support retaliation claim, the Court concludes that Boughton has failed to create a genuine dispute as to the legitimacy of Defendant's nondiscriminatory reasons for those actions. Accordingly, her Title VII retaliation claim fails as a matter of law.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 33) in full and accordingly **DISMISSES** all claims in Boughton's Amended Complaint (Doc. 11) **WITH PREJUDICE**. The Court further **DIRECTS** the Clerk to enter judgment and **TERMINATE** this case on its docket.

**SO ORDERED.**

March 29, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

45